UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SHAUL LEVY,

                  Plaintiff,

          v.                      Case No.: 17-cv-4022 (NSR) (JCM)

LAW OFFICES OF J. HENRY NIERMAN;
J. HENRY NIERMAN; and
RECOVERY OF JUDGMENT LLC,

                  Defendants.

## **DECLARATION OF EVAN S. ROTHFARB**

Evan S. Rothfarb, an attorney duly licensed to practice law in the State of New York and admitted to practice in this Court, does hereby affirm under the penalty of perjury:

1.      I am an attorney at Schlanger Law Group, LLP, counsel for Plaintiff and, as such, am familiar with the facts and documents relevant to this dispute.

2.      I make this declaration in opposition to the motion for summary judgment by Defendants Law Offices J. Henry Nierman ("LOHN"), J. Henry Nierman ("Nierman") and Recovery of Judgment, LLC ("ROJ" and together with LOHN and Nierman, "Defendants") (the "Motion"), and in support of Plaintiff's cross-motion for summary judgment pursuant to Fed. R. Civ. P. 56 (the "Cross Motion"). For the reasons below, the Court should deny Defendants' Motion and grant Plaintiff's Cross Motion.

## **PROCEDURAL HISTORY**

3.      On December 12, 20107, Plaintiff entered into a Flat Fee Retainer Agreement and incurred $3,000 in fees paid for legal services from the undersigned's law firm to defend against Defendants' debt collection efforts. Collectively attached hereto as Exhibit "A" is a true and correct copy of the Flat Fee Retainer Agreement.

4. Plaintiffs commenced this action on May 30, 2017 alleging violations of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq*., and New York General Business Law § 349 ("GBL 349"). (*See* Dkt. No. 1).

5. The Summons and Complaint were personally served on defendants J. Henry Nierman and Law Offices of J. Henry Nierman on July 12, 2017 and Defendants J. Henry Nierman and Law Offices of J. Henry Nierman did not timely answer or otherwise move with respect to the Complaint.

6. The Summons Complaint were served on the authorized agent for Defendant Recovery of Judgment LLC on July 7, 2017. Recovery of Judgment LLC did not timely answer or otherwise move with respect to the Complaint.

7. On September 15, 2017, Plaintiff submitted a request for entry of default against all Defendants. (*See* Dkt. No. 19).

8. On September 22, 2017, Clerk's Certificates of Default were issued for each Defendant. (*See* Dkt. Nos. 20 - 22).

9. On January 3, 2018, by order to show cause, Plaintiff moved for default judgment against Defendants. (*See* Dkt. Nos. 24 - 27).

10. On April 20, 2018, at the Show Cause Hearing of Plaintiff's application for default judgment, counsel appeared for Defendants. The Court, among other things, ordered Defendants' counsel to file an appropriate appearance for each Defendant and to serve and file a motion seeking leave to late file an answer. The Show Cause Hearing of Plaintiff's application for default judgment was adjourned until May 31, 2018. (*See* Dkt. No. 19).

11. On May 16, 2018, Defendants filed their motion for leave to late file an answer to Plaintiff's Complaint. (*See* Dkt. Nos. 32 - 35).

12.     On January 8, 2019, the Court issued its orders on the parties competing motions denying Plaintiff's Motion for Default Judgment and granting Defendants' motion to late file their answers.  (*See* Dkt. No. 43).

13.     On February 8, 2019, Defendants filed their answers.  (*See* Dkt. Nos. 44 - 47).

14.     On January 30, 2020, the Court issued a scheduling order.  (*See* Dkt. No. 52).

15.     Thereafter, Plaintiff made repeated applications and motions for the Court's intervention to compel Defendants' discovery compliance.  (*See, e.g.,* Dkt. Nos. 53, 64 and 66).

16.     Through the testimony of defendant Nierman, appearing on behalf of all Defendants, on September 29, 2020, Plaintiff conducted Defendants' deposition. A Copy of the transcript of Nierman's deposition is annexed hereto as Exhibit "B."

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SHAUL LEVY,

           Plaintiff,

       v.                                Case No.: 17-cv-4022 (NSR) (JCM)

LAW OFFICES OF J. HENRY NIERMAN;
J. HENRY NIERMAN; and
RECOVERY OF JUDGMENT LLC,

           Defendants.

## **VERIFICATION**

    I declare under penalty of perjury that the foregoing is true and correct.

Dated: February 16, 2021

                                        Evan S. Rothfarb

# EXHIBIT A

# KAKALEC & SCHLANGER, LLP

### DEDICATED TO MARKETPLACE JUSTICE

December 20, 2016

**VIA EMAIL** ████████████████

Shaul Levy

██████████████████
██████████████████

        **Re:**      *Matt Morrison v. Shaul Levy*
        **Index:**   056136/2010 ( New York Civil )

Dear Mr. Levy:

        This letter sets forth our agreement regarding Kakalec & Schlanger, LLP's representation of you in the above-referenced matter, including our agreement regarding payment of the firm's fees.

        1)      <u>Scope of Representation.</u>  We will represent you in attempting to have the judgment taken against you in the above-referenced matter vacated and the case dismissed.  As appropriate, we will also negotiate on your behalf to attempt to reach a mutually acceptable settlement with the judgment creditor.  This agreement does not cover any services other than those indicated here.  It does not cover our representation of you on any appeal, or, for example, in an affirmative claim under the Fair Debt Collection Practices Act.  Any such representation will have to be covered in a separate retainer agreement.

        2)      <u>Our Fees:</u> Our fee for representing you with regard to the services referenced in Paragraph 1, above, is $3000.00 if we are able to achieve a settlement in the matter without litigation beyond the filing of a motion to vacate (e.g. for lack of service).  The flat fee of $3000.00 is to be paid as follows: $1000.00 upon execution of this agreement; $1000.00 on February 1, 2017; and $1000.00 on March 1, 2017.  My office will be in touch to get credit card information and we will use the credit card information you provide to make the payments on the dates indicated herein.  As part of the service covered under the flat fee, we will file a notice of appearance and motion to vacate the judgment.  We will also, if necessary, file a reply to any opposition to the motion and will appear on your behalf at any court hearing on the motion.  However, if we are required to substantively litigate the matter (including discovery, motion practice, hearings, and/or trial) beyond this, you agree to pay us at our customary hourly rates in addition to the flat fee above.  Based on my experience with other cases of this type, I believe it unlikely that any work at our hourly rates will be necessary.  In any event, we will consult with you and obtain your authorization before performing any work that would be billed at our hourly rates.  Our customary hourly rates are as follows:

Daniel A. Schlanger                                          85 Broad Street
dschlanger@kakalec-schlanger.com                            18th Floor
T: (212) 500-6114, ext. 101                                 New York, NY 10004
F: (646) 612-7996                                           www.kakalec-schlanger.com
                                                            Doc ID: a40660a9f2c61faf6ddd1d1e52707d4cc155398e

| Personnel | Rate |
|---|---|
| Partners | $420-$550/hour |
| Associates | $300-$390/hour |
| Paralegals/Support Staff | $100-$150/hour |

Travel time is billed at one half Attorneys' regular hourly rates.

3) <u>Costs and Disbursements</u>. In addition to charges for legal services rendered, certain costs and disbursements will be incurred in the handling of this matter. These costs and disbursements may include postage, printing, photocopying, fees to access online legal databases (e.g. Westlaw, Pacer), tolls and mileage, etc. You authorize us to incur and advance reasonable and necessary costs and expenses in the preparation of your matter and/or litigation of your claim. You agree that costs and expenses totaling $200.00 (two hundred dollars) or less to be charged to your credit card on file without further consent. In the unlikely event that costs and disbursements exceed $200.00, we will obtain your prior authorization before incurring the cost.

4) <u>Acceptance of Settlement Offers.</u> We will not make any settlement or compromise of any nature of any of your claims without your prior approval. You retain the right to accept or reject any settlement. You agree not to make any settlement or compromise of any nature of any of your claims without prior notice to us.

5) <u>Termination of Representation.</u> Our representation of you in this matter terminates upon settlement of this matter, or such other circumstances develop which make it necessary or appropriate that our attorney-client relationship be severed, such as a disagreement or a conflict of interest.

6) <u>Fee Disputes.</u> If you and the firm have any differences regarding the firm's fees, please know that the firm is obligated by New York law to arbitrate our differences before the firm is able to enforce this agreement. In such event, we would provide you with a full and complete explanation of the applicable arbitration rules.

7) <u>Lien.</u> You grant our firm an enforceable lien for its fees, costs and disbursements against the proceeds of any future settlement, arbitration award or judgment related to this matter.

8) <u>No Guarantee.</u> You understand that we cannot and have not promised or guaranteed any particular result in this matter.

9) <u>Entire Agreement.</u> This agreement contains the entire agreement between you and our firm. No other agreement, statement or promise made on or before the effective date of this Agreement will be binding on the parties.

10) <u>Signatures.</u> This agreement may be signed in counterparts. Facsimile and digital signatures are to be treated as originals.

11) <u>Modification.</u> This Agreement may be modified by subsequent agreement of the parties only by an instrument in writing signed by both of them or an oral agreement only to the extent that the parties carry it out.

12)    <u>Receipt of Attachments.</u>    You acknowledge the receipt of the following attachments: Statement of Client's Rights (Attachment 1) and; the Acknowledgement of Client Obligations Regarding Preservation of Evidence (Attachment 2).

We look forward to working with you on this matter towards an acceptable conclusion.

Very truly yours,

Kakalec & Schlanger, LLP

By:    <u>s/Daniel A. Schlanger</u>
        Daniel A. Schlanger

Reviewed, understood and agreed to by:

_____    12/22/2016
Shaul Levy                                                    Date

Doc ID: a40660a9f2c61faf6ddd1d1e52707d4cc155398e

**(Attachment 1)**
# STATEMENT OF CLIENT'S RIGHTS

1. You are entitled to be treated with courtesy and consideration at all times by your lawyer and the other lawyers and nonlawyer personnel in your lawyer's office.

2. You are entitled to have your attorney handle your legal matter competently and diligently, in accordance with the highest standards of the profession. If you are not satisfied with how your matter is being handled, you have the right to discharge your attorney and terminate the attorney-client relationship at any time. (Court approval may be required in some matters, and your attorney may have a claim against you for the value of services rendered to you up to the point of discharge.)

3. You are entitled to your lawyer's independent professional judgment and undivided loyalty uncompromised by conflicts of interest.

4. You are entitled to be charged reasonable fees and expenses and to have your lawyer explain before or within a reasonable time after commencement of the representation how the fees and expenses will be computed and the manner and frequency of billing. You are entitled to request and receive a written itemized bill from your attorney at reasonable intervals. You may refuse to enter into any arrangement for fees and expenses that you find unsatisfactory. In the event of a fee dispute, you may have the right to seek arbitration; your attorney will provide you with the necessary information regarding arbitration in the event of a fee dispute, or upon your request.

5. You are entitled to have your questions and concerns addressed promptly and to receive a prompt reply to your letters, telephone calls, emails, faxes, and other communications.

6. You are entitled to be kept reasonably informed as to the status of your matter and are entitled to have your attorney promptly comply with your reasonable requests for information, including your requests for copies of papers relevant to the matter. You are entitled to sufficient information to allow you to participate meaningfully in the development of your matter and make informed decisions regarding the representation.

7. You are entitled to have your legitimate objectives respected by your attorney. In particular, the decision of whether to settle your matter is yours and not your lawyer's. (Court approval of a settlement is required in some matters.)

8. You have the right to privacy in your communications with your lawyer and to have your confidential information preserved by your lawyer to the extent required by law.

9. You are entitled to have your attorney conduct himself or herself ethically in accordance with the New York Rules of Professional Conduct.

10. You may not be refused representation on the basis of race, creed, color, religion, sex, sexual orientation, age, national origin or disability.

Received by: _____          12/22/2016
                        Shaul Levy                                    Date

Doc ID: a40660a9f2c61faf6ddd1d1e52707d4cc155398e

**(Attachment 2)**

CLIENT ACKNOWLEDGMENT OF:

- OBLIGATION TO PRESERVE ALL EVIDENCE

- OBLIGATION TO PROMPTLY PROVIDE ALL EVIDENCE TO KAKALEC & SCHLANGER, LLP

- ADVICE NOT TO DISCUSS CASE IN SOCIAL MEDIA OR OTHER ONLINE & OFFLINE PUBLIC FORA


**I.      YOU HAVE A DUTY TO PRESERVE ALL EVIDENCE REGARDING THIS LAWSUIT AND THE UNDERLYING DISPUTE**

Be advised that you have a duty to preserve all evidence regarding the facts of the lawsuit and the dispute or other situation that underlies this lawsuit. Here is a non-exhaustive list of the types of materials you may have that could be evidence.

- Contracts
- Receipts
- Repair Orders
- Advertisements
- Letters
- Emails
- Faxes
- Social media posts
- Prior drafts
- Witness statements
- Logs
- Diary entries
- Phone records
- Text messages
- Audio Recordings
- Spreadsheets
- Notes regarding conversations

This is a general list, and is merely provided to give examples. Some cases will not involve all of these types of evidence. Other cases will involve types of evidence that are not on this list. What constitutes evidence will obviously depend on the type of dispute involved, and the particular circumstances.

The general principle, however, is that you must preserve all data of any type (including but not limited to paper records, electronic or digital data on a computer, cell phone, voice messaging system, or other communication or data storage device) relating to the lawsuit or the facts that make up the lawsuit.

Electronic documents and the storage media on which they reside may contain relevant, discoverable information beyond that which may be found in printed documents. Therefore, even where a paper copy exists, you must retain all documents in their electronic form along with information about those documents contained on the media.

In many cases, there may also be tangible things that are not "data" in the traditional sense, but that are nonetheless relevant. For example, in a case involving a defective product purchased by a consumer, the product itself is likely to be evidence, and must be preserved.

You have a duty to preserve and not interfere with the evidence in any manner. For example, you may not edit, damage or delete evidence. Courts have become increasingly strict about preservation issues. Failure to preserve discovery material can result in adverse consequences for your lawsuit, up to and including possible dismissal of this lawsuit, and can also result in an order for you to pay Defendant's attorneys' fees and costs or other significant financial

penalties. Failure to preserve evidence may also result in different or additional sanctions by the Court. This is true even if you did not damage the evidence maliciously but only through carelessness or confusion about whether it was or was not relevant to the litigation.

If you are at all unsure about whether something (say, an email, a receipt, a voicemail, a hard drive, etc.) is related to this lawsuit and must be preserved, always err on the side of preserving the item.

Certain types of computer (or tablet or smart phone) "maintenance" (e.g. "de-fragmenting hard drives, deleting internet cookies, deleting browser history, running "disk clean-up" processes, etc.) can result in damaging or deleting certain types of evidence. In many cases, there will be no issue with conducting these types of maintenance procedures, but in other cases these procedures may result in spoliation of evidence. As a result, please contact Kakalec & Schlanger, LLP prior to conducting any of these types of procedures.

By signing below, you hereby affirm that you have been given notice and agree not to, destroy, conceal or alter any paper or electronic files and other data or evidence of any kind that is in your possession or control, including data that is on your computers, phones, smart phones, tables, back-up drives, and storage media (e.g., hard disks, floppy disks, backup tapes, Zip cartridges, CDs, DVDs, etc.). The phrase "possession or control" is to be interpreted broadly, and to name but one scenario, includes data stored "in the cloud" by a third party vendor on your behalf.

## II.    YOU MUST PROMPTLY PROVIDE ALL EVIDENCE TO KAKALEC & SCHLANGER, LLP

Just as important, *you must provide Kakalec & Schlanger, LLP with all of this evidence as soon as possible.* If you are unclear on whether you have previously provided us with a given document or other data or evidence (e.g. during an initial consultation), you should err on the side of providing it to us again. By signing below, you hereby agree to promptly provide us with all of the various discovery materials relevant to your case, including but not limited to any of the types of evidence referenced in this letter.

If you are unsure regarding your obligation to preserve evidence or your obligation to provide evidence to Kakalec & Schlanger, LLP, please feel free to consult us.

## III.    WE ADVISE YOU NOT TO MAKE COMMENTS ON SOCIAL MEDIA OR IN OTHER PUBLIC FORA REGARDING YOUR CASE

We advise you not to publically comment regarding this lawsuit. This includes refraining from making comments on social media, to the press, and even to friends and extended family. These statements may be discoverable and can sometimes be used to advantage by the other side in the litigation.

The safest course is to simply avoid discussing the case with anyone but your attorneys and spouse.

Our advice in this regard does not change the fact that you must not delete or edit any comments on any social media that you may have already made regarding this lawsuit. As already stated, any of your comments on social media regarding the lawsuit or the conduct leading up to the lawsuit may be discoverable, and therefore, you must take steps to preserve such information.

Prior to signing, please inform us whether you have any questions or concerns about any of the issues discussed in this letter.

Very truly yours,

*s/Daniel A. Schlanger*

Daniel A. Schlanger

Reviewed, understood and agreed to by:

_____          12/22/2016
Shaul Levy                                                              Date
_____

 **HELLOSIGN**

## Audit Trail

| | |
|---|---|
| **TITLE** | Shaul Levy Flat Fee Retainer Agreement, 12-20-2016.pdf |
| **FILE NAME** | RackMultipart20161221-19-1asqlfq.pdf |
| **DOCUMENT ID** | a40660a9f2c61faf6ddd1d1e52707d4cc155398e |
| **STATUS** | ● Completed |

**This document was requested and signed on lexicata.com**

## Document History

| | | |
|---|---|---|
| **SENT** | **12/21/2016**<br>18:35:00 UTC | Sent for signature to Shaul Levy ███████████<br>IP: 77.138.104.228 |
| **VIEWED** | **12/22/2016**<br>14:01:25 UTC | Viewed by Shaul Levy ███████████<br>IP: 107.220.100.67 |
| **SIGNED** | **12/22/2016**<br>14:02:25 UTC | Signed by Shaul Levy ███████████<br>IP: 107.220.100.67 |
| **COMPLETED** | **12/22/2016**<br>14:02:25 UTC | The document has been completed. |

# EXHIBIT B

1

2                  UNITED STATES DISTRICT COURT

3                  SOUTHERN DISTRICT NEW YORK

4      ----------------------------------------------------X

5      SHAUL LEVY,

6                           Plaintiff,

7                                Civil Action No. 17-cv-4022

8              -against;

9      LAW OFFICES OF J. HENRY NIERMAN, RECOVERY OF

10     JUDGMENT LLC and JOSEPH NIERMAN

11                          Defendants.

12     ----------------------------------------------------X

13

14

15             DEPOSITION OF JOSEPH NIERMAN, ESQ.

16                  (Appearing Virtually)

17              Tuesday, September 29, 2020

18

19

20

21

22

23

24     Reported by:  Leonora L. Walker, Court Reporter

25     JOB NO. 184704

1

2          September 29, 2020

3          11:20 a.m.

4

5

6          Deposition of JOSEPH NIERMAN, ESQ.,

7     held virtually, before Leonora L. Walker, a

8     Notary Public of the State of New York.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

```
 1
 2   A P P E A R A N C E S:
 3   SCHLANGER LAW GROUP
 4        Attorneys for Plaintiff,
 5        80 Broad Street
 6        New York, New York 10004
 7   BY:  ROBERT NAHOUM, ESQUIRE
 8
 9   JOSEPH NIERMAN, ESQUIRE
10   PRO SE
11        Attorneys for Defendant:
12        JOSEPH NIERMAN
13        157 Mineral Spring Avenue
14        Passaic, New Jersey 07055
15
16   BARRY CHARLES SCHNEPS, ESQ.
17        Attorney for Defendants:
18        LAW OFFICES OF J. HENRY NIERMAN and
19        RECOVERY OF JUDGMENT
20        41-60 Main Street
21        Flushing, New York  11355
22   BY:  BARRY CHARLES SCHNEPS, ESQUIRE
23
24   ALSO PRESENT:
25   Evan Rothfarb, Esq.
```

Page 4

1

2    --------------------I N D E X------------------------

3    EXAMINATION OF JOSEPH NIERMAN              PAGE

4        BY MR. NAHOUM                         7

5

6    ------------------E X H I B I T S--------------------

7    NIERMAN'S                                 PAGE

8    Exhibit 1 - Letter                        43

9    Exhibit 1A- Certified mail receipt        44

10   Exhibit 2 - Subpoena Duces Tecum          45

11   Exhibit 3 - Letter                        115

12   Exhibit 4 - Answer to Complaint           142

13   Exhibit 5 - Pro Se Answer to Complaint    153

14

15   ------------------R E Q U E S T S--------------------

16   DESCRIPTION                               PAGE

17   1 - Amount of tuition paid                14

18   2 - All ethics complaints                 19

19   3 - Operating Agreement                   23

20   4 - Address/Phone number of Mr. Englander 28

21   5 - Search for ROJ records on computers   84

22

23

24

25

```
1              J. NIERMAN

2            P R O C E E D I N G S

3

4        MR. NAHOUM:  Thank you, Mr. Nierman.

5   Before we get started with the examination,

6   I just want to get a couple things straight

7   here.

8        Ideally, we would be conducting this

9   examination three times.  One for each of

10  the defendants.  I understand that that may

11  be a little impractical for our purposes, so

12  I'm going to do my best to try and ask my

13  questions and be clear about which party I'm

14  asking it of.  I'm going to ask you to do

15  your best to be clear on behalf of which

16  party you're answering.  Okay?

17       MR. Nierman:  Understood.

18       MR. NAHOUM:  And maybe we can remind

19  each other as we go along if we have -- if

20  the other party's having some trouble with

21  it.

22       Let's also clarify who is the 30(b)(6)

23  here.  Mr. Nierman, you are an attorney, but

24  you're also a party to this litigation, and

25  I know that counsel, Mr. Schneps, is also
```

1                    J. NIERMAN

2    here, so I want to know who's representing

3    who?

4         MR. NIERMAN:  So I am representing

5    myself, pro se.  Mr. Schneps is representing

6    both of the co-defendants.

7         MR. NAHOUM:  Okay.  So I'm -- I'm not

8    going to conduct this deposition sending off

9    two sets of objections as we go along.  So

10   let's have it clear now.  Who is going to be

11   making vocal objections, if necessary.

12        Mr. Schneps, you want to chime in?

13        MR. SCHNEPS:  We can let the pro se

14   defendant make the objections.

15        MR. NAHOUM:  So we should not expect to

16   hear any objections from you, Mr. Schneps?

17        MR. Nierman:  I don't know that he has

18   an obligation to waive his right to object.

19   And that if there -- being that there are

20   multiple parties here, and I'm acting pro se

21   as my own attorney, I don't see why we

22   should waive anything.

23        MR. NAHOUM:  I'm not asking you to

24   waive.  So going back to my first issue, it

25   will help us get through those objections if

1            J. NIERMAN

2       we all are very clear about who's asking

3       what of whom, right?

4            MR. Nierman:  Fair enough.

5            MR. SCHNEPS:  Could I just say this?

6            MR. NAHOUM:  Please do.

7            MR. SCHNEPS:  With the deposition, I

8       really doubt there's going to be very many

9       objections in this so, you know, I'm

10      probably going to be largely quiet unless

11      something I consider so outrageous.  So, you

12      know, I think we should just go forward and

13      see how it goes.

14           MR. NAHOUM:  Okay.  Well, if it becomes

15      a problem, we'll deal with it then.

16           Let's begin with the examination.

17  J O S E P H   N I E R M A N, called as a witness,

18       having been affirmed by a Notary Public, was

19       examined and testified as follows:

20               E X A M I N A T I O N

21  BY MR. NAHOUM:

22      Q.   My name is Robert Nahoum.  I am an attorney.

23  I am going to represent the plaintiff for the purpose

24  of these depositions.  I'm going -- you're an

25  attorney, Mr. Nierman, so you're familiar with all

Page 8

1                    J. NIERMAN

2    this, but we're going to go through it anyway so we

3    have a clear record, okay.  So I'm going to ask you a

4    few preliminarily questions and give you a few

5    instructions.

6              Firstly, have you ever been deposed before?

7    A.    No, I've not.

8    Q.    Okay.

9    A.    Not to my recollection.

10   Q.    You've sat through depositions before, yes?

11   A.    Yes, many times.

12   Q.    Okay.  So you recall that you have to give

13   verbal responses to the questions asked of you

14   because the court reporter can't take down your nods

15   of the head and such, right?

16   A.    I understand.

17   Q.    Okay.  And if you want to take a break,

18   that's fine.  If it's an appropriate time to do so, I

19   just ask that at the time you want to take a break,

20   if there's an open question, you answer that

21   question, okay?

22   A.    Understood.

23   Q.    In your capacity as witness for the

24   corporate defendant and the Law Office defendant,

25   where Mr. Schneps is defending the deposition.  He

```
 1                    J. NIERMAN
 2   may object from time to time.  Unless that objection
 3   involves some form of a privilege, the court reporter
 4   will note his objection, but you'll still need to
 5   answer the question.  Understood?
 6        A.   I understand your perspective on that
 7   without agreeing about your legal perspective.
 8        Q.   If it becomes an issue we can deal with at
 9   the time.
10        A.   Understood.
11        Q.   The same applies for your pro se status.  If
12   you're objecting to a question, as long as it doesn't
13   involve a privilege or a trade secret of some kind,
14   you'll have answer the question.
15        A.   As a pro se litigant I believe I'm entitled
16   object to any questions that would be asked to me in
17   my corporate capacity.  Simply as an attorney -- as
18   an attorney of self objecting to a question -- in
19   other words, if there was a third party who was being
20   deposed on behalf of Recovery of Judgments, I as a
21   pro se litigant have a right to object to it.  So in
22   that sense, even if Mr. Schneps might raise an
23   objection to a question that you asked of Recovery of
24   Judgments, I as a pro se litigant would have that
25   right.
```

1                        J. NIERMAN

2          Q.    You're entitled to say whatever you want

3    when you're testifying, okay, but in your capacity as

4    a witness on behalf of Recovery of Judgments or the

5    Law Office of J. Henry Nierman, Mr. Schneps is

6    representing you so it's his objection that have --

7    that, I guess, I will entertain.  But, again, you

8    need to answer the question.

9          A.    I understand your perspective.  I have one

10   question before you continue, sir.  I note that Mr.

11   Rothfarb is on the phone -- is on the zoom call at

12   the same time.  Is he conducting deposition on behalf

13   of plaintiff as well or -- I'm wonder why there are

14   two attorneys here.

15         Q.    I'll be doing the examination?

16         A.    The reason for my question is being that

17   there's a claim against the defendants for --

18   essentially for attorneys fees it seems as -- I'm

19   just going to note my objection for the record the

20   fact that it seems like there's overkill in having

21   two attorneys on behalf of the plaintiffs.

22         Q.    You can take that up at the appropriate

23   time.

24               Mr. Nierman, are you taking any medications

25   right now that might interfere with your ability to

```
 1                    J. NIERMAN
 2  give testimony today?
 3       A.   No, I'm not.
 4       Q.   And again, can you please just state your
 5  full name?
 6       A.   Joseph Henry Nierman.
 7       Q.   What's your home address, sir?
 8       A.   ██████████████████, Passaic, New
 9  Jersey ██████
10       Q.   Do you own that home?
11       A.   No.
12       Q.   Who does?
13       A.   My wife, Susan.
14       Q.   Same last name?
15       A.   Yes.
16       Q.   Is there a mortgage on the home?
17       A.   Yes.
18       Q.   Does your wife work, sir?
19            MR. Nierman:  I'm going to object on
20       grounds that this is irrelevant.
21  BY MR. NAHOUM:
22       Q.   Okay.  Please answer the question.
23            Does your wife work, sir?
24       A.   I'm not going to answer that question.
25       Q.   Why not?
```

1                         J. NIERMAN

2        A.   Because it's not relevant and I want to

3    streamline this deposition.

4        Q.   Sir, I'll ask you one more time.  Does your

5    wife work?

6        A.   I'm going to respectfully decline to answer

7    the question.

8        Q.   Do you have children, sir?

9        A.   Yes.

10       Q.   How many children do you have?

11       A.   Six.

12       Q.   In private or public school?

13       A.   Which ones?

14       Q.   Any.  Do any of your children go to private

15   or public school?

16       A.   They attend -- yes.

17       Q.   Yes what?  Private or public?

18       A.   Private.

19       Q.   How many of your children attend private

20   school?

21       A.   I'm not sure if it's a private school or

22   not.

23       Q.   And --

24       A.   It's college.

25       Q.   Do you know what the tuition is for those

```
 1                    J. NIERMAN
 2  schools?
 3        A.    No, not offhand.
 4        Q.    Ballpark?
 5        A.    I have no idea what my eldest daughter pays
 6  for tuition.  She's in graduate school for PA school.
 7  My second son is in -- is transitioning from one
 8  school to another.  He's on -- he's on a break now.
 9  He just finished in one school.  He's switching to
10  another school.  I have no idea what the tuition is
11  going to be for that school.  And the tuition for my
12  other kids, one is in Touro on a scholarship and
13  three left now.  One is $5,500 per month.  The other
14  two -- I'm sorry, not per month, $5,500 per year, and
15  the other is -- the other two I would estimate are
16  collectively around eight grand, but those are -- I
17  would say those are ballpark and that's because I get
18  considerable discounts from the private institutions.
19  Being that they're -- the fees that I should be
20  paying are considerably higher than those numbers
21  that I just talked about.
22        Q.    Do you have records that would reflect what
23  the tuition is at each of your children's private
24  schools?
25              MR. Nierman:  I'm going to object to
```

```
 1                        J. NIERMAN

 2        this on the basis that it's not relevant.

 3   BY MR. NAHOUM:

 4        Q.   I'm just asking if you have records like

 5   that?

 6        A.   What they're supposed to be or what I pay?

 7        Q.   What you pay.

 8        A.   I imagine so.

 9        Q.   Okay.  So what we'll do is we'll leave a

10   blank here in the transcript, and since you weren't

11   able to answer what the tuition was or what you pay,

12   we'll leave a blank in the transcript.  After this

13   deposition, you have an opportunity to review your

14   records, you can fill in that blank, Okay.

15             MR. Nierman:  Taken under advisement.

16   BY MR. NAHOUM:

17        Q.   Who pays those bills, sir?

18        A.   I do.

19        Q.   For whom do you work?

20        A.   Myself.

21        Q.   Self employment?

22        A.   Correct.

23        Q.   Where?  Do you work on under a trade name?

24        A.   I work under the name of Law Offices of J.

25   Henry Nierman.
```

1                          J. NIERMAN

2       Q.    I'm sorry.  Can you say that more clearly?

3       A.    I work under the name of the co-defendant,

4   Law Offices of J. Henry Nierman.

5       Q.    And what's your business address?

6       A.    I work out of my home.

7       Q.    And your current job title?

8       A.    Attorney.

9       Q.    Are you paid a salary?

10      A.    No.

11      Q.    How are you paid?

12      A.    I earn fees.  I collect fees like money I

13  earned fees.  I use money that's been escrowed or I

14  collect money from clients that owe me money.

15      Q.    Why would -- why would a client owe you

16  money?

17      A.    The same reason a client would you owe you

18  money.  Anyone -- any time an attorney does work for

19  a client they get paid.

20      Q.    And so is it a that fair statement that one

21  hundred percent of what you bill to a particular

22  client is how you earn your income?

23      A.    Yes.

24      Q.    Where did you work before your self

25  employment?

1                    J. NIERMAN

2        A.    I was self-employed while working for

3   Recovery of Judgments.  That's the last employer that

4   I had.

5        Q.    Had you worked at any law firms?

6        A.    Prior to Recovery of Judgments I worked many

7   years ago for Law Offices of Gerald P. Gross.

8        Q.    Where was that?

9        A.    He's an attorney who's based out on Long

10  Island.

11       Q.    When was that?

12       A.    It was more than 15 years ago.  I don't

13  remember when my end date was though.  I -- it may

14  have been as many as 18 years ago.

15       Q.    Can you describe your educational

16  background?

17       A.    My most recent degree is from Fordham

18  University where I attained a jurist doctorate.

19       Q.    AND before that?

20       A.    I got my undergraduate degree from Baruch

21  University.

22       Q.    When was that?

23       A.    I'm sorry?

24       Q.    When?

25       A.    When did I graduate from Baruch?

```
 1                        J. NIERMAN
 2        Q.   Yeah.  Why don't you give me Baruch, and
 3   then you can give me Fordham?
 4        A.   I'm not sure what year I graduated from
 5   Baruch.  It was probably '94, '95.  It might have
 6   been as early as 1993.  I graduated from Fordham in
 7   1998 and was admitted in 1999.
 8        Q.   Besides being a lawyer, do you hold any
 9   special training or professional certificates?
10        A.   Besides my law degree and my --
11        Q.   Yes.
12        A.   -- admission to the bar?
13        Q.   Yeah.
14        A.   I can't think any off hand, no.
15        Q.   And besides your law license, do you hold
16   any other professional licenses?
17        A.   No.
18        Q.   Are you currently in good standing as an
19   attorney with the bar?
20        A.   Yes, I am.  I assume that when you say other
21   licenses you don't mean driver license or anything
22   like that?
23        Q.   I mean professional licenses I think was the
24   question.
25        A.   I just wanted to be clear.
```

```
 1                      J. NIERMAN

 2      Q.   So --

 3      A.   So the answer was correct.

 4      Q.   Are you in good standing with the bar?

 5      A.   To my knowledge, yes.

 6      Q.   Are you in admitted to practice -- I'm

 7   sorry.  Strike that.

 8           In what states are you admitted to practice?

 9      A.   New York.

10      Q.   Are you admitted in any other jurisdiction?

11      A.   No.

12      Q.   Have you ever been the subject of

13   professional disciplinary proceedings?

14      A.   No.  Let me clarify.  When you say subject

15   of disciplinary proceedings, I'm not sure what that

16   term means.  So I want to make sure I understand

17   correctly.

18      Q.   Has an ethics complaint ever been lodged

19   against you?

20      A.   I believe so, yes.

21      Q.   Can you describe that?

22      A.   There was an ethics complaint that was

23   filed, I want to estimate it around five or six years

24   ago.  That was dismissed.

25      Q.   What were you accused of?
```

1                          J. NIERMAN

2          A.    As I recall it was a debtor who was -- who

3    claimed that his monies had been improperly seized.

4    I submitted the evidence to establish that the

5    seizure was proper and the case was adjudicated as me

6    not -- me not having committed any wrongdoing.

7          Q.    You said you submitted the evidence.   To

8    whom did you submit evidence?

9          A.    To the bar.

10         Q.    Have you --

11         A.    Again, the detail breakdown of the entire

12   incident and all the factors that were related to it

13   and they found no wrongdoing had been committed at

14   all.

15         Q.    Are there documents in your possession that

16   reflect the ethics complaint that you just testified

17   to?

18         A.    Are there documents that exist?   Yes, I'm

19   sure.

20         Q.    Do you have any in your possession?

21         A.    I don't know.

22         Q.    Okay.   I'm going to ask that after this

23   deposition you produce every document that you have

24   related to this ethics complaint.

25               MR. Nierman:   Taken under advisement.

1                          J. NIERMAN

2    BY MR. NAHOUM:

3         Q.   Sir, do you have a New York office?

4         A.   That I work out of?  I mean, I have an

5    office located in Flushing, but I'm never there or

6    very rarely.

7         Q.   You testified -- sorry.  You testified a

8    couple minutes ago that you work out of your home?

9         A.   I do.

10        Q.   Okay.  So you keep a New York office.

11   Where's the location?

12        A.   168-02 Jewel Avenue, Flushing 11365.

13        Q.   And do you have a lease for that location?

14        A.   No.

15        Q.   Is it --

16        A.   It's my father's home.

17        Q.   Do you have professional mail delivered

18   there?

19        A.   That's correct.

20        Q.   Is that the address you have on file with

21   the State of New York in terms of --

22        A.   I believe so.

23        Q.   -- in terms of your license?

24        A.   I believe so, yes.

25        Q.   I'm going to ask you a series of questions

```
 1                    J. NIERMAN
 2  now about Recovery of Judgments, LLC?
 3       A.   Understood.
 4       Q.   Okay.  So these questions are going to be
 5  directed to you in your capacity as a witness for
 6  Recovery of Judgments, LLC?
 7       A.   Understood.
 8       Q.   Okay.  Who is Recovery of Judgments, LLC?
 9       A.   I'm not sure what you mean when you say who.
10  It's a corporation.  It's a limited liability
11  company.
12       Q.   And can you describe your understanding of
13  what Recovery of Judgments, LLC does?
14       A.   Recovery of Judgments, LLC has been out of
15  operation since 2017, so right now it's not doing
16  anything.  That statement is -- when it was
17  operating, it was in the business of executing
18  judgments, both judgments that it had acquired and
19  judgments that have third parties.
20       Q.   Can you explain judgments?
21       A.   Judgments are any judgment that have been
22  entered with the clerk of court in the State of New
23  York.
24       Q.   Money judgments you mean?
25       A.   That's correct.
```

1                        J. NIERMAN

2        Q.   When did Recovery of Judgments, LLC form?

3        A.   I want to -- off the top of my head I would

4   estimate in 2013 or '14.

5        Q.   Who formed it?

6        A.   Shawn Porat.

7        Q.   Do you have any involvement with the

8   formation of Recovery of Judgment LLC?

9        A.   I don't believe so, no.  The reason I say I

10  don't believe so is that Shawn started a company

11  called Recovery of Judgment, and he had been

12  operating it before I became involved, and when I

13  joined in, so we created an operating agreement,

14  which reflected our ownership interests, and I

15  believe that we stayed with the same LLC that he had

16  originally formed prior to my involvement therewith.

17       Q.   Do you have a copy of that operating

18  agreement?

19       A.   Not in my possession.  I haven't looked at

20  it in many years.

21       Q.   Where would it be?

22       A.   It could be in records that I have from a

23  long time -- from -- I still have some records in my

24  garage.  It could be there.  The company has not been

25  operational for three years, and I certainly hadn't

```
 1                        J. NIERMAN

 2  looked at it in some -- in quite some time just

 3  before that.

 4       Q.   But this lawsuit has been pending for some

 5  time.

 6       A.   Right.   The company stopped working before

 7  this lawsuit commenced.

 8            MR. NAHOUM:   I'm going to ask that a

 9       copy of the operating agreement be produced.

10            MR. Nierman:   Taken under advisement.

11  BY MR. NAHOUM:

12       Q.   Where is the principal place of business of

13  Recovery of Judgment LLC?

14       A.   There is no principal place of business

15  anymore.

16       Q.   Where was it?

17       A.   We had several locations during our tenure.

18  For awhile we were at 352 Seventh Avenue.   There was

19  a point I think we were on 29 West -- 17 West 29th

20  Street.   There's another point before that I think

21  that we were up on 36 and Seventh Avenue.   I don't

22  recall.   I think 450 Seventh Avenue, but that's

23  really -- I could be wrong.   I don't remember.   That

24  was one of the earlier locations.   We moved around as

25  we grew to better locations.
```

```
 1                    J. NIERMAN
 2       Q.   And were those locations pursuant to real
 3  property leases?
 4       A.   Yes.
 5       Q.   Do you have copies of those real property
 6  leases?
 7       A.   Certainly not.
 8       Q.   Who might have them?
 9       A.   I don't know that anybody has them anymore.
10  Those leases have long since expired.
11       Q.   Do you know who landlords were for those
12  locations?
13       A.   I don't recall any -- the names of any of
14  the corporate landlords, no.  Most of the
15  negotiations for leases was the department that was
16  handled by Shawn.  If you'd like, I can break the way
17  we structured our business relationship --
18       Q.   We'll get there.
19       A.   Okay.
20       Q.   We'll get there.
21       A.   Okay.
22       Q.   Would he have copies of the leases for which
23  you're aware?
24       A.   It's possible.  I would be surprised, but
25  it's possible.
```

```
 1                    J. NIERMAN

 2       Q.   And you don't recall who any of the

 3  landlords were?

 4       A.   No.  I never negotiated with the landlords

 5  nor was I responsible for handling payments of our

 6  rents.

 7       Q.   Who are the officers of Recovery of Judgment

 8  LLC?

 9       A.   Myself and Shawn Porat.

10       Q.   What are your titles?

11       A.   My best recollection -- I don't recall our

12  exact titles.

13       Q.   Can you spell Shawn Porat's name?

14       A.   Shawn is S-h-a-w-n.  Porat is spelled

15  P-o-r-a-t.

16       Q.   Okay.  How do you know Mr. Porat?

17       A.   I found him online looking to sell Recovery

18  of Judgments.

19       Q.   Can you explain that better?

20       A.   I was looking to purchase a business, and I

21  found a website where people would advertise if they

22  were interested in selling a business.  He advertised

23  there on that he was offering Recovery of Judgment

24  for sale, I met with him, and I decided that rather

25  than buying the business completely from him outright
```

1                              J. NIERMAN

2    that it would be a better venture for me to form a

3    partnership with him so I bought into the company.

4         Q.    How much did you pay?

5         A.    It wasn't much.  I think it was $5,000, but

6    I'm not sure.  That's my recollection.

7         Q.    Okay.  You said a few moments ago that there

8    was an operating agreement.  Was there any other

9    documents reflecting your purchase of an interest in

10   Recovery of Judgment LLC?

11        A.    I don't recall.

12        Q.    How did you pay him?

13        A.    You mean like a bill of sale?

14        Q.    Anything.

15        A.    I don't recall there being anything that --

16   I don't recall it being anything that formalized.  We

17   were very -- when it came to a relationship between

18   ourselves, we were very relaxed with respect to

19   titles.  So when you asked me earlier what titles he

20   had or I had, we looked at each other as being

21   co-owners in the company and jointly responsible with

22   each of us having our responsibility delineated in

23   accordance with understanding that we had formed this

24   between ourselves.

25        Q.    How did you pay the $5,000 purchase?

```
 1                      J. NIERMAN
 2        A.    I think a client of mine gave him the money.
 3   So it was a client who owed me money and laid it out
 4   and gave him that money.  That's my recollection.
 5        Q.    I'm sorry.  You sort of cut out here.  Can
 6   you repeat that one more time?
 7        A.    I believe a client of mine gave him the
 8   $5,000.
 9        Q.    Who is that client?
10        A.    David Englander.
11        Q.    Spell it?
12        A.    E-n-g-l-a-n-d-e-r.
13        Q.    And for what purpose did you represent this
14   gentleman?
15        A.    Mr. Englander?
16        Q.    Yes.
17             MR. Nierman:  I'm going to object on
18        the basis that this is not relevant, but
19        I'll answer the question and just ask you to
20        stick to things that are really relevant.
21             THE WITNESS:  I have been representing
22        David in a multiple of various business
23        matters for the last 20 years.  He was my --
24        he's an old friend of mine who is one of my
25        first clients.
```

Page 28

1                    J. NIERMAN

2   BY MR. NAHOUM:

3        Q.   And do you have contact information for the

4   gentleman?  Address, phone number, e-mail address?

5        A.   I do.

6        Q.   Can you provide that?

7        A.   I don't really see the point.

8        Q.   Why don't we leave blanks here in the

9   transcript, and when you have a moment you can go

10  back and fill in the address, phone number, and

11  e-mail address for Mr. Englander?

12            MR. Nierman:  I'm going to object and

13     take your request under advisement.

14  BY MR. NAHOUM:

15       Q.   Who are the directors for Recovery of

16  Judgments, LLC?

17       A.   As I said, we didn't have anything formal

18  between myself and Shawn.  We looked at each other as

19  co-owners.

20       Q.   Who are all the members of the LLC?

21       A.   Just myself and Shawn.

22       Q.   Who is Vera Porat?

23       A.   Vera is Shawn's wife.

24       Q.   And did she have any roles or

25  responsibilities at Recovery of Judgment LLC?

```
 1                    J. NIERMAN

 2      A.   Yes.  She served as the office manager for

 3  the last, I would estimate a year to 18 months that

 4  we were operating.

 5      Q.   Who were her duties as office manager?

 6      A.   She ran the office in every sense of the

 7  word with respect to from taking in mail and

 8  answering questions to overseeing interns to

 9  training, to taking calls and making sure that our

10  cases were being properly processed.

11      Q.   Is she a lawyer?

12      A.   No.

13      Q.   Does she have any special training in law?

14      A.   She has training from myself.

15      Q.   You trained her in what?

16      A.   I trained her in how to do what she did as

17  did Shawn.  Shawn was doing it before I actually

18  started.  Shawn and I both trained her in how to

19  handle the day-to-day operations.

20      Q.   Okay.  Is Shawn a lawyer?

21      A.   No.  Not that I --

22      Q.   Does he have any special training in the

23  law?

24      A.   Self-trained as far as I know.

25      Q.   Did --
```

1                         J. NIERMAN

2        A.    I think he might have -- I know when I met

3   with him when I agreed to purchase Recovery of

4   Judgment from him, he showed remarkable knowledge of

5   the law and what requirements there were and what

6   requirements as far as what we must do when we're

7   executing judgments.  What we are prohibited from

8   doing when executing judgments.  He was self-taught

9   and he understood for more about executing judgments

10  that many of several attorneys that I have spoken

11  with.

12       Q.    Did you provide any training to Mr. Porat

13  on --

14       A.    Yes.

15       Q.    -- legal issues?

16       A.    Yes.  When it came to legal issues, and this

17  comes down to what our specific roles were within the

18  company, I was responsible for handling all of the

19  legal end of things and obviously when it comes to

20  judgment execution there's a great deal of legal

21  matters that come up.  So when there is anything that

22  had to do with preparing papers for proceedings,

23  appearing in court, an answering letters, drafting

24  letters that were not our standard form letters, or

25  negotiating settlements, drafting settlements,

```
 1                    J. NIERMAN
 2  dealing with counsel for any clients or -- not
 3  counsel for clients, counsel for debtors those were
 4  all areas that were my -- under my purview.  With
 5  respect to 99 percent of all other matters, by that I
 6  mean the business end of things, that includes
 7  marketing; that includes setting up the office; that
 8  includes dealing with landlords or bringing in
 9  interns or making sure that things were properly
10  getting done.  So Shawn would set up the structure of
11  things and handle the negotiations with various third
12  parties who we engaged with and oversee payments and
13  that was his capacity.
14       Q.   How were you paid from Recovery of Judgment
15  LLC?
16       A.   I was paid -- you mean what was my rate of
17  compensation?  Is that what you're asking?  I was
18  paid by check.
19       Q.   Were you a salaried -- let me ask it another
20  way.  Were you a salaried employee of Recovery of
21  Judgment LLC?
22       A.   No.
23       Q.   Was Mr. Porat?
24       A.   No.
25       Q.   Mrs. Porat?
```

```
 1                    J. NIERMAN

 2       A.   Not to my recollection.  Actually, I'm not

 3  sure if she was salaried or not.  She may have been

 4  salaried.  I'm not sure.  I don't recall anymore.  It

 5  seems to me that she wouldn't have been salaried

 6  because she was certainly not taking any of the

 7  profits from the corporation.  So -- and I know at

 8  some point we had discussions about her compensation,

 9  so I believe at some point she probably became

10  salaried, but I do not remember what I negotiated and

11  worked out with Shawn on that.

12       Q.   Are there any records that would reflect

13  whether or not Mrs. Porat was a salaried employee?

14       A.   All the business records were maintained for

15  operating ROJ, which is what we call Recovery of

16  Judgments, all the business records were maintained

17  by Shawn.

18       Q.   Do you have access to them?

19       A.   No.  I'm not -- well, we had joint access to

20  bank accounts that were controlled by Recovery of

21  Judgment.  We were both signatories.  So, yeah, I

22  guess, technically the bank probably still has

23  records.  I don't know.

24       Q.   What bank would that be?

25       A.   I think we were using TD Bank from my
```

1                    J. NIERMAN

2    recollection.

3         Q.    Are you aware of an account number?

4         A.    No.

5         Q.    I'll leave a blank here in the transcript,

6    and if you have any records showing what the account

7    number was for ROJ, you can fill that in.

8              MR. Nierman:  I'm going to take that --

9         I'm going to object and take that under

10        advisement.

11   BY MR. NAHOUM:

12        Q.    Can you describe what, if any, relationship

13   there was between Recovery of Judgments, LLC and the

14   Law Office of J. Henry Nierman?

15        A.    The Law Offices of J. Henry Nierman is a

16   name that I used for business purposes.  It's not

17   registered with the State of New York with any

18   agency.  It was just a trade name.

19        Q.    The question was could you describe the

20   relationship between Recovery of Judgment LLC and the

21   Law Offices of J. Henry Nierman.

22        A.    The Law Office of J. Henry Nierman is the

23   trade name that I used when I was working as an

24   attorney and acting on behalf of Recovery of Judgment

25   LLC.

1                          J. NIERMAN

2        Q.   Was Recovery of Judgment LLC a client of the

3    Law Offices of J. Henry Nierman?

4        A.   I don't know that we actually had a retainer

5    agreement or not.  I don't recall whether or not such

6    a thing was properly formed.

7        Q.   I didn't ask you about your retainer

8    agreement.  I asked if it was a client?

9        A.   I guess, technically, yes, they would count

10   as a client.  The term client is a little bit of

11   morphous.  I'm going to reserve -- I'm going to

12   withdraw my answer and say I don't really understand

13   the question.

14       Q.   We'll revisit this.

15       A.   Fair enough.

16       Q.   How many employees did Recovery of Judgment

17   LLC have?

18       A.   One.

19       Q.   Who's that?

20       A.   When?

21       Q.   I'm sorry.  When.  2017?

22       A.   Salaried employees?

23       Q.   Any employees.

24       A.   I mean, technically you can look at myself

25   and Shawn as being employees of the company, and then

1              J. NIERMAN

2    Vera.  I don't believe there were any other

3    employees, per se, no.

4         Q.   Did anybody else work at Recovery of

5    Judgment LLC in 2016 and 2017?

6         A.   We had some interns who would come in and

7    worked for us.  I do not believe that they were

8    employees.

9         Q.   How many interns did you have?

10        A.   I don't know.

11        Q.   Do you know any of their names?

12        A.   No.

13        Q.   Are there any records that reflect interns

14   working for Recovery of Judgment LLC in 2016 and

15   2017?

16        A.   Very possibly.  I would not have those

17   records.

18        Q.   Where would those records be?

19        A.   Oh, I don't know.  That could be with

20   Recovery of Judgment.  That could be with -- or it

21   could be that Shawn has them.  So when I say Recovery

22   of Judgment, let me just clarify this.  When I say

23   Recovery of Judgment that's not the same Recovery of

24   Judgment.  When I say with Recovery of Judgment I'm

25   referring to the entity that is operating doing

1                       J. NIERMAN

2   business currently as Recovery of Judgment.  If you'd

3   like, I can clarify what I mean by that.

4        Q.   By all means, please.

5        A.   Okay.  In 2017, well, late in 2016, I think

6   it's late 2016, this letter was -- the subject of

7   this matter of this suit happened in December of

8   2016; is that correct?

9        Q.   I'm sorry.  I didn't get that?

10       A.   This lawsuit relates to a letter that was

11  sent in December of 2016; is that correct?

12       Q.   Well, this relates to conduct in 2016.

13       A.   Right.  Okay.  So in or around November of

14  2016, Shawn entered into an agreement with a third

15  party named WAK Enterprises for the sale of the

16  assets of Recovery of Judgment.  The sale of the

17  assets really included our clients and control over

18  those accounts, as well as the goodwill of the name

19  Recovery of Judgment LLC and the rights to use the

20  name Recovery of Judgment LLC, as well as training

21  their staff in how to properly, lawfully, and

22  efficiently execute judgments.  So that was signed

23  the end of -- I want to say around Thanksgiving time,

24  but it might have been in December of 2016, and I

25  believe it was closed in January or February of 2017.

```
 1                    J. NIERMAN
 2   So from that point we took all the documents and
 3   records that we had and kept on behalf of Recovery of
 4   Judgment LLC and gave access to all those records to
 5   WAK Enterprises.  As I understand, WAK Enterprises is
 6   currently operating.  I don't know -- well, let me --
 7   there is an entity out there which is operating as
 8   Recovery of Judgment under the authority of WAK
 9   Enterprises.  Whether WAK Enterprises is the actual
10   corporation that's currently running Recovery of
11   Judgment, I have no way of knowing.  But as of
12   closing of that sale of the assets to Recovery of
13   Judgment, the name Recovery of Judgment and all of
14   the assets of Recovery of Judgment were -- became the
15   property of WAK Enterprises.  And I understand that
16   they're currently operating as Recovery of Judgment
17   to this day, although I certainly have nothing to do
18   with that company nor do I believe does Shawn or
19   Vera.
20        Q.   Did you Mr. Nierman individually receive any
21   training from Recovery of Judgment LLC on policies
22   and procedures for debt collection, debt collection
23   compliance?
24        A.   Did I receive any training?
25        Q.   Yes.
```

1                     J. NIERMAN

2        A.    I might have taken a course like a CLE

3   course.  I don't recall.

4        Q.    Did Recovery of Judgment LLC provide any

5   training to the Law Offices of J. Henry Nierman on

6   debt collection and compliance?

7        A.    No.

8        Q.    How many computers were at the location for

9   Recovery of Judgment LLC in 2016?

10        A.    I would have to guess.  I always tell my

11   clients when I'm advising them to do depositions not

12   to guess, so I don't know.

13        Q.    It is twenty computers?

14        A.    Less than that.

15        Q.    Ten?

16        A.    Probably less than that.

17        Q.    Five?

18        A.    It's a fair estimate.

19        Q.    Do you know what platforms those computers

20   operate under?

21        A.    You mean what operating system?

22        Q.    Sure.

23        A.    I don't recall.

24        Q.    Was there a private network between those

25   five computers?

 1                          J. NIERMAN

 2        A.   You mean when they network together -- with

 3   each other?

 4        Q.   Right?

 5        A.   Yes, I believe they were.  That all fell

 6   under the purview of Shawn.  Shawn set all that up.

 7        Q.   Did you have an outsource IT department, or

 8   did you have an IT vendor who set up your computer

 9   network?

10        A.   I have no idea.  I would just come in and do

11   my work.

12        Q.   The interns, how many interns did Recovery

13   of Judgment LLC have in 2016?

14        A.   I have no idea.

15        Q.   Did any of those interns do work for the Law

16   Offices of J. Henry Nierman?

17        A.   No.

18        Q.   Did any of those interns do any work for

19   you, Mr. Nierman?

20        A.   No.

21        Q.   Did Recovery of Judgment LLC in 2016 or

22   2017, have any forms of insurance?

23        A.   Recovery of Judgment, not to my knowledge.

24        Q.   Has Recovery of Judgment LLC ever been sued

25   for violations of the Fair Debt Collection Practices

```
 1                      J. NIERMAN

 2   Act?

 3        A.    I think one time, very early on.

 4        Q.    Do you know when that was?

 5        A.    I want to say it was within the first six

 6   months of when I was working there, and that lawsuit

 7   was withdrawn with prejudice by the plaintiff within

 8   three months of when we -- of when it was filed.

 9        Q.    Settled?

10        A.    No, not settled.  Withdrawn with prejudice.

11   When the lawsuit was brought, I called the attorney

12   on behalf of the plaintiff, explained to him how he

13   was wrong on law, wrote him a letter explaining to

14   him how he was wrong on the law, made it clear that

15   he should withdraw his lawsuit or that we would take

16   appropriate action, and he received my letter, agreed

17   with my perspective and withdrew the action with

18   prejudice.

19        Q.    Can you produce a copy of that letter?

20        A.    Possibly.

21        Q.    Where would a copy of that letter be stored?

22        A.    That would be on one of the computers

23   that -- and again, the reason I say possibly, and I'm

24   a little bit doubtful as to the likelihood that I was

25   succeeding in doing so is because -- as I said, this
```

1                    J. NIERMAN

2  was very early on in formation of Recovery of

3  Judgment LLC, and I know that we updated our

4  computers, like.  Midway through our -- my tenure.

5       Q.   What do you mean you updated?

6       A.   At some point in time when Shawn purchased a

7  whole set of new computers for the office and the old

8  computers were basically destroyed.  So I do not know

9  if that sort of thing would have been -- this is

10  something that was talking about -- it's more than

11  seven years ago.  So.

12       Q.   Sorry --

13       A.   Sorry?

14       Q.   When were the old computers destroyed?

15       A.   I would guess probably 2014, 2015.

16       Q.   Are there any documents that would reflect

17  when the old computers were destroyed?

18       A.   I cannot imagine there being any documents

19  or records.

20       Q.   Well, it happened at the time new computers

21  were purchased, right?

22       A.   Right.

23       Q.   Are there receipts of purchases of new

24  computers?

25       A.   I have no idea.  Shawn purchased those

```
 1                    J. NIERMAN
 2  computers.
 3        Q.   How many computers were purchased?
 4        A.   I don't know.  There was -- I estimated
 5  around five before.  That's the best estimate I can
 6  give you.
 7        Q.   Why did you need five computers?
 8        A.   We had interns who would use computers.
 9        Q.   So you don't recall who any of those interns
10  were, how many there were?
11        A.   No.  Interns would shuttle in and out on a
12  frequent basis.  There usually would be a couple at
13  any given time.
14        Q.   How did you find these interns?
15        A.   Shawn did that.
16        Q.   Advertise for them?
17        A.   You're asking me a question, and I'm telling
18  you I do not know the answer.
19        Q.   Has Recovery of Judgment LLC ever been the
20  subject of court-ordered sanctions?
21        A.   No.
22        Q.   We are trying to get through an exhibit now,
23  okay.
24        A.   Okay.
25        Q.   So this is -- I've pre-marked this as
```

```
 1                    J. NIERMAN
 2   Plaintiff's Exhibit 1, and this is a letter dated
 3   December 27th, 2016.
 4        A.   Okay.
 5        Q.   Joseph Nierman, Law Offices of J. Henry
 6   Nierman?
 7        A.   Yes, I see the exhibit.
 8        Q.   Hold it up and make sure we're looking at
 9   the same one.
10             Why don't you read the first line so we know
11   we're looking at the same letter.
12        A.   Dear Mr. Nierman.  My office was recently
13   retained by Shawn Levy -- Shaul Levy in the
14   above-referenced matter.
15        Q.   Why don't you go ahead and read the very
16   last line so we can make sure we're looking at the
17   same letter.
18        A.   The last paragraph is, the subpoena was not
19   timely as it was mailed, at earliest on December
20   13th, 2016, and did not arrive until only recently,
21   i.e., my client had far less than the required ten
22   days advanced notice required in the CPLR 5224.
23        Q.   Okay.  Mr. Nierman, can you tell me, have
24   you seen this document before?
25        A.   During the course of this lawsuit I saw it.
```

```
 1                     J. NIERMAN

 2        Q.   Have you ever seen it before then?

 3        A.   I don't recall seeing it before then.

 4        Q.   Do you dispute that this is a document

 5   you've reviewed before?

 6        A.   I'm saying I have no recollection of ever

 7   seeing this.  This was sent by e-mail?  Was this sent

 8   by Recovery of Judgment?  I don't recall seeing this

 9   letter.  I mean, prior to this lawsuit.  I saw it

10   during this lawsuit, but I don't recall seeing it

11   prior to.

12        Q.   Let's do this another way.  I'm going to

13   give you an another exhibit that will help us nail

14   this down.

15        A.   Okay.

16        Q.   Okay.  This is 1-A.  Do you have that, sir?

17        A.   1-A, yes.

18        Q.   It's a green card, certified mail?

19        A.   Yes.

20        Q.   Do you have that?

21        A.   This?

22        Q.   Can you read who that's addressed to?

23        A.   Mr. Joseph Nierman, Law Office of J. Henry

24   Nierman, 39 West 29th Street, suite 612, New York,

25   New York 10001.
```

```
 1                    J. NIERMAN
 2        Q.   On the right column there, is that your
 3   signature?
 4        A.   No.
 5        Q.   Do you know who signed for this?
 6        A.   I have absolutely idea who Warren is.
 7        Q.   Well, what is this location, 39 West 29th
 8   Street?
 9        A.   It's possible we were operating there.  I
10   don't recall that particular address, but I certainly
11   will not dispute that it's possible.  I don't think
12   we were ever in suite 612.  I don't think we were
13   ever on the sixth floor.  I don't know.  I don't know
14   what this address is.  I'm not going to guess.
15        Q.   We're going to have to bounce around a
16   little bit to nail this down, okay.
17        A.   Understood.
18        Q.   Let's go ahead and take a look at Exhibit 2,
19   please.
20             Do you see that, sir?
21        A.   Yes.
22        Q.   Do you know what that document is?
23        A.   This is a document that looks like a
24   subpoena being served Matt Morrison -- from Matt
25   Morrison to Shaul Levy.
```

1                        J. NIERMAN

2        Q.   It's a court subpoena; is that right?

3        A.   Well, I don't know if it's a court subpoena,

4   but it looks like a subpoena.

5        Q.   It's got a caption there Civil Court with

6   City of New York, County of New York, Matt Morrison

7   v. Shaul Levy; is that right?

8        A.   I see that.

9        Q.   And caption says subpoena duces tecum; is

10  that right?

11       A.   Yes.  That's what it's labelled on this

12  document, yes.

13       Q.   And can you look at the very last page.  Is

14  that your signature there, sir?

15       A.   Yes, that's my signature.

16       Q.   Okay.  And can you read the address on the

17  signature block there?

18       A.   39 West 29th Street, Suite 612, New York,

19  New York 10001.

20       Q.   Referring your attention back to the

21  Exhibit 1-A, that green card, does refresh your

22  recollection of what that address is?

23       A.   It seems like the address -- besides from

24  the ZIP code which on the letter or on the subpoena,

25  it doesn't seem to have a valid ZIP code.

1                           J. NIERMAN

2       Q.    I'm sorry.  Could you say that one more

3    time?  What doesn't have a valid ZIP code?

4             You're muted, sir.  Mr. Nierman, you're

5    muted.

6             Have we lost Mr. Nierman?

7             Are you there?

8       A.    I'm back.

9       Q.    I lost you there, sir.

10      A.    I apologize.  I keep getting a phone call

11   over and over again, and that's why I was asking

12   you -- I thought I answered the question and I said

13   could I just take a moment to answer this phone

14   because it rang, like, four times.

15            What I see here is -- to answer your

16   question, is that on the subpoena there is an address

17   which seems to have this address of 39 West 29th

18   Street, Suite 612, New York, New York.  The ZIP code

19   is different, but in other respects it seem to match.

20      Q.    If you look earlier in that document under

21   the paragraph it starts "Now, therefore," do you see

22   that?

23      A.    Am I looking at Exhibit 2 again?

24      Q.    Exhibit 2, page 2.

25            Do you see that?

1                          J. NIERMAN

2        A.   Yes.

3        Q.   Can you read the address in the body of that

4   paragraph?

5        A.   Now, therefore, pursuant to CPLR Section

6   5223 and Section 5224, we commend you to appear and

7   attend the Recovery of Judgment at 39 West 29th

8   Street, Suite 612, New York, New York 10001, on

9   December 26th, 2016, at 10:00 a.m., and at any

10  recessed or adjourned dated for the taking of

11  deposition under oath upon oral or written questions

12  on all matters relevant to the satisfaction of the

13  judgment.

14       Q.   Okay.  Does this refresh your recollection

15  on the significance of the address 39 West 29, Suite

16  612, New York, New York 10001?

17       A.   Yes, it does.  I believe that we were

18  probably working out of that address at that time.

19       Q.   Okay.  Referring your attention back to

20  Exhibit 1-A, the green card, you don't recognize that

21  signature?

22       A.   No.  I have no idea who that is.

23       Q.   Do you know who would have been in the

24  office on that date?

25       A.   I cannot even image who someone name Warren

```
 1              J. NIERMAN
 2  would be.  The system that we had for getting mail
 3  was a little frustrating in that -- as I recall in
 4  that office all the mail, it was a -- it was like one
 5  of those types of leases where there is a lobby and
 6  several different offices of different companies all
 7  rent out various rooms on a floor and the mail is
 8  given to a receptionist at the front section, and he
 9  would sort the mail for the different companies and
10  then distribute it.  So my best guess is that
11  assuming this was delivered properly -- well, and I
12  have no idea if it was or not.  I have no idea if
13  this gentleman Warren -- I don't know if it came to
14  the right address or if it went to the wrong place,
15  but that's the only possible explanation I have as to
16  why mail that would have been delivered, properly
17  delivered to that office, would have been signed by
18  someone else.  But again, I have no absolutely no way
19  of knowing who -- what the name of the person signing
20  who he is.
21       Q.   Sir, have you ever been to that office
22  location, 39 West 29th Street?
23       A.   Yes.
24       Q.   Was it, like, an office?  Was it an office
25  share?
```

1               J. NIERMAN

2       A.   Yeah, I mean.  I don't know.  As far as the

3  actual term that people would use when referring to

4  it, I think office share is probably a good -- is

5  probably a good description.

6       Q.   Did Recovery of Judgment LLC have permanent

7  and fixed work stations at this location?

8       A.   Yes.

9       Q.   Was there a lease?

10      A.   Right.  I don't know if they called it a

11  lease.  I think they -- I think most of the

12  agreements they have in New York, and I remember the

13  ones that I had seen, they don't want to call it a

14  lease because then it's more difficult to evict you.

15  I think they call it a right to -- it's something

16  that establishes the right of usage without actually

17  being referred to as a lease.

18      Q.   A license --

19      A.   I think it might have a license to use.

20  That way they don't have to worry about evicting

21  tenants.  I mean, technically -- we're both

22  attorneys, so I don't want to speak incorrectly here

23  and use a legal term that would inaccurate.  I think

24  it's unlikely it was a lease because most of time

25  when I was looking at these agreements, after they

```
 1                    J. NIERMAN
 2   were executed I would note that they were almost
 3   never a lease per se where a landlord would have to
 4   struggle to remove a difficult tenant, but that they
 5   were sort of licensed, which would create no real
 6   property interest in the premise itself.
 7        Q.   But Recovery of Judgment LLC had six work
 8   locations there, yes?
 9        A.   I believe so, yes.
10        Q.   Did you keep your computers there?
11        A.   Yes.  When I would come into work, which was
12   most days, I come -- again, as I said, we bounced
13   around to a few locations and that's why when you
14   tell me an address I don't really remember.  Going
15   back many years, I mean, we had, during the course of
16   five years, at least in possibly five or six
17   different locations.  So now that you refresh my
18   recollection to these documents, I will tell you,
19   yes.  We were located at 39 West 29th Street.  We
20   would not have had a subpoena which would reflect an
21   improper address.  They put down suite 612, I guess
22   we were located -- well, one of the offices there was
23   suite 612.  We had more than suite.  I had my own
24   separate room apart from Vera with a different -- on
25   the same floor with a different entrance.
```

Page 52

1                    J. NIERMAN

2       Q.   How long were you at that location?

3       A.   I have very little recollection.  Other

4   than, say, probably a year, but I have -- I don't

5   know.

6       Q.   In the time that Recovery of Judgment LLC

7   was at this 39th Street location, did you ever

8   conduct any depositions there?

9       A.   I don't remember.  It would not have been a

10  very regular thing to conduct depositions.  Most

11  people who -- you know, do not come in for

12  depositions.  And it wasn't our practice to hold

13  people's feet to the fire on failing to come in for

14  deposition.

15      Q.   Can I refer your attention back to

16  Exhibit 1, the December 27th, 2016 letter?

17      A.   By all means.

18      Q.   At the very top there's an e-mail address.

19  Support@RecoveryofJudgment.com.

20           Who received e-mails directed to that e-mail

21  address?

22      A.   That would have been either Vera or Shawn.

23      Q.   And there's a fax number (646) 810-5781.  In

24  2016, was that a fax number attributable to Recovery

25  of Judgment LLC?

1                    J. NIERMAN

2        A.    Probably it looks familiar.

3        Q.    Who would receive faxes sent to Recovery of

4   Judgment LLC?

5        A.    Vera.

6        Q.    Do you have any recollection of Vera or

7   anyone else handing you a copy of this letter?

8        A.    No.

9        Q.    Do you recall having a telephone

10  conversation with attorney Daniel Schlanger about the

11  contents of this letter?

12       A.    I don not recall that conversation.  That

13  doesn't mean -- I want to be clear.  That doesn't

14  mean it didn't happen.  What I'm telling you is I

15  don't have any recollection of it.  It was not

16  something that seems very memorable.

17       Q.    Were -- was Vera Porat working for Recovery

18  of Judgment LLC in 2016?

19       A.    Yes.

20       Q.    Was Shawn Porat working for Recovery of

21  Judgment LLC in 2016?

22       A.    Yes.

23       Q.    Were they working there on December 27th,

24  2016?

25       A.    I have no idea.

1                     J. NIERMAN

2      Q.    Are there any records that would reflect

3   whether or not they were working there on

4   December 27th, 2016?

5      A.    I have no idea.  When I would come to the

6   office -- I would -- I would -- Vera would come in

7   and say these are the things that I would like you

8   take care of today or these are matters that are

9   pressing or these are things that have to be done,

10  and that was my -- and that would basically become my

11  to-do list for things that had to be done for

12  Recovery of Judgment.  At the same time I was

13  operating my whole law practice, so I would sort of

14  throw in that stuff that needed to be done for

15  Recovery of Judgment LLC together with other work

16  that I had to do for my law practice.

17           So with respect to what was happening with

18  Recovery of Judgment LLC on a day-to-day basis, who

19  was there, who got what, what were they doing, I do

20  not know.

21      Q.    You testified earlier that Recovery of

22  Judgment LLC was sold or the assets of Recovery of

23  Judgment LLC were sold to a company called WAK; is

24  that right?

25      A.    Spelled W-a- -- yes, WAK Enterprises, W-a-k.

1                    J. NIERMAN

2        Q.   When was that?

3        A.   I believe the closing was in January or

4   February of 2017.

5        Q.   After --

6        A.   Go ahead.

7        Q.   After the date of this letter Exhibit 1; is

8   that right?

9        A.   I'm assuming this letter was sent on the

10  date that it says or on date of that -- I don't know

11  what date -- I don't know what date of delivery this

12  is.  It's a very weird looking thing so I don't know.

13       Q.   Does Recovery of Judgment LLC have a

14  document retention policy?

15       A.   With respect to what kind of documents?

16       Q.   Any kind.

17       A.   With respect to anything that was sent to

18  them, we had -- we had measures that were implemented

19  in order to ensure that anything that's potentially

20  send to them would be properly safeguarded and

21  protected and secured away from anyone whose eyes

22  should not being seeing such documents.

23       Q.   Can you describe those measures?

24       A.   Vera and Shawn had set up various sections

25  of the room that were in her office.  Again, my

1                    J. NIERMAN

2   office was separate from her office.  She had set up

3   a section for documents when they came in, and I

4   believe he had a system set up for removing documents

5   when they were no longer pertinent.

6        Q.   Were those policies stated in any written

7   manual or training material?

8        A.   When you say a written manual --

9        Q.   Or similar writing?

10        A.   I don't know.  I don't know if that

11   particular policy was written in any manual.  We had

12   manuals that were set up training interns.  We had

13   manuals that were set up as far as what our policies

14   were and how to deal with clients.  Whether that

15   particular element was written in a manual, I have no

16   idea.  I know that we were -- when we operated, we

17   were terrified of the FDCPA.  The FDCPA put the fear

18   of God in you.  And that's why anytime we ever had

19   any questions -- when we set up our policies

20   initially, when we set up our way of operating how

21   are we going to do these things?  What the interns

22   would be able to do, what they would not be able to

23   do?  Who would be dealing with clients?  How would we

24   handle things in a timely manner?  Like, if there's a

25   demand for various legal matters that come up, how

```
 1                      J. NIERMAN
 2  all of this would be handled?
 3            So we set up a policies, we also set up a
 4  training manual with respect to what we teach interns
 5  to make sure that they're not violating anything
 6  under the FDCPA.  Whenever anything unusual would
 7  come up, which was not standard, fair, not something
 8  that would come up a hundred times a day.  But
 9  anything that would come up that was an unusual type
10  of thing, Vera would question me as to what our
11  responsibilities and duties were under the FDCPA.
12  And she came to me fairly regularly with that sort of
13  question.  For example, is this a valid judgment that
14  we're allowed to -- that we're able to execute?  She
15  would show me something.
16            You as an attorney are aware, a lot of times
17  a judgment from jurisdiction A versus jurisdiction B
18  will look completely different.  In order to know
19  whether it's a valid judgment that's been entered by
20  clerk of the court that's executable versus a
21  decision that's unexecutable or something like that.
22  So she would always question me if there was anything
23  that looked remotely unusual.  And if I didn't know
24  the answer offhand, I would get back to her that day
25  with an answer.
```

1                         J. NIERMAN

2         Q.    Were Recovery of Judgment's documents stored

3    electronically?

4         A.    Yes.

5         Q.    Where?

6         A.    Some we had a cloud.  When we turned over

7    the assets of Recovery of Judgment LLC to WAK

8    Enterprises we gave them our log in access.  That was

9    part of what we were doing.

10        Q.    Log in to what?

11        A.    So we had -- Shawn had set up with a

12   collections -- I don't know if you call it an app or

13   a cloud service, which was specifically oriented for

14   the credit collection industry.  Meaning, that they

15   have -- the same way attorneys have various time

16   clips and things like that, which are designed to

17   help -- which are specialized for the need of the

18   attorney industry.  So credit collections have --

19   credit collections service agencies have set up

20   things that are specialized for the needs of credit

21   collectors.  So all the pertinent information with

22   respect to the creditor, the debtor, the date of the

23   judgment, things of that nature.  The locale, the

24   accruing interests and notes with respect to steps

25   that are going on with collection of file, that was

1               J. NIERMAN

2   all saved on a cloud.  We each had log in information

3   to go in and once we would log in to the system, we

4   would then be able to pull up information about any

5   clients or debtor who we were in process of pursuing.

6   I don't remember if it refers to potential clients or

7   not.  I don't believe that was on there, but I'm not

8   positive.

9        Q.   What was the name of the platform?

10       A.   I don't remember the name of the platform.

11  This was set up by Shawn.  Shawn probably, or Vera,

12  I'd be surprised if they don't remember, but I don't

13  remember.  I only had to log into it myself a handful

14  of times because most of the stuff that I was doing

15  had very little relationship to that end of things.

16  It is very useful when you're collecting judgments.

17  It's a lot of document generation.  It's a lot of

18  documents that are pretty much the same thing, other

19  than different fields which are going to be -- which

20  would vary from one client to another client.  So I

21  believe all the fields and things like that, and our

22  forms, which I would oversee and produce, they would

23  be inputted into the system and then used to

24  basically merge in to this case or that case, would

25  be used to generate those documents for service on

Page 60

1                     J. NIERMAN

2   third parties.

3       Q.   Would Recovery of Judgment LLC interns given

4   access to this platform?

5       A.   Were they given -- I don't know.  I don't

6   recall.  I think probably.  They probably were given

7   access.  I would imagine so, but I'm not sure.

8       Q.   After the sale of Recovery of Judgment LLC,

9   were any documents retained by you or anyone else?

10      A.   No, I didn't keep anything.  I don't know

11  about Shawn, but I'm speaking for myself now, I

12  didn't retain anything.

13      Q.   Why not?

14      A.   I think it was necessary.

15      Q.   You're a lawyer, yes?

16      A.   Yes, I'm an attorney.  Why is that changed

17  at custody?

18      Q.   Did you continue to be the lawyer for

19  Recovery of Judgment LLC after the sale of the

20  company?

21      A.   No.

22      Q.   File change of counsel on all the cases in

23  which you were the attorney of record?

24      A.   The funny thing with that, cases where I was

25  attorney of record, I think there was actually one

1                    J. NIERMAN

2    client who I stayed on as attorney for, and that

3    client had a different function and relationship to

4    Recovery of Judgment LLC than all the other clients.

5    It's not like there were things going on in the legal

6    world for an extended periods of time for Recovery of

7    Judgment LLC.  So -- and that client I had my own

8    agreements with them as to how I represented them.

9         Q.   Why did you sell your interests in Recovery

10   of Judgment LLC?

11        A.   For the money.

12        Q.   What did you get for it?

13             MR. NIERMAN:  I'm going to object to

14      that question.

15   BY MR. NAHOUM:

16        Q.   Okay.  Can you answer, please?

17        A.   Well, I think it's irrelevant.  I think the

18   court has actually said that's not relevant.  I think

19   this has matter come up before the court before, and

20   the court has said I'm not obligated to answer that

21   question.  So I'm not going to provide an answer to

22   that.

23        Q.   Who are the officers of WAK Enterprises?

24        A.   The gentleman that we dealt with was -- oh,

25   I dealt with an individual named Steven Fellas,

1                      J. NIERMAN

2  F-e-l-l-a-s.  I believe his father is the owner and

3  he might be the operator.  I don't know the

4  relationship there.  I believe his father has the

5  same last name.  As I recall, his first name is Ken,

6  K-e-n.

7       Q.   Did you know these gentlemen prior to the

8  sale of Recovery of Judgment LLC?

9       A.   No.

10       Q.   Did you advertise the company for sale?

11       A.   I did not.  I don't know what steps Shawn --

12  I don't know what steps Shawn.  Shawn was the one who

13  located these purchasers and was involved in

14  negotiating everything.

15       Q.   At the time of the sale of Recovery of

16  Judgment LLC, were the buyers notified of the

17  plaintiff in this action's potential FDCPA claim?

18       A.   I do not know.  I don't think we thought of

19  it as a potential FDCPA claim.

20       Q.   For the sale of Recovery of Judgment LLC,

21  was a copy of the letter, Exhibit 1, provided to the

22  buyers?

23       A.   I don't know.  I certainly didn't.

24       Q.   I'm going to ask you some questions about

25  the Law Offices of J. Henry Nierman.

Page 63

1                    J. NIERMAN

2        A.    Okay.

3        Q.    And again, I'm going to try and be specific

4   about from whom I'm expecting an answer and I hope

5   that you'll do the same with your answers.

6        A.    Okay.

7        Q.    You mentioned before that it was a trade

8   name, right?

9        A.    That's -- that's a colloquial description.

10  I don't know that I want to attribute the legal term

11  "trade name" to it, but that is a name that I

12  operated under.

13       Q.    So it's not incorporated?

14       A.    No.

15       Q.    Has any certificates of doing business as

16  certificates been filed on behalf of the Law Offices

17  of J. Henry Nierman?

18       A.    No.

19       Q.    Where is the Law Offices of J. Henry Nierman

20  principal place of business?

21       A.    I would tell you that I don't know when you

22  say a principal place of business.  Let me make this

23  clear.  There is no official Law Offices of J. Henry

24  Nierman.  I would put on my cover letter the Law

25  Offices of J. Henry Nierman.  That's the extent of

1                          J. NIERMAN

2    the existence of Law Offices of J. Henry Nierman.

3    When you say a principal place of business, I'd say I

4    work at the Law Offices of J. Henry Nierman.  I don't

5    know.  Legally how that's defined, I don't know.

6    It's really it's myself.  As I said, I use that as a

7    trade name.  So.

8         Q.   The question is at what address does the Law

9    Offices of J. Henry Nierman operate?

10        A.   Today?  When?

11        Q.   In 2016.

12        A.   I don't recall.

13        Q.   Did the Law Offices of J. Henry Nierman

14   every operate at 39 West 29th Street?

15        A.   I don't know.

16        Q.   You don't know if your law firm ever

17   operated from the same address that Recovery of

18   Judgment LLC was operating in 2016?

19        A.   My point is I don't really understand -- I

20   don't know how to draw that distinction.  I was

21   working out of that location so did I officially -- I

22   didn't officially register Law Offices of J. Henry

23   Nierman with any agencies, with the State of New York

24   or with anybody, so I don't even understand the

25   question.

1                    J. NIERMAN

2        Q.   At what address did the Law Offices of J.

3   Henry Nierman operate?

4        A.   I'm going to say again, I don't understand

5   the question.

6        Q.   What does the Law Offices J. Henry Nierman

7   do?

8             MR. NIERMAN:   I'm going to object as to

9        asked and answered.

10  BY MR. NAHOUM:

11       Q.   What did Law Offices of J. Henry Nierman do

12  in 2016?

13            MR. NIERMAN:   I'm going to object as

14       asked and answered.

15  BY MR. NAHOUM:

16       Q.   Does the Law Offices of J. Henry Nierman

17  have any employees?

18       A.   No.

19       Q.   Does Law Offices of J. Henry Nierman ever

20  share any office space with Recovery of Judgment LLC?

21       A.   I don't think I understand the question.

22       Q.   Do you need to hear it again?

23       A.   No.  I don't understand the terminology that

24  you used.

25       Q.   Did your law firm ever share office space

```
1                         J. NIERMAN

2   with Recovery of Judgment LLC?

3          A.    Are you asking did we share a lease?

4          Q.    Share office space.

5          A.    Okay.  So I'm going to try to explain this

6   one more time.  I, Joseph Nierman, would use the name

7   Law Offices of J. Henry Nierman.  There is no formal

8   entity called the Law Offices of J. Henry Nierman.

9   While I was working for Recovery of Judgments, I was

10  working out of an office for my own law practice

11  which is called Joseph Nierman or you can call the

12  Law Offices of J. Henry Nierman.  They're synonymous.

13  They're the same thing.  And at the same time, I was

14  also doing work on behalf of Recovery of Judgment

15  LLC.  With respect to were we sharing an office, I

16  don't know what that means.  That's like asking me

17  was I sharing an office with myself.  The lease was

18  between Recovery of Judgment and -- or whatever

19  lease, which I said is not a lease.  The license

20  agreement was between Recovery of Judgment LLC and

21  the landlord.  There was no it separate fee for that

22  license paid by me individually or by Law Offices of

23  J. Henry Nierman.

24         Q.    What percent of the Law Offices of J. Henry

25  Nierman's practice is devoted to debt collection?
```

1                    J. NIERMAN

2        A.    Today?  Zero.

3        Q.    2016?

4        A.    The minimal amount.  With respect to debt

5   collection?  How do you qualify debt collection?

6   Meaning, if -- let me explain my question and you

7   tell me is this debt collection.  A debtor comes over

8   to me and asks me a question saying is this a valid

9   judgment, and I look it up and I see this is a valid.

10  They're not taking any steps to actually execute the

11  judgment.  I'm just answering a legal question.

12            Is that debt collection?

13       Q.    Well, you tell me.  It's your practice.

14       A.    No, what I'm saying -- no, but you're asking

15  me now to break down percentage.  And so if you're

16  asking me -- if you want to qualify that as debt

17  collection whether there was a great deal of --

18  depending if the number significantly increases, I

19  wouldn't qualify that as debt collection.  So I would

20  say that you look at my actual time spent on debt

21  collection matters, I would say that my time spent

22  was probably less than five percent of my time.

23       Q.    What was the other 95 percent spent on?

24       A.    The other 95 percent was spent on my own

25  legal work, which is not debt collection.

Page 68

```
 1                    J. NIERMAN
 2      Q.   What's your own legal work?
 3      A.   Commercial litigation.
 4      Q.   Plaintiff or defendants?
 5      A.   Both.
 6      Q.   For non payment?
 7      A.   Defense and non payment was the most common
 8  thing.
 9      Q.   Plaintiff?
10      A.   I did very, very little plaintiff's work.
11  In fact, I would have to -- I think -- my most
12  significant client was Mr. Englander whose name I
13  mentioned earlier.  He had me on retainer, which
14  basically was if he had a matter, a legal matter, he
15  would come to me as his -- as his counsel.  Most of
16  the overwhelming majority of his cases were defense.
17  I don't recall doing any plaintiffs work for him
18  since 2012, 2013.  So 2016, I would say that I did --
19  the only debt collection I was doing was the work I
20  did for Recovery of Judgment LLC.
21      Q.   About how many clients did the Law Offices
22  of J. Henry Nierman have in 2016?
23      A.   I don't know.
24      Q.   A hundred?
25      A.   No, much less.
```

1              J. NIERMAN

2      Q.   Less than 50?

3      A.   Probably a couple dozen.  Depending on --

4      Q.   And what percent of those case, or those

5   clients rather, were including non payment?

6      A.   That I was representing as plaintiffs?

7      Q.   Plaintiff or defendants?

8      A.   Most of them.  Sometimes I get called up to

9   handle a lease.  Most of them -- almost -- I would

10  say 90 percent of the work I did was defense.

11     Q.   How often did anyone at Recovery of Judgment

12  ask you questions about debts and judgments?

13     A.   Like a two-minute thing.  Like look at this

14  paper.  Like, tell me what you think.

15     Q.   Any questions about debts and judgments?

16  You're kind of splitting hairs on what debt

17  collection is, right.  You're splitting hairs on what

18  debt collection is.  If you want to break it down --

19     A.   This is --

20     Q.   -- how many times were you asked questions

21  about debts and judgments?

22     A.   In a week or what are you asking me?

23     Q.   How about a day?

24     A.   Less than once a day.

25     Q.   How about a week?

1              J. NIERMAN

2        A.    I would estimate probably like a question

3   would come up once or twice every three weeks.

4        Q.    In 2016, how many documents, debt collection

5   documents, for Recovery of Judgment LLC have your

6   signature on them?

7        A.    A lot.  A lot.

8        Q.    How many is a lot?

9        A.    I couldn't even give a guess.  It's

10  definitely a lot.  It's definitely a lot.

11       Q.    Would you consider that debt collection?

12       A.    I don't know that I'm engaged in debt

13  collection.  I mean, I don't know -- I haven't

14  researched this to say am I -- is that consider me

15  spending time on debt collection.  When this is --

16  this is what I want to clarify for you.  A large part

17  of judgment execution is document creation, document

18  production.  The process basically is -- I mean, if I

19  would set up a form and say, okay, if you're sending

20  out information to party X, you're going to use this

21  form.  That needs to be signed by an attorney.  So I

22  have a stamp, so I stamp the information subpoena.

23  So this document that you show as Exhibit 2, or

24  whatever it is or exhibit -- a subpoena, that

25  signature there is my stamp.  So it is my signature.

1          J. NIERMAN

2   The stamp was created by me, creating the signature

3   for purpose of creating a stamp, but as far as me

4   actually touching the document, very few of them that

5   I actually personally invest any time touching a

6   document.  I would say that far less than a tenth of

7   one percent of all documents that went out of there

8   that I actually touched with my own fingers.

9        Q.   To be clear, it's your testimony that

10  documents were created with your signature stamped to

11  them which you did not review?

12       A.   What I would say is that documents which

13  would have my signature on them, they're not

14  documents that I sat down and went through.  No.

15  They basically use a form that I created.

16       Q.   And in 2016, how many such documents were

17  transmitted?

18       A.   I have no idea.

19       Q.   Was it more than a hundred?

20       A.   I imagine so, yes.

21       Q.   Was it more than five hundred?

22       A.   I don't know.

23       Q.   A thousand?

24       A.   I'm not going to speculate.  I have no idea.

25       Q.   Are there any documents that would reflect

```
 1                     J. NIERMAN
 2   how many times your signature appeared on a debt
 3   collection device in 2016?
 4        A.   I think the records of WAK Enterprise
 5   probably would have that.
 6        Q.   What would that record be?
 7        A.   I'm saying you go through their files and
 8   you see documents that was sent on this particular
 9   person.  So if the information subpoena went out that
10   would have my signature on it.
11        Q.   Is there a central database that was
12   maintained by Recovery of Judgment LLC that would say
13   how many kinds of restraining notices were sent?  How
14   many kinds of information subpoenas were written?
15   Anything like that?
16        A.   That seems doubtful.  There would be no
17   purpose of that.
18        Q.   How is that information tracked?
19        A.   That would be tracked as you go into a
20   client and you see what documents were sent out for
21   client -- unto debtor X or debtor X on collection of
22   debtor X.  You would see a list of documents that
23   went out.
24        Q.   In all those documents that we're talking
25   about, would they list the Law Offices of J. Henry
```

1                          J. NIERMAN

2   Nierman?

3        A.   Probably.  I haven't looked at them.  I

4   haven't looked at the forms in a great -- in a long

5   time, but they would have my signature on them.  They

6   would either have my name -- they would probably say

7   Law Offices of J. Henry Nierman with my signature.

8        Q.   And would they identify the creditor as

9   Recovery of Judgment LLC?

10        A.   That would depend on the case.  There was

11   some cases that were owned by Recovery of Judgment

12   LLC.  There were some cases that we purchased and put

13   in our name.  There were some that name never

14   changed.

15        Q.   What do you mean the name never changed?

16        A.   When you enter -- when you're assigned a

17   judgment under New York law, when party A assigns a

18   judgment to party B, you're asking me -- it doesn't

19   change captions unless you so desire.  So this case

20   will say Morrison versus Levy, even though it's own

21   by Recovery of Judgment LLC.  All the rights and

22   interests are owned by Recovery of Judgment LLC.  It

23   was legally assigned, and under New York law there's

24   an assignment that's recognized that all the

25   interests in that judgment now belongs to Recovery of

```
 1                      J. NIERMAN
 2   Judgment LLC.  When you create a document, however,
 3   under New York law, unless you go to court and change
 4   the caption, the caption retains the original caption
 5   that it had when the judgment was first entered.
 6        Q.   Okay.  But what about your signature block
 7   on these documents.  It would say --
 8        A.   It would look like -- it would look like --
 9   I don't know.  It would probably depend on the
10   document.
11        Q.   Well, what difference would it make?
12        A.   I'm saying is I'm not the attorney for
13   Morrison.  I'm the attorney for Recovery of Judgment.
14   So I'm serving as the attorney for Recovery of
15   Judgment LLC.  I'm not -- so -- I'm the attorney for
16   the party who is executing the judgment even though
17   their name is not reflected in the document itself.
18   Make sense?
19        Q.   Yes.  I want to nail this down.
20        A.   I don't know how -- I'm not --
21        Q.   So let's talk about the world of forms,
22   right.  You're talking about forms where your
23   signature is stamped to it.  To let's talk about the
24   world of forms that would go out.  You tell me if
25   these are the documents that Recovery of Judgment
```

1               J. NIERMAN

2  would transmit.  Restraining notices?

3       A.   Some times, yes.

4       Q.   Property executions?

5       A.   I don't know.  When you say property

6  executions, you mean, like, document that says

7  property execution?

8       Q.   Property execution specific form under

9  Article 52 of the CPLR?

10      A.   I don't recall property executions actually

11 being utilized by Recovery of Judgment.

12      Q.   Okay.  Wage executions?

13      A.   So wage executions that's served by a

14 sheriff or a marshal, and there will be document that

15 we would actually prepare to give to the marshal to

16 serve so, yes.  We definitely had a few of those and

17 that would -- yes, to answer your question.

18      Q.   Information subpoenas?

19      A.   Yes.

20      Q.   Subpoenas duces tecum?

21      A.   Yes.

22      Q.   Okay.  For all of those five categories of

23 documents, would the signature block be the same on

24 each of those?

25      A.   Probably.

1                         J. NIERMAN

2        Q.    And what would the signature block say?

3        A.    Probably what you see in the subpoena duces

4    tecum.

5        Q.    Tell me.  Would it say J. Nierman, attorney

6    for Recovery of Judgment LLC?

7        A.    I haven't looked at this in years, so I

8    don't remember what I put in this form with respect

9    to whether it says specifically attorney for Recovery

10   of Judgment LLC or how it is identified.  I don't

11   remember that.  I don't -- certainly, this is too

12   important of a question for me to speculate about, so

13   I don't want to mislead you and I don't know the

14   answer.

15       Q.    And in the year 2016, how many of those such

16   documents would have been transmitted?

17            MR. NIERMAN:  I'm going to object and

18       ask you to specify.

19   BY MR. NAHOUM:

20       Q.    I've given you five categories of documents.

21   I can go through them again.  Restraining notices,

22   property executions, wages executions, and

23   information subpoenas and subpoena duces tecum?

24       A.    Uh-huh.

25       Q.    Right.  In 2016, how many of those

1                          J. NIERMAN

2    categories would be transmitted by you?

3         A.    There's five categories, probably all five.

4         Q.    How many collectively?

5         A.    How many documents we sent out in total?

6         Q.    Right.

7         A.    I have no idea.

8         Q.    Is it more than 500?

9         A.    I couldn't even speculate that.  I have no

10   idea.

11        Q.    And what percentage of those documents did

12   you review before they were sent?

13        A.    I'm not sure what your question is asking.

14   You're saying --

15        Q.    Well, did you --

16        A.    I want to make sure I'm understanding you

17   correctly because I don't want to misspeak.  You're

18   saying, like, if a document was created using this

19   form of XYZ --

20        Q.    Let me be very specific.  Let me be very

21   specific, okay.

22        A.    Go ahead.  Okay.

23        Q.    You have these forms.  A document was spit

24   out from the printer with your signature on it at

25   some point in time, folded up and put in an envelope

1                     J. NIERMAN

2   with postage on it and mailed out?

3        A.   Right.  And my signature is stamped on it.

4        Q.   Okay.  We agree.

5             How many such documents did you review

6   before they were mailed?

7        A.   When?

8        Q.   In 2016.

9        A.   I would spot check documents from time to

10  time, but I don't know.  I mean, did I actually

11  review, like, the whole document?

12       Q.   Yes.

13       A.   I don't know.  I don't know.

14       Q.   Okay.  And the ones that you did review, for

15  how long did you review them?

16       A.   I won't spent more than 30 seconds looking

17  at a document.

18       Q.   And what would a review of the document

19  entail?  What would you do in reviewing the

20  documents?

21       A.   I'd make sure that the form was proper.  I

22  make sure that the -- that would pretty much be it.

23       Q.   Would you look at the underlying data?

24       A.   No.  No, I didn't do that.

25       Q.   Did the Law Offices of J. Henry Nierman have

1                    J. NIERMAN

2    any interns in 2016?

3         A.   Probably.

4         Q.   How many?

5              MR. NIERMAN:  I'm going to object and

6         say asked and answered.  I didn't know this

7         answer an hour and a half ago.  I'm not

8         going to know it now.

9    BY MR. NAHOUM:

10        Q.   At what location did the interns working for

11   the Law Offices of J. Henry Nierman in 2016 work?

12        A.   They would work in the office with Vera.

13        Q.   They would work in the office of Recovery of

14   Judgment LLC?

15        A.   Correct.

16        Q.   Did they take direction from anyone else

17   other than you?

18        A.   Vera much more than from me.  They would be

19   trained and --

20        Q.   I'm sorry.  This is one of those moments

21   where I want to make sure we're clear about who I'm

22   asking a question of, okay?

23        A.   Okay.

24        Q.   The question was, in 2016, did the Law

25   Offices of J. Henry Nierman have any interns?

1                    J. NIERMAN

2       A.   Oh, no.  Definitely not.  I thought you were

3    asking about Recovery of Judgment LLC.

4       Q.   I got it.  That's one of the moments I

5    warned of earlier.  I wanted to make sure it's good?

6       A.   I appreciate you doing that.

7            Can I take a moment to use the bathroom?

8       Q.   Yeah.  Let's take five minutes.

9       A.   Okay.

10           (Whereupon a break was taken at

11      12:56 p.m.)

12           MR. NAHOUM:  Back on the record.

13   BY MR. NAHOUM:

14      Q.   Just a couple more questions on the Law

15   Offices of J. Henry Nierman and then we'll move onto

16   other material.

17           What, if any, document retention policy does

18   the Law Offices J. Henry Nierman have?

19           Well, strike that.

20           Did it have in 2016?

21      A.   I'm not sure what you mean by policy?

22      Q.   Let's go slower.  In 2016, did the Law

23   Offices of J. Henry Nierman have a document retention

24   policy?

25      A.   It was nothing written.

1                          J. NIERMAN

2       Q.   Okay.  Describe it.  What was your policy?

3       A.   I had files that I would maintain and hold

4  onto for things that I dealt with.

5       Q.   Did you have electronic files?

6       A.   No.  Everything was -- everything I kept

7  would have been hard copies.

8       Q.   Do you litigate in court, sir?

9       A.   Yes.

10      Q.   Do you --

11      A.   If I need a document and it's been e-filed

12  or I can pull it up on e-file, I'll save it on my

13  computer.  I guess when you say save e-files, so on

14  my computer I'll have -- I'll create a file for a

15  client and then all the files that I have or the

16  files of my adversary, I'll save appropriately under

17  that client's folder.

18      Q.   Do you keep an electronic folder within

19  windows for a client in a matter and a document file;

20  is that fair?

21      A.   Yes, yes.

22      Q.   What is your retention policy for such

23  electronically stored documents?

24      A.   I save files that I'm working on.

25      Q.   For how long do you save them?

1                    J. NIERMAN

2        A.   I usually will save them -- it will depend

3    on the clients and the matter.  I don't actively

4    destroy any of them.  So when you say how long do I

5    save them, I'm never thinking, oh, okay.  This is a

6    file I need to destroy.  So anything that I'm working

7    on for my clients, I'll have on a computer.  Does

8    that make sense?

9        Q.   Did you save Recovery of Judgment LLC files

10   on your computer?

11       A.   No.  I mean, if I worked on something, what

12   I would do is, so I had a computer when I was working

13   there that was designated as being my computer and it

14   was in my room.  And files that I actively worked on,

15   let's say, in theory, if I wanted to respond to this

16   letter, so there would be a copy of that letter that

17   I was drafting in response on that would have saved

18   on that computer.

19       Q.   Would any Recovery of Judgment LLC records

20   be stored on a Law Offices of J. Henry Nierman

21   computer?

22       A.   Law Offices of J. Henry Nierman doesn't own

23   any computers.  I own computers.  I personally own

24   computers.

25       Q.   Well -- yeah.  Would any Recovery of

1                          J. NIERMAN

2   Judgment LLC records be stored on any of your

3   computers?

4        A.   Some records are there, yes.

5        Q.   What records?

6        A.   So the most -- if you recall earlier I

7   testified that we changed systems and updated

8   computers, so at that time I go a new computer.  So

9   any records, anything that I generated or created

10  would be -- from that time would be on that computer.

11       Q.   So before you changed the computers was

12  anything from the old system moved over to the new

13  system?

14       A.   I don't recall -- oh, yeah.  Actually, I

15  should correct that.  I believe I -- again, I'm

16  thinking back like six years now.  So my recollection

17  is that I had something from, like, old stuff from

18  Recovery of Judgment LLC that I did transition onto

19  the new computer in case I needed to use something

20  yet again or to tweak or alter a letter appropriately

21  for a new case.  So I think I probably had something

22  where they were all saved under conglomerate folder

23  of old stuff.  I haven't really thought about it, but

24  I probably do have stuff from that old computer that

25  was transitioned to the new one.

```
 1                        J. NIERMAN

 2            The new one, by the way, for the purposes of

 3    being clear, it's not a new computer today by any

 4    stretch.  I mean, that was a refurbished computer

 5    when we got.  So --

 6       Q.   When was that?

 7       A.   This is when we updated our computer system.

 8       Q.   Do you know what year that was?

 9       A.   I guessing 2014, 2015.

10       Q.   Where is that computer right now?

11       A.   It's in my house.

12       Q.   And on that computer in your house right now

13    there are Recovery of Judgment LLC records, yes?

14       A.   Yes.

15       Q.   Are there Recovery of Judgment LLC records

16    on that computer in your home right now relating to

17    this matter?

18       A.   No.  Actually let me strike that.  I don't

19    know of any.

20       Q.   Okay.  So I'm going ask that after the

21    deposition is completed, you go back and look and see

22    if there's any Recovery of Judgment LLC records on

23    the computer stored in your house right now, and if

24    they are related to this matter, you produce them

25    all.
```

1          J. NIERMAN

2              MR. NIERMAN:  That's a reasonable

3      request and I'll take that under advisement.

4      At the same time, I'll be clear, just to be

5      clear, I'm saying taken under advisement

6      because that's just how I was trained as an

7      attorney to respond to a request like that.

8      I recognize it's a valid request, and I

9      anticipate following your requests.

10  BY MR. NAHOUM:

11      Q.    Have you deleted, since 2016, any Recovery

12  of Judgment LLC records from your computer?

13      A.    Not to my recollection, no.

14      Q.    Are you aware whether any Recovery of

15  Judgment LLC records relating to this matter have

16  been deleted?

17      A.    I'm not aware of anything like that, no.

18      Q.    Are any Recovery of Judgment LLC records on

19  which the Law Offices of J. Henry Nierman or you

20  Mr. Nierman as an attorney, are any such records

21  stored in the cloud?

22      A.    Yes.

23      Q.    Do you know what cloud platform it is?

24      A.    That's the same platform that we were

25  talking about earlier that I don't know the name.  I

1                          J. NIERMAN

2     can tell you that WAK Enterprises certainly still has

3     access to it.  In fact, during this course of

4     discovery they've accessed it.

5          Q.   How do you know?

6          A.   They turned over records.  They're the ones

7     who produced the copy of the assignments of the

8     judgment.  So if they had those, I cannot understand

9     why they wouldn't everything else that was related to

10    Mr. Levy.

11         Q.   Do you still have access to that cloud-based

12    storage?

13         A.   No, I do not.

14         Q.   Do you have any liability insurance?

15         A.   No.

16         Q.   Do the Law Offices of J. Henry Nierman have

17    any form of insurance?

18         A.   No.

19         Q.   Has the Law Offices of J. Henry Nierman or

20    your J. Henry Nierman attorney, ever been sued for

21    violation of the Fair Debt Collection Practices Act

22    beyond this particular case?

23         A.   Well, I think I mention the earlier thing

24    which was withdrawn.  It was withdrawn.

25         Q.   Do you have those papers?

1                          J. NIERMAN

2        A.    No.

3        Q.    Has the Law Offices of J. Henry Nierman or

4    you, Mr. Nierman attorney, ever been the subject of

5    court-ordered sanctions?

6        A.    No.

7        Q.    I'm going to ask you some questions about

8    the underlying lawsuit that resulted in the judgment.

9        A.    Okay.

10       Q.    You're familiar with the matter the Matt

11   Morrison against Shaul Levy?

12       A.    Yes.

13       Q.    How are you familiar with that matter?

14       A.    Well, it was one of our ROJ clients and

15   there's this pending lawsuit.

16       Q.    Did ROJ purchase the judgment in that

17   matter?

18       A.    I believe it was assigned to ROJ.  Yes, it

19   was assigned to ROJ.

20       Q.    Okay.  So you said that it was ROJ's client.

21   Is ROJ a law firm?

22       A.    ROJ would execute -- ROJ, no is not a law

23   firm.  They are a collection service -- they are a

24   collection agency that work on behalf of third

25   parties.  This case as I recall was a very old case

1                        J. NIERMAN

2   of ROJ's.  In fact, I think, as I recall this case

3   actually came to us before I was even involved with

4   ROJ.  That's how long it was kicking around in ROJ's

5   system.

6              When Shawn first set up ROJ, part of the

7   structural setup was that he would have a judgment

8   creditor execute an assignee in favor of Recovery of

9   Judgment and contemporaneously therewith, he would

10  have the client execute a contingency agreement which

11  would spell out the amounts of money that Recovery of

12  Judgment LLC would retain in the event of successful

13  execution of a judgment and how much would be turned

14  over to the original judgment creditor.  That's what

15  happened here in this case.

16       Q.   So that was the business model of ROJ in

17  2016?

18       A.   That was really the business model of ROJ

19  initially.  I'm not sure if we kept that same system

20  on, but that certainly is -- that certainly was in

21  place at the time that Mr. Morrison retained ROJ and

22  that was what we did with his particular case.

23       Q.   So the judgment that ROJ would be assigned

24  would not be paid for outright in cash like a client

25  with consumer debt buyer.  This is sort of a

```
 1                    J. NIERMAN
 2   contingency basis?
 3        A.   That were some cases that ROJ purchased, but
 4   this was not one of them.
 5        Q.   Did Recovery of Judgment LLC or anyone from
 6   Recovery of Judgment or you know Mr. Morrison before
 7   the judgment was signed?
 8        A.   I don't know whether Shawn knew him or not.
 9   As I said, I believe this case started before I was
10   with ROJ.
11        Q.   Did you represent Mr. Morrison in the
12   underlying case?
13        A.   No, I did not.
14        Q.   When the judgment was assigned from
15   Mr. Morrison to Recovery of Judgment LLC, was an
16   assignment of judgment filed with the court?
17        A.   Yes.
18        Q.   Was notice of that assignment provided to
19   Mr. Levy?
20        A.   I do not know.  I assume so.
21        Q.   Who signed the notice of assignment that was
22   filed with the court on behalf of Recovery of
23   Judgment LLC?
24        A.   I just said I do not know, so I won't be
25   able to answer that question.
```

1                          J. NIERMAN

2        Q.   You said you didn't know about the notice to

3    Mr. Levy.  My question was the document, right, the

4    assignment of judgment that particular document, the

5    notice of assignment of judgment.

6             You understand the document I'm referring

7    to?

8        A.   Are you talking about the document that

9    effectuated the assignment itself?

10       Q.   The document that notifies the court that

11   the judgment creditor had been replaced with

12   assignee?

13       A.   That would have been Shawn.

14       Q.   He would have signed the notice to the

15   court, court pleading?

16       A.   Yes, it's very possible that he would have.

17   I haven't looked at that document, so I want to --

18   actually, I want to strike that answer and tell you

19   that I do not know that for sure.  Because that's

20   what I -- that's what I assume has happened and I

21   don't think there's any problem with the non attorney

22   signing on behalf of our corporation.

23            He had -- and again, as I said to you

24   earlier, when I met him he had an uncommon

25   understanding of judgment execution and the legal

1                    J. NIERMAN

2    system.  So if he had -- if he had managed to produce

3    o that on his own, I would not be remotely surprised

4    because he knew --

5        Q.   So when the judgment was assigned from

6    Mr. Morrison to Recovery of Judgment LLC, a notice

7    was filed with the court.  Was a similar notice given

8    to Mr. Levy?

9            MR. NIERMAN:  I'm going to object as

10       asked and answered.

11           THE WITNESS:  I don't know.

12   BY MR. NAHOUM:

13       Q.   When the judgment was assigned from

14   Mr. Morrison to Recovery of Judgment LLC, was a

15   change of counsel filed with the court?

16       A.   I don't know.

17       Q.   Did you ever file change of counsel in

18   matters where Recovery of Judgment LLC was assigned a

19   judgment?

20       A.   I believe so.  I'm thinking back now to,

21   like, 2014, which is when that practice was more our

22   norm.  As I think I indicated earlier, and if I

23   didn't I'll indicate it now, there was a certain

24   point in time when we stopped doing the assignment of

25   the judgments.

1                        J. NIERMAN

2          So we certainly didn't do it as widespread

3    as we had when we first began our operations.  It was

4    just too many reasons to not do it that way.  And I

5    do recall that prior to changing over that I had to

6    list myself as attorney of record for the assignee.

7    So I believe that there were some cases that

8    happened.  Again, I do not believe that's what

9    happened in this case because I don't recall this

10   case coming to Recovery of Judgment LLC after I

11   joined on.  Now, is it possible that I came on and

12   did that on behalf of Recovery of Judgment LLC in

13   this case even if it was in their file?  It's

14   possible.  I really don't remember doing that though.

15        Q.   What would have been the reason not to file

16   the assignment of judgment with the court?

17        A.   Anytime a judgment was assigned -- this is

18   what I want to get clear, anytime a judgment was

19   assigned, it was filed with the courts to make it a

20   valid assignment.

21        Q.   Okay.  What about notice?  Did every one of

22   those cases where assignment of judgment -- a notice

23   of assignment of judgment was filed with the court,

24   was there also notice given to the judgment debt?

25        A.   I believe so.  I believe so because as I

1                        J. NIERMAN

2    recall that was a requirement in properly assigning

3    the judgment.  So I believe that was the case, but

4    I'm not -- you asked me if there were cases that

5    happened.  I'm certainly not looking at their files

6    now.  I haven't looked at those files in many years,

7    and I'm not going to tell you yes, it was because I

8    do not know the answer to it.

9         Q.    And who at Recovery of Judgment LLC would be

10   the one to make those decisions?

11        A.    Decisions on what?

12        Q.    On whether or not it was appropriate to file

13   a notice of assignment of judgment to give notice to

14   debtor that a judgment had been assigned.  Whose job

15   was it to make those decisions?

16        A.    I feel like we're talking in two different

17   wave lengths here so I want to try to get on the same

18   page as you.

19        Q.    Yeah.

20        A.    Okay.  We as -- Shawn and I jointly when we

21   first began set up a method of operation as to how we

22   were going to take judgments in, what we were going

23   to do with them, and how we were going to process

24   those cases to try and effectuate execution as

25   efficiently as possible.  Initially, that -- part of

1                         J. NIERMAN

2    that process was continuing practice that he had

3    employed prior to my purchasing into the company.

4    That practice that he had employed was to have all

5    our clients assign their judgments to Recovery of

6    Judgment LLC.

7              Now, as you're aware as an attorney, the

8    process of assigning judgments is a multi-faceted

9    process.  There is the execution of documents.  It's

10   got to be done before a notary.  It's got to be

11   properly notarized.  You have to notify the court who

12   the new attorney is that's working on behalf of the

13   case, and all of these various matters.  What

14   happened with respect to specifically Shaul Levy,

15   I'll tell you that the documents therein that have

16   been reported speak for themselves.  You're asking

17   with respect to notice thereafter being served upon a

18   judgment debtor, and I'm telling you that if a notice

19   was ever required to be served, that was part of our

20   process was to serve a debtor.  Make sure to follow

21   to every step to the letter as to what we had to do.

22        Q.   And you testified a number of times today

23   that your partner was very well versed in debt

24   collections, right?

25        A.   Yes, that's correct.

1                              J. NIERMAN

2          Q.    Okay.  So whose decision was it to -- who

3    made the decisions on when to give notice?  Was it

4    you the lawyer or was it your partner?

5          A.    Notice to the court?

6          Q.    Notice to the court and notice to the

7    judgment debtor?

8          A.    That was a joint decision that we made to

9    give notice to the court and notice to -- by the time

10   I came on, that was a joint decision to give notice

11   to the court and notice to the debtor.

12         Q.    In this case, Mr. Morrison's judgment, who

13   made the decision whether to give notice or not give

14   notice?

15         A.    I cannot -- what I'm saying to you is I

16   don't remember this case.  I'm telling you what our

17   policy was.  I don't -- this was not anything

18   memorable.  Now that we're sitting here today having

19   litigation, now it's obvious this case sticks out

20   like a sore thumb.  But with respect to what our

21   overall policy is, I'm being crystal clear with you

22   about what it was.  Now you want me to narrow it down

23   and say what decisions did you Joe Nierman make or

24   what did Shawn make, and I'm telling you this is not

25   a case that he and I discussed separate and apart

1              J. NIERMAN

2    from any other case that we were handling.  So I

3    can't give you a definitive answer to that other than

4    this is what we did.

5         Q.   You're the 30(b)(6) notice here for Recovery

6    of Judgments, right?  You're the person produced

7    who's most knowledgeable about the events of this

8    litigation, right?

9         A.   Uh-huh.

10        Q.   And it's your testimony that you have no

11   recollection whatsoever what happened with this

12   particular case in terms of the assignment of

13   judgment?

14        A.   That's not at all what I'm saying.  What I'm

15   saying to you is I'm the one who's most knowledgeable

16   with respect to what our policies -- what legal

17   policies we had set in place and with respect to what

18   legal, you know, what legal matters and procedures

19   were employed, which I'm giving you that information.

20   That information is -- there's nothing specifically

21   unique about Shaul Levy other than the fact that

22   we're litigating actions that happened with respect

23   to him.  That's nothing that Shawn is going to be

24   able to say, oh, hey, on this particular case we did

25   this.  You think he's going to know something

```
 1                    J. NIERMAN
 2   specific about it?  God bless.  I can't even imagine
 3   that he would.
 4        Q.   And you think that because your volume of
 5   cases was so vast?
 6        A.   We did have a pretty significant volume of
 7   cases, yes.  We had a lot of cases.
 8        Q.   Now these policies that you're talking
 9   about, were these memorialized in writing?
10        A.   Yes.
11        Q.   Where is that writing?
12        A.   As I indicated in our discovery responses, I
13   don't have anything.
14        Q.   Were those policies once stored on your
15   computer, the one in your home?
16        A.   No.
17        Q.   Where were they stored?
18        A.   They were produced in, like, a hard copy.
19        Q.   How many were produced?
20        A.   Ever?  I don't know.
21        Q.   Who were they distributed to?
22        A.   They're distributed to anyone who ever
23   worked for Recovery of Judgment LLC or our interns.
24        Q.   Who wrote those policies?
25        A.   I did together with Shawn.
```

```
1                         J. NIERMAN
2        Q.   When was that?
3        A.   I would say early on when we first drafted
4   stuff.
5        Q.   Was that -- sorry.
6        A.   When first set up our structure.  So I
7   wanted to be sure that we had -- that everything was
8   crystal clear as to how we were going to operate.
9        Q.   What year was that?
10       A.   I don't remember what year I bought into
11  this company.  I'm guessing it was 2012 because I
12  always think of the duration of our -- my tenure
13  there as being five years long.  So I'm
14  speculating -- if you try and tell me, you know, push
15  it down, was it before this or after this, I would
16  tell you I would come in around 2012.
17       Q.   So you bought into the company in 2012, and
18  as part of establishing this new business for
19  yourself you wrote policies on what to do on
20  acquiring judgments for collections; is that fair?
21       A.   Yes.
22       Q.   Okay.  And you wrote those policies on a
23  place that would be stored on a computer; is that
24  fair?
25       A.   Yes.
```

Page 99

1                    J. NIERMAN

2        Q.    And then you would print them and distribute

3    them to people work for Recovery of Judgment LLC; is

4    that fair?

5        A.    Okay.

6        Q.    And did you ever amend or update those

7    written policies?

8        A.    I don't recall doing that.

9        Q.    But you testified a few moments ago that you

10   had changed the way you took assignment of judgments,

11   right?

12       A.    What we changed was the decision to not take

13   assignments being that we stopped having them be

14   formally assigned so that --

15       Q.    What was the structure after that?

16       A.    If the client would come in they -- the

17   judgment was not always -- as I recall, the judgment

18   was not always assigned to Recovery of Judgments.

19       Q.    When was that decision made?

20       A.    I don't recall.

21       Q.    Was it before or after --

22       A.    I'm trying --

23       Q.    Sorry.  Go ahead.

24       A.    I'm trying to think whether it was before or

25   after 2015 when we got those new computers.  I don't

1                        J. NIERMAN

2    remember.

3         Q.    This case, the judgment was acquired by

4    Recovery of Judgment LLC before the change in policy;

5    is that right?

6         A.    Yes, before.

7         Q.    For documents that would be produced by

8    Recovery of Judgment LLC, court documents, remember

9    those five categories of enforcement devices we

10   talked about earlier, right?

11        A.    Okay.

12        Q.    The documents like that, what would your

13   signature block look like?

14        A.    I thought we went through this already,

15   didn't we?

16              I don't have copies of those forms up.

17   You're asking me would they look the same.  I'll tell

18   you this.  Every subpoena would like this one.

19        Q.    So what you're saying then is, even if

20   Recovery of Judgment LLC did not take assignment of

21   the judgment, the signature block would say

22   J. Nierman, attorney for Recovery of Judgment LLC; is

23   that right?

24        A.    Is that what it has on the block there?  I

25   wasn't even looking at the block.

1                        J. NIERMAN

2        Q.    I'm asking you.   I'm asking you about the

3   signature?

4        A.    Okay.   So what I'm saying to you is I

5   haven't looked at these forms in many years.   So

6   you're asking me what was written in the block on

7   these forms that I created not in 2016.   I created

8   many years before 2016, and what was written in those

9   blocks, and I'm telling now, you're asking me in

10  2020, I'm telling you I don't know.

11       Q.    Here's what I'm trying to understand,

12  Mr. Nierman.

13       A.    Okay.

14       Q.    Recovery of Judgment LLC is not a law firm,

15  correct?

16       A.    Correct.

17       Q.    And they're being hired to collect on

18  judgments, right?   Judgments that have not been

19  assigned to them; is that right?

20       A.    This debt was assigned to them though.

21       Q.    I know.   But you said there was a change in

22  policy.

23       A.    I'm believe --

24       Q.    So I'm trying to understand what happened

25  after that change in policy.

```
 1                    J. NIERMAN

 2        A.   I don't -- I can't imagine how this is

 3   relevant to Mr. Levy at all, but for the sake of

 4   argument, let's assume that they were not assigned.

 5   Now, if I'm acting as attorney for Recovery of

 6   Judgment, Recovery of Judgment is retained by Mr. X

 7   judgment creditor to assist in executing that

 8   judgment.  I am now serving as an attorney for

 9   Recovery of Judgment.  That's an accurate statement.

10   That's not an inaccurate statement.  I'm not sure --

11        Q.   And it's an accurate statement that Recovery

12   of Judgment LLC is not a law firm?

13        A.   That's correct.

14        Q.   So this is what I'm confused about, sir.

15   Who was hired?  Was it Recovery of Judgment?  Was it

16   the Law Offices of J. Henry Nierman, or was it

17   J. Henry Nierman, attorney at law?

18        A.   It was definitely not me or the Law Offices

19   of J. Henry Nierman that's been hired.  So, again,

20   I'm telling you what my recollection is to the best

21   of my recollection, and I think it's pretty evident

22   that anyone that watches this whole thing, I'm being

23   as -- I'm doing my best to give you my best

24   recollection as to how we operated and what we were

25   doing.  I'm not withholding any information.  I'm
```

1               J. NIERMAN

2   being as direct with you as possible.  My

3   recollection is that there was a point in time where

4   we changed our function as to how we did it.  We

5   stopped having everything assigned.  That is my

6   recollection.  I don't know that that's the case.  I

7   believe that's the case.  I don't think there's

8   anything problematic from a legal perspective for

9   Recovery of Judgment serving as a debt collection

10  agency working on behalf of a third party without

11  taking assignments without being an attorney.  They

12  don't have to be an attorney to do that.  They can

13  assist on one the same way you can pay someone to set

14  up a zoom meeting for and you don't have to be --

15  they don't have to be an attorney to do that.  The

16  steps that they're taking there, I don't think that

17  there's anything wrong with what they were doing.  Do

18  you believe that I'm mistaken --

19       Q.   Somebody was sending subpoenas, were they

20  not, sir?

21       A.   Oh, I don't know about that.  That's your

22  speculation.  I don't know about that.

23       Q.   You tell me.  Was Recovery of Judgment LLC

24  sending subpoenas in cases in which it was listed as

25  the judgment assignee where it didn't take assignment

1                          J. NIERMAN

2    of the judgment?

3         A.   Oh, whoa, whoa.  You just put words in my

4    mouth I never said.

5         Q.   Okay.  Clear it up for me.

6         A.   Not once did I ever say that Recovery of

7    Judgment held itself out as a judgment assignee in a

8    case where they were not a legal judgment assignee.

9    No such thing ever happened or would it ever had

10   happened.

11        Q.   That's fine.  That's why I asked you about

12   the signature block.  What does it say?

13        A.   I don't -- and I think I answered.  The

14   signature block on our subpoenas look like the

15   signature block you have here in Exhibit 2.

16        Q.   So okay.  So your testimony is then in cases

17   in which Recovery of Judgment LLC did not take

18   assignment of a judgment, but was hired to collect on

19   a judgment, the signature block would say J. Henry

20   Nierman, attorney for Recovery of Judgment LLC?

21        A.   No.  That's not what I'm saying because I

22   would --

23        Q.   What would it say?

24        A.   I don't know that any subpoena duces tecum

25   was ever sent out for a client who we did not take

1                    J. NIERMAN

2    assignments.

3         Q.    How about a restraining notice?

4         A.    No.

5         Q.    Wage execution?

6         A.    I don't know.  What I'm saying is I don't

7    know that any of those executions, any of those

8    efforts which would effectuate seizure of money,

9    restraining money.  I don't know that that ever

10   happened once on a case that had not actually been

11   legally assigned to Recovery of Judgment.

12        Q.    But there would be documents that would

13   answer these questions one way or the other, yes?

14        A.    Probably.

15        Q.    Where would those documents be located?

16        A.    All of these documents would be in

17   possession of WAK Enterprises.  I don't know why -- I

18   mean, there are questions -- that's an answer I've

19   told Mr. Rothfarb for the last two years.

20             So you're asking me what happened in cases

21   where there was no assignment.  I don't -- like I

22   said, I don't think we continued that system

23   throughout the duration of Recovery of Judgment.  I

24   am positive that not once did I ever hold out

25   Recovery of Judgment as being a -- as being an

```
 1                    J. NIERMAN

 2   assignee of a judgment that was not assigned to it.

 3   That would be fraud.  I never once would ever

 4   consider doing something like or risking my law

 5   license over something so stupid.

 6        Q.   When Recovery of Judgment LLC was assigned

 7   the Morrison judgment, what documents were

 8   transferred to Mr. Morrison to Recovery of Judgment

 9   LLC?

10        A.   I'm sorry?  What's your question?  I don't

11   understand.

12        Q.   Yeah.  I'll try to ask it better.

13             When the judgment from Mr. Morrison against

14   Mr. Levy was assigned to Recovery of Judgment LLC,

15   what, if any, documents were transferred from

16   Mr. Morrison or Mr. Morrison's attorney or anybody

17   else to Recovery of Judgment LLC?

18             MR. Nierman:  I'm going to object.

19        That calls for speculation.

20   BY MR. NAHOUM:

21        Q.   Were there any documents transferred?

22             MR. Nierman:  And I'm going to object

23        on the basis it calls for speculation.  I

24        answered earlier this happened before I was

25        involved with Recovery of Judgment.  I will
```

1                              J. NIERMAN

2          tell you that --

3     BY MR. NAHOUM:

4          Q.    Do you know the answer?

5          A.    The answer I know is this:  On our system we

6     have a copy of the underlying judgments.  It was a

7     consent to judgments that was executed, that Mr. Levy

8     and/or his counsel consented to this judgment.  A

9     judgment that he subsequently claimed was fraudulent

10    and did not exist.  How that happened, I don't know.

11         Q.    Was there any other judgments -- were there

12    any other documents that were provided to Recovery of

13    Judgment LLC?  It's a simple question.  It's not a

14    trick question.

15         A.    No, I understand that.  I'm telling you I

16    don't know.  I don't have access to these files.  You

17    think I'm making that information up.

18         Q.    And if those files exist, they'd be with WAK

19    Enterprises, correct?

20         A.    That's correct.

21         Q.    Recovery of Judgment LLC was provided a copy

22    of the judgment; is that right?

23         A.    Yes.

24         Q.    Did you --

25         A.    I reviewed it subsequent to the commencement

1                        J. NIERMAN

2    of this litigation.  Did I look at it beforehand, I

3    don't recall.  I know 0when I looked at it I was

4    astonished that anyone would come in with a claim in

5    this letter that Mr. Schlanger wrote dated 7/27, that

6    this judgment was fraudulent considering his own

7    client had consented to entry of this judgment.

8    Perhaps you can explain that to us.

9        Q.    I'm going to refer your attention back to

10   Exhibit 2.  This was the subpoena, okay.

11       A.    Uh-huh.

12       Q.    You used this earlier to refresh your

13   recollection, but now I'm going to ask you some

14   questions about this document in particular.  I'm

15   going to ask you to take look at it.

16       A.    Which part would you like me to look at?

17       Q.    Well, look at the whole document and tell me

18   what it is?

19       A.    It looks like a subpoena.

20       Q.    How do you know that?

21       A.    It says on it subpoena duces tecum.

22       Q.    Who drafted this document?

23       A.    This document would be something I drafted.

24       Q.    It stays in a form?

25       A.    Yes.

```
 1                      J. NIERMAN

 2       Q.    And turning your attention to very last page

 3  there, is that your signature?

 4       A.    It looks like my signature stamp on it, yes.

 5       Q.    Mr. Nierman, we've talked about it a few

 6  times already, this is a stamp signature.  That's not

 7  actually your signature pen to paper, right?

 8       A.    That's correct.

 9       Q.    Did you read this document before you signed

10  it?

11       A.    I don't remember.

12       Q.    Was it your usual customary practice to read

13  subpoenas before you signed them?

14       A.    Sometimes they were signed on my behalf.

15       Q.    Who would be responsible for making the

16  decision whether or not you read a subpoena before

17  you signed it?

18       A.    I would make that decision.  Subpoenas were

19  going out and I would -- so sometimes I would be,

20  like, you know, I would ask to look at a subpoena.

21       Q.    What factors would you consider in

22  determining whether or not to read the subpoena or

23  not?

24       A.    Really that was -- it would not be because

25  this is a Levy case and I want to make a owner view
```

1                    J. NIERMAN

2    this document.  It would be a matter of just

3    reviewing and making sure and maintaining that our

4    office is complying with the FDCPA in the way it's

5    producing documents.  So I would periodically come in

6    and look over work that was being generated to ensure

7    that there was not some sort of gross mishap that was

8    occurring.  So is it possible that I saw this?  Yes.

9    Is it definite I saw it?  Far from it.

10        Q.   Okay.  I asked you if you reviewed this

11   document before you signed it.  I'm going to ask you

12   a slightly different question.

13        A.   Well, you asked -- okay.  Go ahead.

14        Q.   Did you review this document before it was

15   mailed?

16        A.   I'm going to give you the same answer.  I

17   don't know.

18        Q.   Who, if anyone, at Recovery of Judgment LLC

19   approved this document?

20        A.   Vera.

21        Q.   And do you know if she read it before you

22   signed it?

23        A.   Okay.  When you say you signed it, again,

24   I'm going to be clear, it's a stamped signature.

25        Q.   What is that stamp supposed to indicate?

```
 1                         J. NIERMAN

 2        A.   The stamp is -- means I gave my authority

 3   for this document to be produced.

 4        Q.   Okay.  We're in agreement on what signed

 5   document means.  Who, if anyone, at Recovery of

 6   Judgment LLC approved this document before your

 7   signature was stamped on it?

 8        A.   So I would answer the question thusly.  I

 9   approved this form.  This form is something I

10   generated and something that I would periodically

11   review to ensure they were complying with the work

12   product that I had and not that someone came in there

13   and all of a sudden inserted 50 different questions

14   or changed the language, et cetera.  So that being

15   the case, what I would tell you is that my hand is

16   involved in the form which led to the creation of

17   this document and the procedures which set up for

18   this document to be served.

19        Q.   Okay.  And so because it's a form, there is

20   a certain documents -- excuse me -- certain

21   information and data that would get inputed into a

22   system, and that information would merge with the

23   form and out would come the finished document; is

24   that right?

25        A.   Yeah.  All this would come through that
```

1              J. NIERMAN

2   platform that we were discussing earlier that you

3   were basically -- my recollection, again, this goes

4   back four years -- my recollection is you basically

5   would pull up a client or you would pull up a client

6   and you would say generate information subpoena or

7   document subpoena or whatever, subpoena duces tecum

8   and then it would just be generated out.  They would

9   take that document, take my stamp, stamp my name onto

10  it, and then mail it out.  Periodically, I would

11  review to make sure that no one had tinkered with the

12  form to ensure that it was actually something that

13  was complying with the FDCPA.

14       Q.   Who did the data entry?

15       A.   I don't know.

16       Q.   Was it you?

17       A.   Definitely not.

18       Q.   Did you review the data that was entered?

19       A.   On this particular case, I don't recall

20  reviewing it.

21       Q.   If you were reviewing this, would you take a

22  copy of a subpoena and take a copy of the judgment

23  and look at the two together and make sure the

24  information lined up?

25       A.   Sometimes.  I don't recall -- I do not

1                              J. NIERMAN

2    recall doing that in this case.

3        Q.    What would make you do it in the case where

4    as other cases you wouldn't?

5        A.    As I said, it would be like a random sort of

6    sampling kind of thing.

7        Q.    Turning your attention back to the first

8    page of this subpoena Exhibit 2, to whom is this

9    subpoena addressed?

10       A.    Shaul Levy, 5757 Collins Avenue, apartment

11   1706, Miami Beach, Florida 33140.

12       Q.    And do you have any reason to believe the

13   document wasn't mailed to the address listed on that

14   "to" line?

15       A.    I do not.

16       Q.    When was this document mailed?

17       A.    I don't know.

18       Q.    It was signed December 10th, 2016; is that

19   right?

20       A.    Okay.

21       Q.    Is there any reason to think it wouldn't be

22   mailed somewhere around that time?

23       A.    It would seem likely.

24       Q.    Who was responsible for doing the mailing?

25       A.    Vera.

1                        J. NIERMAN

2         Q.    You're a New York attorney, can you describe

3    what the process is for serving a subpoena out of

4    state?

5         A.    Serving a subpoena out of state?  It would

6    have to comply with -- it would have to comply with

7    New York law.

8         Q.    Do you know what New York law is for serving

9    an out-of-state subpoena?

10        A.    I never served out-of-state subpoenas, so I

11   am -- I would have to refresh my own recollection as

12   to what requirements would have to be undergone.  I

13   don't want to answer offhand.

14        Q.    Okay.

15        A.    Again, back then I was doing judgment

16   execution on behalf of Recovery of Judgment and these

17   sort of issues would come up, these sort of questions

18   would come up and pass my attention far more

19   frequently than they would today, so...

20        Q.    Did the service of Exhibit 2, this subpoena,

21   comply with New York State procedure for service of

22   an out-of-state subpoena?

23             MR. NIERMAN:  I'm going to object on

24        the basis that calls for a legal conclusion.

25   BY MR. NAHOUM:

```
1                     J. NIERMAN

 2        Q.    Sir, you're a lawyer at a deposition.

 3   You're named as a defendant and so is your law firm.

 4        A.    And.

 5        Q.    So you're more than qualified to answer the

 6   question.  Based on your knowledge, did service of

 7   this subpoena to an out-of-state defendant comply

 8   with New York procedure?

 9        A.    Well, you're assuming that it's a -- that's

10   an attempt to serve a subpoena.

11        Q.    Okay.  Please take a look at Exhibit 3.

12        A.    Okay.

13        Q.    All right.  For purposes of identification,

14   this is appears to be a letter, Law Offices of --

15   letter head -- Law Offices of J. Henry Nierman, dated

16   December 10th, 2016.

17              Do you see that?

18        A.    I do.

19        Q.    Okay.  Could you just hold it up so I can

20   make sure we're looking at the same letter.

21              Yeah.  Okay.

22              Please read under Dear Mr./Mrs. Levy.  Can

23   you just read what that paragraph says?

24        A.    Dear Mr./Mrs. Levy, enclosed herein, please

25   find a subpoena duces tecum directing you to appear
```

1                      J. NIERMAN

2   for a post-judgment deposition on December 16th, 2016

3   [sic] at 10:00 a.m., and turn over your financial

4   information.  These financial documents include tax

5   returns, bank statements, and other documents as

6   detailed therein.

7        Q.   Stop right there.  I'm trying to refresh

8   your recollection here because a moment ago you

9   testified that Exhibit 2 was not service of a

10  subpoena; is that right?

11       A.   I don't know that it is service of subpoena.

12  I don't think it's a valid service of subpoena.  I

13  don't think it's something that is enforceable.

14  Certainly not -- I would not -- if you ask me my

15  legal opinion of it, I will tell you my legal opinion

16  is that it's not a legally enforceable subpoena.

17       Q.   Okay.  Let's be clear then.  My question was

18  did service -- I'll use a different word so we don't

19  use a charged word here.  Did the mailing of

20  Exhibit 1 -- excuse me, Exhibit 2, comply with New

21  York procedure for service of a subpoena out of

22  state.

23       A.   I will tell you that it did not effectuate

24  a -- what's the word I'm looking for.  It did not

25  effectuate an enforceable subpoena.

1                        J. NIERMAN

2        Q.    So what was the purpose then?

3        A.    The purpose was just to get an answer -- to

4    get information that Recovery of Judgment was

5    entitled to have.

6        Q.    If you weren't intending to effectuate

7    service, were you just trying to trick him?

8        A.    I wouldn't say trying to trick him.  I would

9    tell you that we're entitled to that information and

10   that's information Recovery of Judgment -- every

11   question in that subpoena we're getting closer to the

12   questions, and the questions are pretty

13   self-explanatory.  I don't know if you need me to

14   read them to you.  The question is seeking out

15   information which would assist Recovery of Judgment

16   in executing a judgment that had been assigned to

17   Recovery of Judgment.

18       Q.    Okay.  Let's go back to Exhibit 3 then for a

19   second because I want to make sure we get this clear.

20   Let's get a little foundation for this letter so that

21   we know exactly what we're talking about.

22             You recognize this letter, Exhibit 3?

23       A.    I recognize it as something that was

24   produced by the plaintiff in this response to

25   discovery.

1                    J. NIERMAN

2        Q.   Let's not use plaintiff or defendant because

3   we have two cases here.  So produced by whom?

4        A.   Produced by Mr. Levy pursuant to discovery.

5        Q.   Have you seen this letter before?

6        A.   I don't remember seeing it before.  If

7   you're asking before this litigation, I don't

8   remember seeing it before this litigation.

9        Q.   Does this appear to be your letterhead?

10       A.   Yes.

11       Q.   Do you have any reason to doubt that it's

12   your letterhead?

13       A.   Oh, I would say that this certainly came --

14   this almost certainly.  I would be surprised that

15   this did not Recovery of Judgment.

16       Q.   Well, it says Law Offices of J. Henry

17   Nierman so who did it come from?  Recovery of

18   Judgment or did it come from you?

19       A.   That's more of a legal question.

20   Technically, it's -- I guess you would say my law

21   office operating on behalf of Recovery of Judgment.

22       Q.   So you're a lawyer representing a client; is

23   that right?

24       A.   That's a fair assessment.

25       Q.   Okay.  You're the client's agent; is that

1                         J. NIERMAN

2    right?

3         A.    The client being Recovery of Judgment?

4         Q.    Right.

5         A.    Yes.

6         Q.    Okay.  And it's law -- it says right here,

7    Law Offices of J. Henry Nierman, and then bottom

8    there it's got J. Nierman, Joseph Nierman, legal

9    counsel, right?

10        A.    Right.

11        Q.    And that's a stamp of your signature, right?

12        A.    Right.

13        Q.    Okay.  So is the fact that this is a cover

14   letter that accompanied the mailing of Exhibit 2, the

15   subpoena to Mr. Levy?

16        A.    That seems very likely.

17        Q.    Can you read the second paragraph of

18   Exhibit 3?

19        A.    Yes.  Please take notice, that failure to

20   comply with a properly issued subpoena entitles the

21   creditor to move the court to impose sanctions on the

22   debtor and request additional fines and/or

23   imprisonment.

24        Q.    Was this letter mailed knowing that it was

25   not a properly issued subpoena?

Page 120

1                          J. NIERMAN

2          A.    I don't know.  The letter -- I'm going to

3     ask you to rephrase question because I don't think

4     that was a conscionable question.

5          Q.    This is a cover letter that comes with a

6     subpoena.  You testified a minute ago that this

7     subpoena was not properly effectuated.  I asked you

8     what the intent was of the letter.  What the intent

9     was of the subpoena.  You said to get information; is

10    that right?  Is that fair?

11         A.    Yes.

12         Q.    Okay.  The information you claim Recovery of

13    Judgment was entitled to; is that fair?

14         A.    Yes.

15         Q.    So I'm asking what the intent was of that

16    second paragraph then?

17         A.    I think the intent is to clarify the legal

18    position here which is if this is a properly issued

19    subpoena, in that case then that would entitle the

20    creditors to move the court to impose sanctions

21    and/or request additional funds and/or imprisonment.

22         Q.    And was this letter and the subpoena sent

23    knowing that the subpoena was not a properly issued

24    subpoena?

25         A.    Whose knowledge?

1                            J. NIERMAN

2        Q.   Yours.

3        A.   I didn't send this letter.

4        Q.   Who sent it?

5        A.   I would assume that it was Vera.

6        Q.   That's your signature on it sir, isn't it?

7        A.   Yes.

8        Q.   And that's your signature on the subpoena

9   that accompanied it, right?

10       A.   That's correct.

11       Q.   You didn't review any of this before it

12   sent; is that right?

13       A.   I'm asking you this:  Is there something --

14   is there information here that's inaccurate?

15       Q.   Well, you tell me.  It's your letter.  It's

16   your subpoena.

17       A.   I'll tell you, the way you worded the

18   question was what's the intent of the letter, and the

19   letter itself does not have intent.  It's the sender

20   who can have intent behind the letter.  So the way

21   you worded the question is something that was

22   somewhat --

23       Q.   Mr. Nierman, you're not going to dance

24   around answering this, okay.

25       A.   No, but here's the question --

```
 1                         J. NIERMAN
 2        Q.   No, no, no.  It's a very simple question.
 3             THE COURT REPORTER:  One at a time.
 4             MR. NAHOUM:  Sorry.
 5   BY MR. NAHOUM
 6        Q.   You sent a subpoena to a gentleman out of
 7   state threatening fine and imprisonment if it was
 8   complied with; is that right?
 9        A.   No, that's not true.
10        Q.   Okay?
11        A.   I just read to you what it said.  What it
12   says is, failure comply with a properly issued
13   subpoena entitles the creditor to move the court to
14   impose sanctions on the debtor and request additional
15   funds and/or imprisonment.
16        Q.   Was your intent to leave the reader of this
17   letter believing that they had a legal obligation to
18   answer the subpoena?
19        A.   And what I said to you is I didn't send this
20   letter.  My signature is on it.  Did I give authority
21   to Vera to put my signature on it?  Yes.  I gave her
22   authority to stamp forms that I created.  So what I'm
23   saying to is you're asking me what was my intent when
24   this letter was sent.  I'm telling you I don't even
25   remember this letter being sent.  I don't know that I
```

```
1                        J. NIERMAN
2    ever saw it.  I doubt I did it.  It seems very
3    unlikely.  So you're asking me what was your intent,
4    and I'm telling you how can I have intent about
5    something, an event, that I do not know about?  So
6    that's not me dancing.  That's me being realistic.
7    You're asking me a question about what my intent was
8    and I'm telling you I couldn't have any intent
9    because I didn't send the letter.  So then you asked
10   me who did send the letter.  I said Vera.  You said
11   was your signature there.  I said okay, yes.  It is
12   my signature there because I did authorize her to
13   send out letters with my signature on it and that's
14   what happened here presumably because everything
15   leads to the conclusion that this was drafted by ROJ
16   using letter that I also authorized her to use.
17   She's not committing fraud in that perspective.  She
18   was not doing -- she was not stealing the use of my
19   name.  I gave authority for her using my name.  What
20   I'm saying to you is when you ask me what my intent
21   was, I'm telling you is I did not have intent because
22   I was not involved in the creation of this document.
23        Q.   Okay.  Thank you.  Let's go through it --
24   we'll go through it three times so we make sure each
25   witness gets their answer, okay.  You already
```

1                          J. NIERMAN

2    answered what the intent was of Mr. Nierman the

3    attorney.

4              What was the intent of the Law Offices of

5    J. Henry Nierman whose name appears on the top of

6    this letterhead when it sent this letter and the

7    subpoena?

8         A.   And I'm saying to you that the Law Offices

9    of J. Henry Nierman is Joseph Nierman.  The same

10   answer as the first answer.

11        Q.   So let me ask again this:  You're here as a

12   30(b)(6) witness for Recovery of Judgment.  What was

13   the intent of Recovery of Judgment LLC when it mailed

14   Exhibit 3 and Exhibit 2 to Mr. Levy?

15        A.   That is an excellent question, and what I'm

16   telling is the intent here was clearly to get him to

17   answer these questions.

18        Q.   Was the intent to get those questions

19   without having any legal compulsion?

20        A.   I would say the intent was to get those

21   questions without having the legal ability to enforce

22   compulsion -- to enforce his -- his compliance with

23   the letter.  It's a letter.  At the end of the day

24   it's a letter.  When Mr. Schlanger would contact with

25   Mr. Levy, I'm sure the first thing he said to him was

```
 1                    J. NIERMAN
 2   this is not validly served.  So he knew immediately
 3   before any lawsuit, before he put pen to paper,
 4   before this letter -- wrote a letter on December
 5   27th, they were well aware that was not threatening
 6   any type of fine or imprisonment or anything of the
 7   kind because they were well aware that even under the
 8   terms and terminology that was written on the cover
 9   letter it was evident that was saying that this
10   cannot be enforceable.  You're not under the threat
11   of anything.  Nothing can happen to you.  If
12   Mr. Schlanger spoke to me, which presumably he did
13   based on your question before, I would have told him
14   that no, there was no intent for us to compel
15   compliance.  So I think that answers all of your
16   questions.
17        Q.   Mr. Nierman, are you an honest man?
18        A.   I didn't thoroughly --
19        Q.   It's a yes or no question.  Are you an
20   honest man?
21        A.   Yes.
22        Q.   On a scale of one to ten how would you rate
23   your level of honesty?
24        A.   I always try to be honest in everything I
25   say and everything I do.
```

1                      J. NIERMAN

2        Q.   Mr. Nierman, are you an ethical man?

3        A.   Very much so.

4        Q.   On a scale of one to ten how would you rate

5   your level of ethics?

6        A.   I would rate my ethics as being a ten.

7        Q.   Both Exhibits 3 and 2 have what appear to be

8   watermarks on every page that say "final notice"; is

9   that right?  Is that fair?

10       A.   It seems to be, yes.

11       Q.   You approved these forms, yes?

12       A.   Yes.

13       Q.   Why do they say "final notice"?

14       A.   That was probably a strategic thing that

15   Shawn and I -- I don't remember how we came up with

16   putting final notice on a subpoena or anything like

17   that.  I don't remember any conversation about that.

18   So I don't know -- I don't know why it would say

19   final notice.

20       Q.   In 2016, was it your customary and regular

21   practice to put the watermark final notice on letters

22   enclosing subpoenas and on subpoenas?

23       A.   Probably.

24       Q.   Was it your customary and regular practice

25   to put those watermarks on letters and subpoenas

1                    J. NIERMAN

2   being sent to out-of-state debtors?

3       A.   I don't know that such a thing ever happened

4   before.  You're asking about custom and practice,

5   what I'm saying to is that as a general rule we did

6   not take cases where the debtor was out of state.

7   This did not happen.  Yeah, this happened.  This case

8   was taken in before I was involved.  As a general

9   rule, someone calls me up and they say that the

10  debtor is out of state and the judgment is out of

11  state, we farm it out.  We don't even have any these.

12      Q.   But you didn't farm out this one.  This one

13  you sent the subpoena; is that right?

14      A.   So it certainly seems.  The only -- I mean,

15  the reason I'm confirming -- the extent I'm agreeing

16  is that this looks like something that my office

17  produced.  So I do not deny that.  I do not recall

18  sending this letter, this subpoena or anything

19  associated with this, but I don't -- I'm saying to

20  you I did not do it.  Vera would have done it.  If

21  Vera had done it, I would not be surprised because

22  this looks like something the type of thing that we

23  generate.  So --

24      Q.   I'm sorry.  Go ahead.

25      A.   So that is how much information I have about

1                    J. NIERMAN

2   this.  I would be astonished if Vera remembered

3   anything about this because she sent out a lot of

4   letters.

5        Q.   Okay.  Let's be very clear about something,

6   in December of 2016, J. Henry Nierman was the

7   attorney of Recovery of Judgment LLC in the matter of

8   Matt Morrison against Shaul Levy; is that right?

9        A.   Yes.

10            THE COURT REPORTER:  Mr. Nierman, I

11       need you to slow down a little bit for me,

12       please.

13            MR. NIERMAN:  I apologize for causing

14       any difficulties for you.

15   BY MR. NAHOUM:

16       Q.   These watermarks that say final notice, if

17   the subpoena was not properly served it couldn't have

18   been a final notice, could it have?

19       A.   I don't really understand that question.

20       Q.   Well, it says final notice.  What does final

21   mean?

22       A.   I think the words "final notice" are very --

23   are self-explanatory.

24       Q.   You're muted.  Stop.  Stop.  You're muted.

25            THE COURT REPORTER:  I don't hear

1                        J. NIERMAN

2      anything.

3  BY MR. NAHOUM:

4      Q.   Are you there?

5      A.   I think so.  Sometimes if I get a call it

6  sort of disconnects me.

7      Q.   I get you.  Do you want to take a

8  five-minute break?

9      A.   I don't need a break if it's not going to

10  take much longer.  I don't know if the court reporter

11  needs a break.  I'm usually more concerned for them

12  because they work harder than either of us do,

13  especially apparently with me as a deponent, it's

14  particularly strenuous on the court reporter.

15            MR. NAHOUM:  Let's take five minutes.

16            (Whereupon a break was taken at

17      2:06 p.m.)

18            MR. NAHOUM:  Back on the record.

19  BY MR. NAHOUM:

20      Q.   Mr. Nierman, turning your attention back to

21  Exhibit 2, the subpoena duces tecum.  Can you tell me

22  for what date the subpoena was made returnable?

23      A.   December 26th, 2016.

24      Q.   And who selected this date?

25      A.   I assume that Vera did.

1                          J. NIERMAN

2        Q.   I'm sorry?

3        A.   I assume that Vera did.

4        Q.   Why do you assume that?

5        A.   I assume she generated this document.

6        Q.   When you schedule return dates for

7   subpoenas, what's the process for selecting dates?

8        A.   The minimum time requirement as to how many

9   days in advance it has to be served.  Although this

10  one is not serving a subpoena as we described

11  earlier.  This is a letter.

12       Q.   I'm referring to Exhibit 2, the subpoena

13  duces tecum.

14       A.   I understand it's a letter that looks like a

15  subpoena.  What I'm saying is this not a subpoena.

16       Q.   Let's be clear what you're talking about.

17  Are you talking about Exhibit 2 or Exhibit 3 because

18  I have a letter as Exhibit 3, and I have a subpoena

19  and that's Exhibit 2?

20       A.   Oh, I understand the letter claims that it's

21  a subpoena.  I understand that the document looks

22  like a subpoena.  I'm telling you now that I don't

23  think it's a subpoena.

24       Q.   What do you think it is?

25       A.   I think it's an attempt to get him to answer

1                    J. NIERMAN

2    questions.

3         Q.   I'm reading this -- okay.  Let's get this

4    straight here because I'm looking at the caption on

5    the top of Exhibit 2.  It says subpoena duces tecum.

6    Am I reading that wrong?

7         A.   No, you're not reading that wrong.  I'm

8    telling you that I understand that it looks like a

9    subpoena.  What I'm also telling is that it's not an

10   enforceable subpoena.  When I hear the term subpoena

11   I think it's something that is enforceable where

12   someone failed to comply with the subpoena that there

13   are consequences.  This does not meet that

14   definition.  There were no consequences for his

15   failure to respond to it.

16        Q.   So it purports to be a subpoena, but it's

17   not one.  Is that what you're saying?

18        A.   What I'm saying is this looks like a

19   subpoena.  It is not a subpoena.

20        Q.   What is it?

21        A.   I'm saying it's a letter.

22        Q.   But it says subpoena duces tecum, does it

23   not?

24        A.   It does.

25        Q.   Okay.  And on the caption is says the

1                        J. NIERMAN

2    People of the City of New York; is that right?

3         A.    Yes.

4         Q.    Okay.  And this is not just a subpoena for

5    information of documents.  It's a subpoena directing

6    the recipient to appear at your office and give live

7    testimony; is that right?

8         A.    That's what it indicates.

9         Q.    You didn't hear my question.  Do you --

10        A.    I don't think that you are -- I don't think

11   that either of us disagree that this was

12   unenforceable.

13             Do you think it was enforceable?

14        Q.    So going back to my question, when you

15   schedule the return date for subpoenas how is the

16   date selected?

17        A.    I did not schedule the subpoena.

18        Q.    Who did?

19        A.    I speculated, and frankly I probably should

20   not have speculated because I'm not answering with

21   information.  I'm telling you if I had to guess, I

22   would guess Vera.

23        Q.    In December of 2016, of all the people

24   capable of generating this document, selecting that

25   date, who among those people?

1                      J. NIERMAN

2        A.   I would have been if I had been consulted

3   about particular thing.  Shawn would have been.  It's

4   unlike he would been consulted because it's not the

5   sort of thing that he did.  Vera.  Those are the

6   three people who would have come up with a date.  No

7   intern would have been authorized to select a date.

8        Q.   When the Law Offices of J. Henry Nierman

9   selects a return date for testimony or subpoenas, how

10  are those dates selected?

11       A.   I'm not -- I just want to make sure I

12  understand the question.  Because you're asking the

13  question now to Law Offices of J. Henry Nierman?

14       Q.   The Law Offices of J. Henry Nierman or you

15  Henry Nierman attorney at law as we've talked about

16  in the same suit, yes?

17       A.   Yes.

18       Q.   Okay.  So how do you select return dates for

19  subpoenas?

20       A.   I normally would pick something that would

21  be 20 to 30 days out.

22       Q.   Did you do that here?

23       A.   I wasn't involved in this.

24       Q.   But your signature is on here, is it not?

25       A.   Yes.

```
1                        J. NIERMAN

2        Q.   December 26th, is that the day after

3   Christmas; is that right?

4        A.   I believe -- most years.

5        Q.   Is there a year when it's not?

6        A.   Not to my knowledge.

7        Q.   And are you aware that December 26th, 2016,

8   was a Monday?

9        A.   Okay.  That's your testimony.  I'm not aware

10  of that.

11       Q.   Do you have any reason to disbelieve that?

12       A.   No.  I just haven't looked at a calendar.

13       Q.   Fair enough.  Are you aware that in

14  observance of Christmas Day, the New York State

15  courts were closed on December 26th, 2016?

16       A.   I don't know.

17       Q.   You're not aware of it?

18       A.   No, I'm not aware.  I don't know that

19  December 26th -- I know that December 26th in a

20  normal is not a legal holiday.  Now you're telling me

21  that the regularly scheduled holiday of Christmas

22  because it fell on a Sunday in 2016 was treated as

23  Christmas for legal holiday purposes, I don't know

24  that's true or false.

25       Q.   Do you have any reason to doubt that the New
```

1                          J. NIERMAN

2    York State courts were closed on December 26th, 2016?

3         A.   Yes.   I have every reason to doubt it

4    because in most years that would not be the case.

5    Most years they refer to that as boxing day.

6         Q.   If I told you --

7         A.   It's not a legal holiday.

8         Q.   If I told you that I looked at the calendar

9    and December 26th, 2016, the courts were closed in

10   observance of the Christmas Day would you think I was

11   a liar?

12        A.   I would think that you should be put on the

13   stand, and you sound like you'd probably be an

14   excellent witness for the plaintiff.

15        Q.   What --

16        A.   I don't know if this is something that's

17   true or not true.

18        Q.   What is the process your law -- what is the

19   process you as a lawyer or your law office uses for

20   ensuring that the return date of subpoenas are not

21   selected on dates in which the courts are closed?

22        A.   You look at a calendar.

23        Q.   Did you do that here?

24        A.   I didn't generate this letter, so I did not

25   do that here.   But I have made it clear to Vera that

1                          J. NIERMAN

2    in no circumstances can she schedule a subpoena for a

3    legal holiday, if that's your question.

4         Q.    When did you do that?

5         A.    Before she started working.

6         Q.    Is that part of training?

7         A.    Correct.

8         Q.    And is that element of her training stated

9    in the document?

10        A.    I haven't looked at that document in a long

11   time so I don't know.

12        Q.    Is there a written policy for Recovery of

13   Judgment LLC on when to select subpoena return dates?

14        A.    Vera's training, let's be clear, is very

15   difficulty training that happened with interns.  I

16   want to be crystal clear about this because I don't

17   know if you covered this.  I want to be clear about

18   this.  Vera's training was far more extensive than

19   what anyone else got.  She was the office manager.

20   We had to know that she was going to be able to

21   handle the day-to-day activities in a way that was

22   not going to subject us to lawsuits, specifically at

23   the FDCPA violations.  So that being the case, I

24   spent a great deal of time with her educating her

25   about the law and what she must do and what she must

```
 1                    J. NIERMAN
 2  not ever do and where -- and where her
 3  responsibilities lay.  Included in that was an
 4  explanation that under no circumstances can we ever a
 5  schedule a return date of anything on a legal
 6  holiday.
 7          Was that something that I wrote down,
 8  probably not because her training that I gave her was
 9  far more extensive than anything that I would have
10  put into a manual.  I'm talking about hundreds of
11  hours of training, which is ongoing even afterwards.
12  We've had to update her on different legal matters.
13  So her training was far more extensive because her
14  responsibilities were far more extensive.
15          I personally invested a great deal of time
16  in teaching her what she should do, as did Shawn.  As
17  I said, Shawn understood a great deal about the law.
18      Q.   And yet despite all of that training and all
19  of that time you spent with her, that training failed
20  in this case; isn't that right?
21      A.   That's your conclusion.  Well, what I'm
22  saying to you is this:  Would I have sent out this
23  letter to look this way?  Am I happy this letter went
24  out this way?  No.  I'm not happy this letter went
25  out this way.
```

1                          J. NIERMAN

2      Q.   So if you had -- is it a fair statement if

3  you had reviewed this letter, and if you had reviewed

4  the subpoena before it was sent out, you would have

5  stopped it?  Is that a fair statement?

6           MR. NIERMAN:  I'm going to object

7      because that calls for speculation.

8  BY MR. NAHOUM:

9      Q.   Okay.  Go ahead and answer the question,

10  please.

11      A.   No.  I'm not going to speculate.

12      Q.   Well, you can.

13      A.   I can and I choose not to.

14      Q.   Did there ever come a time where you were

15  presented with a judgment enforcement device bearing

16  your signature that you stopped from being

17  transmitted because it was out of compliance?

18      A.   I assume so, but I can't think of any

19  examples offhand.  Although I don't know if it would

20  have gotten to the stage of actually being generated.

21  Normally questions -- normally situations like that,

22  the document never actually would have been prepared.

23  It would be something that we, like, questioned.  It

24  would be asking and it would be no, no, you cannot do

25  that.  So to give a full answer to your question, it

1                          J. NIERMAN

2   probably never happened because I don't think

3   documents like that were ever actually created.

4        Q.   Were you asked whether or not it was

5   permissible to send a letter and a subpoena to an

6   out-of-state debtor for testimony and the production

7   of documents?

8        A.   In this particular case?

9        Q.   No, generally.

10       A.   I don't recall that conversation.  It's the

11  sort of thing I would taught her.

12       Q.   Were you asked in this particular case

13  whether or not it was appropriate to send a subpoena

14  to an out-of-state debtor?

15       A.   Certainly I don't recollect that at al.

16       Q.   Were you ever asked whether or not it's

17  appropriate to schedule a deposition for December 26,

18  2016?

19       A.   No.

20       Q.   Have you ever --

21       A.   I just want to clarify also that, as I said,

22  this sort of thing -- situation of having an

23  out-of-state debtor is highly unusual.  So it's not

24  some sort of thing that came up very often.  You're

25  asking me if I taught her that.  As I said, cases

1                      J. NIERMAN

2   that came in which involved out-of-state debtors, we

3   punted regularly.  And I told her, don't take cases

4   like that.  And we actually had some with respect to

5   Jersey cases that I would just farm out -- that I

6   would try to farm out to someone from New Jersey.  We

7   punted our cases like this left and right.  We had a

8   lot of cases and we rejected a lot of cases because

9   cases had to meet certain specifications.  They had

10  to prove that they had a valid judgment and that that

11  valid judgment was in New York and the debtor was in

12  New York, and we had a lot of circumstances where we

13  were very meticulous to make sure we're only dealing

14  with New York people.  So when you ask me if I taught

15  her about out-of-state debtors and sending a letter

16  via subpoena duces tecum, I don't know that I

17  actually do have to cover that because we didn't have

18  clients like this.  We didn't have --

19       Q.   Okay.  So because you punted, to use your

20  word, on the out-of-state judgments, you didn't have

21  any policies or procedures on how to collect on those

22  judgments; is that right?

23       A.   What I'm saying is I don't remember it being

24  anything that I focused on very much at all.  I would

25  have told her that the reason we don't take these

```
 1                    J. NIERMAN
 2   debtors because it's all sorts of different
 3   regulations that apply.
 4        Q.   So you did not have policies on how to send
 5   subpoenas to out-of-state debtors; is that right?
 6        A.   That's wrong.  The policy was don't take
 7   these cases.
 8        Q.   But you did take this case.
 9        A.   That's the policy.
10        Q.   Okay.  But you did take this case, so you
11   didn't have a policy or procedure on how to collect
12   on this judgment because it was out of state; is that
13   right?
14        A.   No, that's not right because I explained to
15   you earlier this came to us before I was involved.
16        Q.   Mr. Nierman --
17        A.   I'll make it clear.  You want your
18   admission.  This is your admission, okay.  Here's
19   your admission.  I'll talk slowly so make sure that
20   the court reporter does not struggle to take down any
21   words I'm about to say.  My admission to you is that
22   this debtor was out of state.  This debtor was a case
23   that came in before I was involved.  My understanding
24   was we had no cases that were out of state.  I missed
25   this one.  So the rules which governed our policies
```

1                      J. NIERMAN

2    were all designed to apply to cases where we're

3    dealing with an out of state -- with an in-state

4    debtor.  Those are rules are not appropriate for an

5    out-of-state debtor.  I was unaware of this case.  So

6    the rules that we followed were not geared for a

7    Shaul Levy type of situation, and that is how you and

8    I find ourselves in a deposition today.

9        Q.  So if you had read this letter bearing your

10   signature and that subpoena bearing your signature

11   before they were sent out, you would have stopped it,

12   right?

13              MR. NIERMAN:  I'm going to object that

14        that's asked and answered.

15              THE WITNESS:  I'm not going to

16        speculate.  I don't know what I would have

17        done with this letter if I had seen it.  I

18        don't know.  I do know that everything is

19        designed to make sure we were a hundred

20        percent complying with every regulation

21        under the FDCPA.

22   BY MR. NAHOUM:

23       Q.  I'm going to ask you now to take a look at

24   what pre-marked as Exhibit 4.

25       A.  Okay.

1                       J. NIERMAN

2        Q.   You got that there?  For the purposes of

3   making sure that you and I are on the same page and

4   what document we're looking at, this is an answer

5   filed for Law Offices of J. Henry Nierman and

6   Recovery of Judgment.

7             Do you see the one?

8        A.   I see it.  Do you want me to hold it up for

9   you.

10       Q.   Yes.  I want you to hold that up.

11       A.   Good?

12       Q.   Yes.  Okay.

13            Can you explain what this document is?

14       A.   It looks like an answer to the complaint.

15       Q.   Have you seen it before?

16       A.   Yes.

17       Q.   When?

18       A.   Probably before it was filed.

19       Q.   When you say answer to the complaint, can

20   you give me more on that?  Answer to what complaint?

21       A.   The complaint in this action.

22       Q.   And who is answering the complaint?

23       A.   Barry Schneps on behalf of the corporate

24   defendants.

25       Q.   You have testified repeatedly today that Law

```
 1                    J. NIERMAN
 2   Offices of J. Henry Nierman and J. Henry Nierman are
 3   the same, yes?
 4        A.   Yes.
 5        Q.   Okay.  Why then is there a separate answer
 6   for the Law Offices of J. Henry Nierman?
 7        A.   I will admit that when this case came in
 8   because of the circumstances with Law Offices of
 9   J. Henry Nierman, I was very confused as to under the
10   law whether or not I was permitted -- because it was
11   being identified as a corporate defendant and because
12   I'm not admitted in federal court, I was confused as
13   to whether or not I was permitted to represent an
14   entity that's been designated as Law Offices of
15   J. Henry Nierman.  Seeing as I needed Mr. Schneps to
16   represent Recovery of Judgment in its corporate
17   capacity, it just seemed to make the most sense to
18   have him represent both named corporate defendants
19   even though Law Offices of J. Henry Nierman is not a
20   valid corporation of any kind.  It just seemed that
21   the most sufficient way to do what needs to be done
22   without having to requiring any further explanation.
23        Q.   Please turn your attention on page 2 to
24   paragraph 5?
25        A.   Five?  I don't have.
```

1                          J. NIERMAN

2        Q.    Under the heading first affirmative defense?

3        A.    Uh-huh.

4        Q.    It says the underlying judgment is a valid

5    judgment entered in New York City Housing Court; is

6    that right?

7        A.    That's correct.

8        Q.    How do you know that the underlying judgment

9    was valid?

10       A.    It says produced by WAK Enterprises.

11       Q.    I'm asking you how you knew that the

12   underlying judgment was valid?

13       A.    Because I saw the document that -- I saw a

14   copy of the judgment.

15       Q.    Okay.

16       A.    I'm confused.

17       Q.    That's your answer.  You saw a copy of the

18   judgment; is that right?

19       A.    Yes.

20       Q.    And besides looking at the copy of the

21   judgment, did you do anything else to verify that it

22   was a correct document?

23       A.    Not to my recollection.

24       Q.    Did you do anything to verify that the

25   judgment had not yet been satisfied?

1                          J. NIERMAN

2        A.    There was no satisfaction that it had been

3    entered.

4        Q.    Entered where?

5        A.    With the court.

6        Q.    Did you search the court docket?

7        A.    I don't recall doing that search.

8              Is that your claim?  Is that Mr. Levy --

9        Q.    I'm asking you a question.

10        A.    Okay.

11        Q.    Was it your customary and regular practice

12    to search or not search court dockets to see if

13    judgments had been satisfied?

14        A.    As a general rule, yes.

15        Q.    You didn't do it in this case?

16        A.    Again, this case came in before I was

17    involved.

18        Q.    Okay.  Before you became involved -- let's

19    clarify what you mean when you say involved.  When

20    you say "involved" you mean representing Recovery of

21    Judgment in the matter of Matt Morrison against Shaul

22    Levy, right?

23        A.    Can you please repeat the question?  I'm

24    sure I understand that.

25        Q.    You keep talking about -- you keep using the

```
 1                    J. NIERMAN
 2   term "involved."  When your involvement as a
 3   demarcation point chronologically, right?  I want to
 4   know what we mean by "involved."  Let's define
 5   involved.
 6        A.   Involved means --
 7        Q.   I'm interpreting -- let me finish.
 8             I'm interpreting "involve" to mean you as an
 9   attorney representing Recovery of Judgment LLC in the
10   matter of Matt Morrison against Shaul Levy; is that
11   right?
12        A.   No.  When I've been saying involved here,
13   I've been saying my involvement with Recovery of
14   Judgment.
15        Q.   Okay.  I want to make sure that we're just
16   clear what our definitions are.
17        A.   Okay.
18        Q.   Fair enough.
19             And you testified now that you did not
20   search the court docket to determine whether or not
21   this judgment was a valid judgment?
22        A.   I had a copy of the judgment.
23        Q.   Right.
24        A.   Okay.
25        Q.   And you didn't check to see whether or not
```

1                    J. NIERMAN

2   the judgment was satisfied or not satisfied?

3      A.   I do not recall doing that search for this

4   particular case.

5      Q.   Okay.  Now, my question was, was it your

6   customary and regular practice to check dockets

7   before you began collecting on cases in your role as

8   an attorney?

9      A.   Yes.

10      Q.   Did you check dockets to see whether or not

11   they were satisfied or not?

12      A.   Yes.

13      Q.   Is there a reason you didn't do that here?

14      A.   I didn't say I didn't do it here.  I said I

15   don't recall doing it here.

16      Q.   Is there a reason you wouldn't have done it

17   here?

18      A.   Well, if it's an old docket sometimes, if

19   it's a very old case, in that case sometimes it takes

20   a long time whether -- and as I said, this case came

21   in before I came in.  So I don't know that I went

22   through every case that we had on file to see was

23   this judgment executed or not.  I don't know that I

24   did that.

25      Q.   Can you turn your attention to Exhibit 4 to

1                          J. NIERMAN

2     paragraph 15 on page 3.  It says some are all of the

3     defendants do not qualify as debt collectors; is that

4     right?

5          A.   Yes.

6          Q.   Can you please describe what that means?

7          A.   That means I don't know that I qualify under

8     the law as a debt collector.

9          Q.   Why not?

10         A.   Well, the term -- it's a term of art, debt

11    collector, so depending on the amount of my time that

12    I invested in doing debt collection and the amount of

13    efforts that someone has to take in order to classify

14    or qualify as a debt collector, so I'm not sure that

15    under the law that I meet those specifications.  So

16    when I'm filing an answer as a potential defense,

17    that's something I'm going to establish of the

18    plaintiff.  I'm going to force the plaintiff to

19    establish as being valid.

20         Q.   The term debt collector, it's not a term of

21    art.  It's a legal term, right?  And --

22         A.   You're correct.  It's a legal term, not a

23    term of art, yes.

24         Q.   And it means any person who uses any

25    instrumentality of interstate commerce or the mails,

1              J. NIERMAN

2  in any business, the principle purposes of which is a

3  collection of debts.

4          Do you not meet that definition?

5      A.   I don't know that as an attorney I meet that

6  definition.  I don't know the standards for attorney

7  qualifies as a debt collector.  It's not the same as

8  Recovery of Judgment whose principle function is to

9  do debt collection.

10     Q.   What is it?

11     A.   There's certain standards.  If someone is

12  a -- from the family law and someone comes up to him

13  and says, hey, can you help me collect a debt and

14  they work on that debt, they don't instantly qualify

15  as a debt collector under the FDCPA.  I'm sure you're

16  aware of that.

17     Q.   Do you practice family law?

18     A.   No.  I practice commercial litigation.  Very

19  little of my commercial litigation involves debt

20  collection.  Most of it is in defense.

21     Q.   You represented Recovery of Judgment for how

22  long, sir?

23     A.   Five years.

24     Q.   And what's their principle business?

25     A.   They do debt collection.

```
1                        J. NIERMAN

2        Q.    And you as their agent, did you do debt

3   collection?

4        A.    When you say "as their agent," you mean as

5   their attorney or you mean as the owner of Recovery

6   of Judgment?

7        Q.    As their attorney.

8        A.    So I'll tell you this much.  I've looked

9   through this legal issue several times during the

10  course of my involvement with Recovery of Judgment,

11  and whether I am personally qualified as a debt

12  collector or not, and I see very conflicting -- I

13  found very conflicting law or a law that, at the very

14  least to me, is conflicting as to whether or not I,

15  as an owner of a debt collection company who is also

16  serving as an attorney for that debt collection

17  agency qualifies under the law as a debt collector.

18            So when I'm drafting an answer to a

19  complaint, I'm certainly going to list that as a

20  potential affirmative defense.  Does that mean that

21  under the law I am not a debt collector?  No.  It

22  means that I may or may not be a debt collector.

23  Assuming I'm not a debt collector, I'm not liable

24  under the FDCPA.  That is why it's in the answer.

25       Q.    You said some or all of the defendants do
```

1                          J. NIERMAN

2    not qualify as debt collectors in -- this is your

3    sixth affirmative.  Let's remember this is answer for

4    Recovery of Judgment LLC and the Law Offices of

5    J. Henry Nierman, okay.  So the answers you're giving

6    responding to document Exhibit 4 in that capacity.

7         A.    Uh-huh.

8         Q    You said in your sixth affirmative

9    defense, some or all defendants do not qualify as

10   debt collectors.

11              Can you just explain why maybe perhaps

12   you are not a debt collector?  What aobut Recovery

13   of Judgment LLC?  Is Recovery of Judgment LLC a debt

14   collector?

15        A.    I believe Recovery of Judgment LLC is a debt

16   collector.

17        Q.    Please turn your attention to paragraph 17

18   on page 3 under the seventh affirmative defense,

19   paragraph 17 says, plaintiff does not qualify as a

20   consumer under the governing statutes.  Explain what

21   that means.

22        A.    In order to be afforded the Fair Debt

23   Collection Practices Act protection, you would have

24   to be a consumer.  So I had not searched whether or

25   not this is deemed being a consumer.  Is that -- this

```
 1                    J. NIERMAN
 2  is a circumstance of him -- I assume that this --
 3  this whole thing that came up pursuant to rent.  I
 4  don't know why he owed the money.  Do you know why he
 5  owed the money?
 6       Q.   Did you examine the underlying case?
 7       A.   I saw the judgment.  I did not examine it.
 8  I don't recall seeing the underlying case.  Certainly
 9  not in preparation of this answer, I didn't examine
10  this.  So what I'm saying to you is, I can -- you and
11  I can speculate as to why this judgment was entered,
12  and the most likely answer is that it was rent.  And
13  if it was rent and he was a consumer, then he's
14  afforded FDCPA protection.  But you cannot state to
15  me with certainty, unless you know more about the
16  underlying case than I do, that he was a consumer.
17  Can you?
18       Q.   I'd like you to take a look at Exhibit 5
19  that I pre-marked as Exhibit 5.  Do you have that
20  there?
21       A.   I'm pulling it up.  What's Exhibit 5?  Is
22  that my answer?
23       Q.   Yes.  So for purposes of just making sure
24  we're on the same page here, this is a pro se answer
25  from you.  So hold that up.
```

1                          J. NIERMAN

2        A.   Yes, I have it here.

3        Q.   Okay.  What is this document?

4        A.   This is my answer to the complaint in the

5   underlying action.

6        Q.   And by "you" you mean?

7        A.   Me personally prepared by me.

8        Q.   Take your time.  My question is did you

9   draft this pleading?

10       A.   Yes.

11       Q.   The signature lines says 157 Mineral Spring

12   Avenue in Passaic, New Jersey.  Is that your home

13   address?

14       A.   That's correct.

15       Q.   Why did you not list the professional

16   address?

17       A.   I was answering this pro se.

18       Q.   I understand.  Is there a reason why you

19   didn't include a professional address?

20       A.   If I was going to get mail on it, it was

21   easier to get that mail at my home address.

22       Q.   I'm going to go through some of the similar

23   questions that I just went through.  I'm going do

24   this because I want to make sure that we're

25   getting -- this is one of those situations where I

1                       J. NIERMAN

2    wanted to make sure we know who is giving an answer

3    here, okay.

4           So please turn your attention to paragraph 5

5    on page 2.  The underlying judgment is a valid

6    judgment entered in New York City Housing Court.

7           Do you see that?

8    A.    Yes.

9    Q.    How do you know that?

10   A.    I saw a copy of the judgment.

11   Q.    Did you do anything more to verify that it

12   was a valid judgment?

13   A.    Other than the -- my answer is the same as

14   before with respect to the first answer.

15   Q.    Turning your attention to paragraph 15 on

16   page 3.  Some or all of defendants do not qualify as

17   debt collectors?

18   A.    Yes.

19   Q.    Who are you talking about?

20   A.    In this particular setting, I'm talking

21   about myself individually.

22   Q.    Are you talking about the Law Offices of

23   J. Henry Nierman?

24   A.    Technically, yes.

25   Q.    And the Law Offices of J. Henry Nierman is

1                         J. NIERMAN

2   not a debt collector?

3        A.   Correct.

4        Q.   Why is that?

5        A.   The same reason I explained before.

6        Q.   Turning your attention to paragraph 17 on

7   page 3.  Plaintiff does not qualify as a consumer

8   under the governing statutes.

9             Can you explain that?

10       A.   I think that's a very well-worded response.

11  We do not know if he's a consumer.  Only consumers

12  are afforded protection under the FDCPA.  Until the

13  Plaintiff can establish that he's a consumer, the

14  FDCPA is inapplicable to him.

15       Q.   Turning your attention to paragraph 19 on

16  page 3.  If you go under the eighth affirmative

17  defense.  It says, defendants take careful steps to

18  operate and comply with the FDCPA and all governing

19  statutes.  The subject letter/subpoena was an

20  isolated incident; is that right?

21       A.   Yes.

22       Q.   Is issuing the letter of subpoena, so that's

23  Exhibits 2 and 3, can you please describe each and

24  every careful step Recovery of Judgment LLC took to

25  comply with the Fair Debt Collection Practices Act?

1                    J. NIERMAN

2        A.   Well, I think that's a misreading of what's

3    written in the answer.  The answer is talking about

4    the general policies and steps of the -- of Recovery

5    of Judgment as defendants.  So you're saying please

6    clarify what steps they took with respect to this

7    particular instance and that's not -- this is

8    something in our general policies.

9        Q.   I'm reading your words, sir.  Defendants

10   take careful steps to operate and comply with FDCPA

11   and all governing statutes.  The subject

12   letter/subpoena was an isolated incident?

13       A.   Exactly.  It's an outlier.  It's not a

14   reflection of the general policies that were employed

15   by Recovery of Judgment.

16       Q.   I'm asking you which -- what are each and

17   every careful step that Recovery of Judgment LLC took

18   to comply with the Fair Debt Collection Practices Act

19   when it sent Exhibits 2 and 3?

20       A.   I cannot properly answer that question

21   because there are too many things that fit that

22   answer.

23       Q.   Give me the top ten?

24       A.   Okay.  The fact that on the letter there's

25   no stamp, there's no signature.  There's nothing

1                         J. NIERMAN

2    indicating that it's coming from a debt collection

3    agency.  The fact that there's no cursing in this

4    letter.  The fact there are countless elements of the

5    FDCPA which are reflected with respect to what is put

6    into any letter that came out of Recovery of

7    Judgment.

8              So all these things that you would not --

9    that you haven't raised in your complaints are

10   reflection of steps that were taken by ROJ to ensure

11   complicity -- I don't like the word complicity --

12   compliance -- compliance with the FDCPA.

13        Q.   The FDCPA generally prohibits the use of

14   false, deceptive, misleading, harassing debt

15   collection practices.

16              Do you agree with that?

17        A.   Are you quoting a particular section of the

18   FDCPA?

19        Q.   I'm just asking if you agree with that

20   statement.

21        A.   Probably.

22        Q.   Yes or no?

23        A.   If you want to quote to me a section of the

24   FDCPA, I can tell you yes or no.

25        Q.   Does the FDCPA prohibit the use of false

1                          J. NIERMAN

2     debt collection practices?

3          A.    False debt collection practices?  I don't

4     know what you mean by "false."  You can't say

5     something untrue in a letter that you're sending

6     through the mail because of the FDCPA.  Does that

7     answer your question?

8          Q.    That's a fine definition.

9          A.    Okay.  I believe that's true.

10         Q.    Do you believe it's also true if something

11    is misleading?

12         A.    I don't know.  I mean, it probably depends

13    on what misleading means.  I'm not sure what

14    misleading means.  I don't think this letter is

15    misleading.  That's where you and I disagree.  You're

16    saying because it says subpoena -- you know, I'm

17    going to break this down on the record here.  So

18    you're saying because it says subpoena, and even

19    though it has a qualifier that's saying that there's

20    nothing here that affects anything if it's not

21    validly served and somehow this is deemed misleading.

22    I don't think that's true.  My take on the FDCPA is

23    you're wrong.  You're mistaken.

24         Q.    Sir, I'm not saying anything.  I'm asking

25    you questions.  You're the one doing all the saying

1               J. NIERMAN

2  here?

3       A.   Okay.  So you're asking me -- you're asking

4  me am I allowed to say something that's misleading,

5  so I say to you is if that's what's written in the

6  FDCPA then I certainly wouldn't argue with that.

7       Q.   You stated here in your eighth affirmative

8  defense that defendants take careful steps to operate

9  and comply with the FDCPA and all governing statutes.

10  The subject letter/subpoena was an isolated incident.

11       A.   Right.

12       Q.   Right.

13       A.   Correct.

14       Q.   And I'm asking you what steps you took to

15  make sure that the subject letter and subpoena

16  weren't misleading?

17       A.   I started giving you a list of different

18  things.  Do you want me to continue giving you a list

19  of other FDCPA violations that are not found in this

20  letter?

21       Q.   How about misleading --

22       A.   Because it sounds like you're testing my

23  knowledge of the FDCPA as to esoteric things that are

24  unrelated to this complaint.  So that's why I don't

25  understand the question.

1                    J. NIERMAN

2        Q.    I'm not testing your knowledge.  I'm reading

3    your defense from your answer.

4        A.    And my point is this.  The point of this

5    answer, and if you want me to clarify what this

6    answer is saying, it's saying under the general

7    policy Recovery of Judgment and all the defendants

8    took many steps to ensure that something like this

9    would never, ever happen.  This is not a reflection

10   of a poor method of operation by Recovery of Judgment

11   or the defendants.  We take many steps.  This was an

12   outlier in that there are elements in here that do

13   not comport with our normal standard as to how we

14   operate.  When I'm saying that --

15       Q.    I want to bring your attention to

16   paragraph 21 under the ninth affirmative defense.  It

17   says the subject letter/subpoena resulted from

18   excusable lawyer error.

19             Can you please describe what that excusable

20   lawyer error was?

21       A.    That was intended to say that to the extent

22   there's anything about this letter that is not

23   compliant with the FDCPA that was lawyer error.

24       Q.    What is the lawyer I error?  You're the

25   lawyer.  It's your error.  What was your error?

 1                       J. NIERMAN
 2        A.    What I'm saying is, assuming that anything
 3   that is wrong with this letter that was an error.  So
 4   I'm not going to draw for you a legal conclusion here
 5   as to what is or what isn't potentially illegal about
 6   this letter when I don't know if there's anything
 7   illegal about it.  But assuming arguennendo [sic]
 8   that there is something illegal about this letter,
 9   that was my lawyer error.  I don't know that there
10   was anything, but assuming if you can prove -- if you
11   can --
12        Q.    So is it your take then that it doesn't
13   matter what was wrong with the letter, if it was
14   wrong, it was an error?
15        A.    With the allegations you raised?  Yes.  And
16   if there was something wrong here, yes, that was an
17   error.
18        Q.    It doesn't matter what was wrong.  If it was
19   something wrong, it was an error?  Is that your
20   testimony?
21        A.    I don't really understand that question.
22        Q.    You just explained what you meant that if
23   there was anything wrong here, it was because it was
24   an error.  Yes?
25        A.    In other words, under the law there is

```
 1                    J. NIERMAN
 2   something -- you raised allegations that there are
 3   errors in -- there are things that are FDCPA
 4   violations.  To the extent that you are correct, then
 5   that was a lawyer error.  Yes.
 6         Q.   Okay.  What was the error?  What was the
 7   error that you made?
 8         A.   Did I just not answer that question?
 9         Q.   No.
10         A.   I don't think there are any errors.  I think
11   there's nothing wrong with this letter.  It does not
12   mean that ultimately my perspective as to whether or
13   not there was anything wrong with this letter are
14   going be validated by a court.  Assuming a court were
15   to agree with any of your allegations, then that was
16   a result of my error.  I am not going to sit here and
17   say, oh, you're correct this was illegal when I don't
18   think it was illegal.
19         Q.   Was it an error to mail a subpoena on your
20   judgment to an out-of-state debtor?
21         A.   I already said I don't think this is a
22   subpoena.
23         Q.   Was it an error to mail a letter to an
24   out-of-state debtor on a New York judgment telling
25   that person that if they didn't answer the subpoena
```

1                    J. NIERMAN

2   they'd be subject to additional fines and/or

3   imprisonment.

4        A.   That's not what that letter says.  The

5   letter says assuming it's properly served.

6        Q.   Was the subpoena and the cover letter

7   intentionally mailed to Mr. Levy?

8        A.   I do not know.  I did not mail it.

9        Q.   You're answering on behalf of who at this

10  moment?

11       A.   I'm answering on behalf of myself.

12       Q.   Okay.  I'm going to ask you a question as a

13  witness for Recovery of Judgment LLC.

14       A.   Okay.

15       Q.   Was the subpoena and cover letter

16  intentionally sent to Mr. Levy?

17       A.   I have no recollection.

18       Q.   Was the subpoena and cover letter

19  intentionally mailed to Florida?

20       A.   I have no recollection.

21       Q.   Was December 26th, 2016, intentionally

22  selected as a return date for the subpoena?

23       A.   I have no recollection.

24       Q.   What is an excusable attorney error for a

25  document that an attorney signs but did not review

1                    J. NIERMAN

2  before it was mailed?

3            MR. NIERMAN:  I'm going to object that

4      it calls for a legal conclusion.

5            THE WITNESS:  I have not researched

6      that.

7  BY MR. NAHOUM:

8      Q.   What, if any, procedures were in place at

9  Recovery of Judgment LLC to avoid mailing New York

10 State subpoenas to out-of-state deponents?

11           MR. NIERMAN:  Objection; asked and

12     answered.  Now we're just going over the

13     same thing over and over.

14 BY MR. NAHOUM:

15     Q.   How, if at all, were those procedures

16 followed here?

17     A.   After all of what?

18     Q.   You just said it was asked and answered.  So

19 you've already told me what your procedures were.

20 How --

21     A.   I'm not sure I understand the question.  I'm

22 just trying to clarify the question.

23     Q.   I'm asking you about mailing subpoenas to

24 out-of-state deponents.  Mailing letters indicating

25 they're enclosing subpoenas to out-of-state

1                        J. NIERMAN

2   deponents.  What procedures were in place to prevent

3   from that happening, and how were those procedures

4   followed?

5        A.    And what I'm answering to you is that we

6   were not outfitted to take care of out-of-state

7   debtors.  That's what I answered previously.

8        Q.    So whatever procedure you had --

9        A.    Our procedures were designed for in-state

10  debtors.  I was unaware that we had an out-of-state

11  debtor.

12       Q.    So your procedures failed to prevent this

13  letter, Exhibit 3, and the subpoena from being

14  mailed; is that right?

15       A.    Because -- out of the hundreds of cases that

16  we have I was unaware we had this out-of-state

17  debtor.

18       Q.    So your procedure failed; is that right?

19       A.    No.   What I'm saying is it wasn't geared for

20  this.

21       Q.    Is that not a failure?  But it happened.

22  But it happened.

23       A.    Okay.

24       Q.    So it failed, did it not?

25       A.    Our procedures weren't set up for this.

1                     J. NIERMAN

2   It's almost like asking me how did my phone fail to

3   do word processing if I have no app for word

4   processing.  It's not set up for that.

5        Q.   I'm going to ask you a question about the

6   Law Offices of J. Henry Nierman and J. Henry Nierman

7   the individual lawyer.  Okay?

8        A.   Okay.

9        Q.   What procedures were in place at the Law

10  Offices of J. Henry Nierman to avoid scheduling New

11  York State subpoenas return dates on national

12  holidays?

13       A.   I would pull up a calendar and see if the

14  date that I was plan on scheduling was on a national

15  holiday.

16       Q.   Did you do that before transmitting

17  Exhibits 3 and 2?

18       A.   I never transmitted Exhibits 3 and 2.

19       Q.   So your signatures appear there, do they

20  not?

21       A.   That's correct.

22       Q.   Are there other instances in other cases

23  where Recovery of Judgment LLC mailed New York State

24  subpoenas to out-of-state deponents?

25       A.   Not to my knowledge, no.

1                        J. NIERMAN

2        Q.    Are there any documents that would confirm

3    that?

4        A.    I don't have any documents on this case.

5    All these documents are in possession of WAK

6    Enterprise.

7        Q.    Did the Law Offices of J. Henry Nierman

8    retain any Recovery of Judgment LLC's documents?

9        A.    If you're asking me personally, I think I've

10   answered that, but there are some documents in my

11   possession, yes.

12       Q.    Included in any of those documents will

13   there be instances where you mailed subpoenas to

14   out-of-state deponents?

15       A.    No.

16       Q.    How do you know that?

17       A.    I wouldn't have generated it nor do I think

18   we have any cases like that, but I never generated

19   any of these documents in cases where they were

20   supposed to be generate.  So to think that I would

21   generate in a case where they were not supposed to be

22   generated seems impossible, and that's why I say no.

23       Q.    During the span of your representation of

24   Recovery of Judgment LLC, how many depositions did

25   you take?

1                       J. NIERMAN

2        A.   Probably a handful at most.

3        Q.   What's a handful?

4        A.   I don't remember ever taking a deposition of

5    a client where there was a court reporter that was

6    hired to take down testimony of --

7        Q.   You said client.  You meant debtor, yes?

8        A.   Thank you for correcting me, yes.  So I

9    don't recall a single circumstance where we actually

10   paid a court reporter to come in and take down

11   questions that I asked to a debtor.  So the likely

12   answer to your question is zero.

13       Q.   Okay.  Have you ever taken a deposition or a

14   debtor exam, even without a court reporter, on behalf

15   of Recovery of Judgment LLC pursuant to a subpoena?

16       A.   I think that probably there were informal

17   question sessions that I had with someone which would

18   not be under oath.  Meaning, on the rare occasion

19   that someone would come in in response to a subpoena,

20   in lieu of actually swearing them in and asking them

21   questions, we usual just sit them down and ask a

22   handful of questions about where they're at and what

23   they can do to resolve the debts.  That's really what

24   the objective was in sending a subpoena.  It was not

25   to sit there and drill them and get information out

1                    J. NIERMAN

2  of them.

3           So I think that the number of times that

4  someone actually came into my offices in response to

5  a subpoena was probably during the course of my five

6  years in working there, less than ten times.  And in

7  every one of those circumstances it would lead to us

8  trying to negotiate a settlement based on the means

9  of the debtor.

10      Q.   So you would issue a subpoena directing the

11  recipient of the subpoena to come to your office to

12  give testimony in furtherance of your effort to

13  execute on a judgment and rather than conducting a

14  deposition, you'd ask them some questions and you get

15  a settlement agreement.  Is that what you're saying?

16      A.   More often than not, yes.

17      Q.   In any of those cases, did any of those

18  debtors appear with counsel?

19      A.   I don't remember.

20      Q.   Have you ever gave motion to the court to

21  compel compliance for the subpoena?

22      A.   No, not to my recollection, but I'm

23  99 percent sure that never happened.

24      Q.   And in those cases where they did come to

25  meet with you, where did you conduct those

1                         J. NIERMAN

2    interviews?

3         A.    My office.

4         Q.    Which office?

5         A.    The same office we would have been in at the

6    time the situation arose.  As I said, we changed

7    offices several times.

8         Q.    And you never hired a court reporter to take

9    testimony during one of those interviews?

10        A.    To my recollection, no.  I don't remember

11   ever hiring a court reporter to take any of this.

12             MR. NAHOUM:  I want to take a

13        two-minute break.

14             MR. NIERMAN:  Do you know how much

15        longer?

16             MR. NAHOUM:  Not much.  That's why

17        we're taking a two-minute break.

18             (Whereupon a break was taken at

19        3:05 p.m.)

20             MR. NAHOUM:  Back on the record.

21   BY MR. NAHOUM:

22        Q.    Did there come a time when you bought out

23   Mr. Porat's interests in Recovery of Judgment LLC?

24        A.    There came a time when I obtained complete

25   ownership without actually buying him out per se.

```
 1                      J. NIERMAN
 2      Q.   When was this?
 3      A.   I believe it was 2015.
 4      Q.   I'm sorry?
 5      A.   I believe it was in 2015.
 6      Q.   2015?
 7      A.   Yes.
 8      Q.   Is that right?
 9      A.   That's my recollection.
10      Q.   Okay.  Did the Porats continue working at
11 Recovery of Judgment LLC after you acquired their
12 interests?
13      A.   Yes.  Not their interests.  Shawn's
14 interests.  Vera never held interests.
15      Q.   Okay.  Did both stay on?
16      A.   Yes.
17      Q.   In what capacity?
18      A.   The same capacity.
19      Q.   Okay.  You said it wasn't a buyout.  Explain
20 the transaction.
21      A.   My recollection is that he executed
22 documents making me a hundred percent owner of the
23 company.
24      Q.   No consideration?
25      A.   No consideration.
```

```
 1                      J. NIERMAN
 2      Q.   Why did he do that?
 3      A.   You'd have to ask him.
 4      Q.   Why did you do that?
 5      A.   Because if I have a choice of owning
 6  50 percent of something or a hundred percent of
 7  something, I'll take a hundred.
 8      Q.   Did you make the offer to him, or did he
 9  make the offer to you?
10      A.   He made the offer to me.
11      Q.   And what incentive did he get for that?
12      A.   You would have to ask him.
13      Q.   Well, it's a fact question.  There's some
14  reason why the man did it.  What was your
15  understanding of why he did it?
16      A.   I don't recall what the reason was.  I
17  certainly was doing a lot more for the company than
18  he was doing at the time.  I don't recall if there
19  was negotiations where I was frustrated with the
20  share of distributions or a personal issue with
21  respect to operation of the company which led to it,
22  or some other factors which led to it.  So I do know
23  that I didn't pay anymore, and that there came a
24  point in time when he said that he was going to
25  transfer his interests to me while at the same time I
```

```
 1                         J. NIERMAN
 2   would maintain the same distribution, but I had
 3   legally complete control of ROJ.
 4       Q.   So your testimony is because you were
 5   dissatisfied with the way he was performing --
 6       A.   No, that's not my testimony.  My testimony
 7   is --
 8       Q.   So I don't understand.  I don't understand
 9   it.  Clear it up for me.
10       A.   My testimony is I don't recall what led to
11   it.
12       Q.   Really?
13       A.   Yeah, really.
14       Q.   That's not a memorable event, sir?
15       A.   No, it wasn't because we continued operating
16   exactly the same way.  It was more of a paper
17   transaction than anything else.  He still took the
18   same cut both with respect the distributions that
19   came during the course of operations and with respect
20   to closing the sale of the assets of the company.  It
21   in no way affected my bottom line, so really it was
22   not something that's terribly memorably at all.
23       Q.   Okay.  So nothing changed except that you
24   acquired 100 percent ownership of the company, and
25   here under oath today you can't remember at all why
```

1                    J. NIERMAN

2    he did it?

3        A.   I'm telling you that he and I had an

4    up-and-down relationship and that there were times

5    that we had disagreements with respect to

6    distributions and things of that nature, and I don't

7    remember exactly what led to him deciding to give me

8    that interest.

9        Q.   Okay.  I want to know a little bit more

10   about the transfer of assets from Recovery of

11   Judgment LLC to WAK.

12       A.   Okay.

13       Q.   What do you mean when you say a transfer of

14   assets?  What were the assets that were transferred?

15       A.   The primary asset was control of the -- was

16   their rights to the judgment -- to execute on the

17   judgments that had been assigned to Recovery of

18   Judgment under their control.

19       Q.   What was the value of those judgments?

20       A.   Market value or total value as far as what

21   the judgments were worth?

22       Q.   What was the portfolio value?  The face

23   value?

24       A.   The face value?  I'm sure it was in the

25   millions.  The actual market value though, typically

1                          J. NIERMAN

2  judgments tend to sell somewhere between three to six

3  cents on the dollar.

4      Q.   So you sold the -- the primary assets you

5  say are the judgments, the right to collect on the

6  judgments?

7      A.   I think more than that what they were

8  looking for is I think they wanted the name because

9  the name Recovery of Judgment has been identified by

10  the public as being a company that excels in judgment

11  execution.  It has a very good, strong presence on

12  Google, and a lot of countless emphatically positive

13  reviews, and the training that we provided.  There

14  was extensive training --

15      Q.   To whom?  Training to whom?

16      A.   To WAK.  WAK employees.

17      Q.   How many WAK employees did you train?

18      A.   So most of training was actually done -- the

19  direct training by Vera.  I was involved in teaching

20  the legal elements behind it.  With respect to the

21  operation elements, she handled all of that.  I would

22  say half a dozen.

23      Q.   There were a half a dozen employees?

24      A.   Something like that.  That's my

25  recollection.  Somewhere between four and eight.  So

1                    J. NIERMAN

2   I think half a dozen is a good estimate.

3        Q.   To perform the same function that you and

4   Porats had been doing, yes?

5        A.   Correct.

6        Q.   And you trained them on how to do it in

7   compliance with the FDCPA?  Is that what you're

8   saying?

9        A.   Yes.

10       Q.   Okay.  What did you tell them?

11       A.   It took three months.  From the time that --

12   literally from the date that we signed the contract

13   until closing, several days a week, Vera would go

14   there or I would go there and train these individuals

15   on to how properly execute a judgment.

16       Q.   Go where?

17       A.   To their WAK offices.

18       Q.   Where is that?

19       A.   I don't remember where it was at the time.

20   It was a few blocks away from our office.  This is

21   ranging from late November early December of 2016

22   until closing, which I said was in January or

23   February of 2017.

24       Q.   I'm sorry?

25       A.   Exactly during the period when all this was

1                    J. NIERMAN

2   happening.  Okay.  It was during the period that --

3   I'll tell you this much.  I'm remember signing this

4   agreement -- I'm 99 percent sure we signed this

5   agreement before that subpoena was sent out.  That

6   the subpoena was definitely would not have been sent

7   out by WAK Enterprises because they did not take

8   control of anything with Recovery of Judgment.  They

9   wouldn't have known now to create the subpoena back

10  in early December 2016.  They were not involved in

11  performing any of ROJ's functions until after closing

12  which was at the earliest late January 2017, and

13  probably not until February of 2017.  And during that

14  time period, which we're talking, I don't know,

15  somewhere around eight to 10 weeks, we spent hundreds

16  of hours of training the staff on how to properly

17  execute a judgment while being FDCPA compliant.

18        Q.    Okay.  In training, were they using

19  computers?

20        A.    Yes.

21        Q.    Your computers or their computers?

22        A.    Their computers.

23        Q.    So when did you transfer your computers to

24  WAK?

25        A.    I don't think our computers were ever

1                           J. NIERMAN

2     transferred to them.  I think that -- I think that

3     our access to the cloud was transferred over to

4     representatives of WAK.

5          Q.   When was that?

6          A.   At closing.

7          Q.   That was in -- what was the date again?

8          A.   Late January or early February 2017.  I do

9     not know if Vera set up an account for purposes of

10    training.  I don't know how she did it because I was

11    not there when she was doing most of her training of

12    WAK Enterprises.  So I don't know if they had an

13    account.  My role in training them was really just

14    giving them an education of the law, and what the Dos

15    and Don'ts of the FDCPA are and what they -- I had to

16    make sure to be clear about -- and also just a

17    generally understanding of how the legal system works

18    so they can understand the distinction between a

19    state judgment and a federal judgment, the interest

20    that accrues on each -- I'm talking too fast.  I

21    apologize.  But a general legal understanding is it

22    what I was trying to provide.

23         Q.   When all the judgments were signed over to

24    WAK, did you sign any consent to change attorney?

25         A.    I don't recall signing that.  I'm trying

1                         J. NIERMAN

2   to -- I'm trying to think about what happened at the

3   closing.  That's an interesting question how we did

4   that or whether there was a global -- I was not

5   involved in drafting of these documents.  And I also

6   know that the actual judgment that we had was the

7   least of their interests.

8              In WAK Enterprises, my understanding was at

9   the time that they were doing this that they -- they

10  had their own business where they had their own

11  judgments that they would -- that they wanted to

12  execute on and it was too costly for them to pay

13  someone.  They didn't like losing that much money.

14  So really for them the training was the essence of

15  what they were getting -- of what they were getting

16  out of this deal.  And to boot, to the extent they

17  could successfully execute on any judgments that we

18  had, great.

19             So if I was the one drafting the documents,

20  I probably would have had a global transfer of all

21  the assets, including the judgment.

22        Q.   My question was about a consent to change

23  attorney, right.  We understand what a consent to

24  change attorney is.  It's a document that gets filed

25  with the court and notifies the world who the

1                          J. NIERMAN

2    attorney of record is, right?  We understand that?

3         A.   I do understand that, yes.

4         Q.   Did you sign any consent to change attorney

5    when you transferred the assets of Recovery of

6    Judgment LLC to WAK?

7         A.   I don't remember.  It was four years ago and

8    there was a lot of documents that we were signing.

9         Q.   Are you still attorney of record on

10   judgments that Recovery of Judgment LLC is

11   collecting?

12        A.   I don't believe so, no.

13        Q.   Do you get any mail as the attorney of

14   record on any of these matters?

15        A.   No, no.  I don't get anything on that.

16             MR. NAHOUM:  Thank you.  I have no more

17        questions.

18             THE NIERMAN:  Great.  I just want to

19        ask you, first of all -- Barry, do you have

20        any questions for me?

21             MR. NAHOUM:  I think Barry is walking

22        the dog.

23             MR. NIERMAN:  I think he's good.

24             We are scheduled to have a conference

25        at 10:30 on Thursday; is that correct?

```
 1                    J. NIERMAN

 2         MR. NAHOUM:  You can take -- whatever

 3    administrative issues you have, you can take

 4    it up with Evan or Evan's office.

 5         THE WITNESS:  I want to ask you

 6    because, you know, this whole thing -- this

 7    whole deposition was pushed back -- we can

 8    go off the record on this.

 9         (Whereupon the deposition concluded at

10    3:20 p.m.)

11                    --oo0oo--

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 183

1                        J. NIERMAN

2    STATE OF _____ )

3                                     )

4    COUNTY OF _____ )

5

6

7           I, JOSEPH NIERMAN, ESQ., the witness

8    herein, having read the foregoing testimony of the

9    pages of this deposition, do hereby certify it to be

10   a true and correct transcript, subject to the

11   corrections, if any, shown on the attached page.

12

13

14

15                   _____

16                   JOSEPH NIERMAN, ESQ.

17

18

19

20

21

22

23

24

25

```
 1                    J. NIERMAN

 2          ERRATA SHEET FOR THE TRANSCRIPT OF:

 3   Case Name:

 4   Dep. Date:

 5   Deponent:

 6

 7                    CORRECTIONS:

 8   Pg.   Ln.  Now Reads      Should Read         Reason

 9   ___   ___  _____   _____   _____

10   ___   ___  _____   _____   _____

11   ___   ___  _____   _____   _____

12   ___   ___  _____   _____   _____

13   ___   ___  _____   _____   _____

14   ___   ___  _____   _____   _____

15   ___   ___  _____   _____   _____

16   ___   ___  _____   _____   _____

17   ___   ___  _____   _____   _____

18

19                        _____

20                        Signature of Deponent

21   Subscribed and sworn to before me

22   This ___ day of _____, _____.

23

24   _____

25   (NOTARY PUBLIC) MY COMMISSION EXPIRES:  _____
```

Page 185

```
 1                          J. NIERMAN

 2                  C E R T I F I C A T E

 3   STATE OF NEW YORK

 4   COUNTY OF NASSAU

 5

 6              I, Leonora L Walker, a Notary Public, the

 7   officer before whom the foregoing deposition was

 8   taken, do hereby certify that the foregoing

 9   transcript is a true and correct record of the

10   testimony given; that said testimony was taken by me

11   stenographically and thereafter reduced to

12   typewriting under my supervision; that reading and

13   signing was requested; and that I am neither counsel

14   for or related to, nor employed by any of the

15   parties to this case and have no interest, financial

16   or otherwise, in its outcome.

17              IN WITNESS WHEREOF, I have hereunto set

18   my hand and affixed my notarial seal this 5th day of

19   October 2020.

20              My commission expires May 17, 2024.

21

22         _____

23         NOTARY PUBLIC IN AND FOR THE

24         STATE OF NEW YORK

25         Notary Registration No. 01WA6109670
```