Shaul Levy

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK


SHAUL LEVY,

Plaintiff,

vs.                       DEPOSITION OF:
                          SHAUL LEVY


LAW OFFICES OF J. HENRY NIERMAN,
J. HENRY NIERMAN and RECOVERY OF JUDGMENT LLC,


Defendants.

- - - - - - - - - - - - - - -


     TRANSCRIPT of the stenographic notes of the
proceedings in the above-entitled matter, as taken by
and before STACEY J. ORLICK, a Certified Shorthand
Reporter, License No. XI00226700, and Notary Public of
the State of New Jersey, held via Zoom, on October 22,
2020, commencing at 10:53 a.m.

Shaul Levy

```
                                                      Page 2

 1    A P P E A R A N C E S:

 2

         SCHLANGER LAW GROUP, LLP
 3       80 Broad Street, Suite 1301
         New York, New York 10004
 4       BY:  ROBERT NAHOUM, ESQ. Of Counsel
         Attorneys for Plaintiff
 5       (212) 480-1011

 6

 7       LAW OFFICES OF J. HENRY NIERMAN
         157 Mineral Spring Avenue
 8       Passaic, New Jersey 07055
         BY:  BENJAMIN NIERMAN, ESQ.
 9       Attorneys for Defendant J. HENRY NIERMAN

10

11       BARRY C. SCHNEPS LAW OFFICE
         7 Chatham Square, #C5
12       New York, New York 10038
         BY:  BARRY C. SCHNEPS, ESQ.
13       Attorneys for Defendant RECOVERY OF JUDGMENT
         (212) 566-2005
14

15

16

17

18

19

20

21

22

23

24

25
```

Shaul Levy

Page 3

```
 1                INDEX

 2
     WITNESS              EXAMINATION BY           PAGE
 3
     SHAUL LEVY           MR. NIERMAN              4,79
 4                        MR. SCHNEPS               78
                          MR. NAHOUM                82
 5

 6

 7                EXHIBITS

 8   NUMBER              DESCRIPTION           PAGE

 9   1                   Judgment             12
     2                   Letter               21
10   4                   Complaint            52
     5                   Subpoena             31
11

12

13

14

15
     (Original exhibits retained by counsel.)
16

17

18

19

20

21

22

23

24

25
```

Shaul Levy

Page 4

1   S H A U L   L E V Y, residing at 2899 Collins Avenue,

2   Miami Beach, Florida 33140, having been duly sworn by

3   the Notary Public, testified as follows:

4   EXAMINATION BY MR. NIERMAN:

5   Q.      Good morning, Mr. Levy.  My name is Joseph

6   Nierman.  I'm a pro se defendant in an action in federal

7   court which is encaptioned Levy versus Nierman.  In

8   layman's terms it means you are suing me.  I'm going to

9   be asking you a series of questions today and I ask you

10  wait until I finish asking my question before you

11  respond even if you think you know where I'm going, and

12  that you keep all of your answers verbal rather than

13  just shaking your head or gesticulating in one manner or

14  another.  I ask that you not interrupt me not because of

15  my ego, but rather we can have a clear transcript and

16  it's easier for the court reporter to take down

17  everything we are saying.  Do you understand these

18  instructions?

19  A.      Yes.

20  Q.      If at any time I ask you a question and you do

21  not understand, state so and I will try and rephrase it

22  in a way that you comprehend.  Do you understand?

23  A.      Yes.

24  Q.      If at any time you need to take a break, please

25  feel free to ask for one.  I would just ask that you

Shaul Levy

Page 5

1   answer any pending questions before you take such a

2   break and taking a break could be to consult with your

3   counsel, but again, if there's a pending question I ask

4   that you answer that question before you take such a

5   break.  Do you understand?

6   A.      Yes.

7   Q.      What's your name?

8   A.      Shaul Levy.

9   Q.      How do you spell that?

10  A.      S-h-a-u-l L-e-v-y.

11  Q.      Do you go by any other names?

12  A.      I have a nickname of Charly.

13  Q.      How is that spelled?

14  A.      C-h-a-r-l-y.

15  Q.      Is that your legal name or not?

16  A.      No, just an easy name.

17  Q.      Have you ever gone by the name of Guy, G-u-y.

18  A.      No.

19  Q.      No one ever called you Guy?

20  A.      No.

21  Q.      Charly Guy?

22  A.      No.

23  Q.      You said you live on Collins Avenue in Florida?

24  A.      Yes.

25  Q.      How long have you been living there?

Shaul Levy

Page 6

1    A.      Many years.

2    Q.      Can you be more specific, please?

3    A.      Three, maybe three, four.

4    Q.      You said you lived there for the last three or

5    four years?

6    A.      Yes.

7    Q.      Do you own or rent your home?

8    A.      Own.

9    Q.      When did you purchase that home?

10   A.      About --

11           MR. NAHOUM:  I'm going to object here.  Let's

12   get this out early.  If we are going to head down the

13   path are of debtor exam, I'm going to stop it in its

14   tracks.

15           MR. NIERMAN:  He said he doesn't know how long

16   he has been living there.  I'm trying to get that

17   information so we can understand where he has been

18   living and when.

19           MR. NAHOUM:  You can answer.

20   A.      Maybe about five years ago.

21   Q.      Around 2015?

22   A.      Around there, yeah.

23   Q.      Do you live alone?

24   A.      No.

25   Q.      Who lives with you?

Shaul Levy

Page 7

1    A.       I'm married with kids.

2    Q.       What is your wife's name?

3    A.       Is that relevant?

4    Q.       It doesn't matter if it's relevant.  Answer the

5    question.

6             MR. NAHOUM:  You can answer it.

7    A.       Dessa, D-e-s-s-a.

8    Q.       How many children do you have?

9    A.       Five.

10   Q.       Do you work from home or you do you work in an

11   office?

12   A.       Work in an office.

13   Q.       Where do you work?

14   A.       I work at Brilliance Jewels.

15   Q.       Where are they located?

16   A.       Miami.

17   Q.       Do you own that business?

18   A.       No.

19   Q.       How long have you been working at Brilliance

20   Jewels?

21   A.       Seven years, six years, around there.

22   Q.       Where did you live before you lived in your

23   current address?

24   A.       5757 Collins Avenue.

25   Q.       How long were you living there?

Shaul Levy

Page 8

1   A.      Two years.

2   Q.      Where were you living before that?

3   A.      I forgot the address.   100 Lincoln Road, the

4   address.

5   Q.      Where is that?

6   A.      Collins Avenue.

7   Q.      That's also on Collins Avenue?   How long were

8   you living there?

9   A.      Sorry?

10  Q.      When were you living there?

11  A.      Before that.

12  Q.      Can you give me a year?

13  A.      Approximately eight years ago.

14  Q.      How long were you living there?

15  A.      Two years.

16  Q.      When you say you were living there eight years

17  ago, so you moved in there roughly eight years ago?

18  A.      Yeah, eight years ago.

19  Q.      You moved to Florida eight years ago?

20  A.      Yes.

21  Q.      Where were you living before you moved down to

22  Florida?

23  A.      The big city.

24  Q.      What is the big city?

25  A.      New York.

Shaul Levy

 1   Q.      We are back now to around 2012 that you moved

 2   down to Florida?

 3   A.      Yeah.

 4   Q.      Where in New York were you living before you

 5   moved down to Florida?

 6   A.      In Brooklyn.

 7   Q.      What is the address where you were living?

 8   A.      I don't remember.

 9   Q.      How long were you living there?

10   A.      Two years.

11   Q.      Did you own or rent your residence in Brooklyn?

12   A.      Rent.

13   Q.      What was the name of your landlord?

14   A.      I will get back to you on that.

15   Q.      I'm asking you to answer the question, please.

16   A.      I don't know.

17   Q.      You don't know where you were living?

18   A.      I know where I was living.  I don't remember.

19   It's many years ago.

20   Q.      Are you familiar with 635 West 42nd Street,

21   apartment 19D in New York, New York?

22   A.      Can you repeat it again?

23   Q.      The address is 635 West 42nd Street, apartment

24   19D, New York, New York.

25   A.      When do I need to remember this?

Shaul Levy

Page 10

```
 1   Q.      I'm asking you if you are familiar with this
 2   address at all?
 3   A.      I lived in so many places in New York I have to
 4   look it up.
 5   Q.      Did you ever live at that address?
 6   A.      I have to look it up.
 7   Q.      Did you own any property in New York?
 8   A.      No.
 9   Q.      You owned no real property in New York City?
10   A.      No, no property.
11   Q.      Are you familiar with an individual named Matt
12   Morrison?
13   A.      Sounds familiar.
14   Q.      Does it sound familiar that he was your landlord
15   at one point?
16   A.      Maybe.
17   Q.      I'm looking for a yes or no.
18   A.      I don't have exact.  You ask me questions of
19   many years ago.  I don't have it in front of me, I don't
20   have answer.  If you want me to get back to you.  You
21   want to take an answer from me on something I don't
22   remember, so how exactly do you want me to answer it?
23   Q.      Are you familiar with an individual named Andy
24   Yen?
25   A.      No.
```

Shaul Levy

Page 11

1   Q.      You having difficulty remembering so I want to

2   make sure that we are clear here.  Are you currently

3   suffering from dementia, alzheimer's or any kind of

4   medical condition that would affect your memory?

5   A.      Not that I know.

6   Q.      What is your date of birth?

7   A.      February 13, 1974.

8   Q.      That would make you 46 years old; is that

9   correct?

10  A.      Yes.

11  Q.      Have you taken any medication within the last 24

12  hours which might have a side affect of affecting your

13  memory?

14  A.      I took it, I don't know, this morning.

15  Q.      Have you taken any other medication which might

16  have affected your memory?

17  A.      No.

18  Q.      Within the last 24 hours, did you have alcohol,

19  recreational drugs, or any type of substance that might

20  impair your memory?

21  A.      No.

22  Q.      As you sit here today, do you have any reason to

23  believe that your memory would be impaired?

24  A.      No.

25  Q.      I provided to your counsel a list of exhibits

Shaul Levy

Page 12

1    and asked that you print them out and have them ready

2    for you for this deposition.  Do you have them with you?

3    A.      No.

4    Q.      I need you to be looking at these exhibits in

5    order for you to proceed with this examination, so I'm

6    going to ask did you get -- do you have those e-mails

7    in. Your -- did you receive those e-mails?

8            MR. NAHOUM:  Mr. Levy, check your e-mail and you

9    should see an e-mail from our office with some

10   attachments to it.

11           MR. NIERMAN:  Let's take a five minute break

12   while he prints everything out.

13           (Break taken.)

14   Q.      You said you work in your office.  Where is that

15   located?

16   A.      Miami.

17   Q.      What's the address?

18   A.      It's 36 Northeast 1st Street.

19   Q.      I'm going to ask you to look at what I have

20   marked as Defendant's Exhibit-1 for purposes of

21   identification.  That should have come up as a file

22   labeled Exhibit-1 for you.  I would ask if you see that

23   there?

24   A.      Can you tell me what it is?

25   Q.      It's a page that looks like it's in landscape

Shaul Levy

Page 13

1    rather than portrait.  It should look like this,

2    transcript of judgment.  Have you ever seen this

3    document before?

4    A.      Not that I remember, March 2010.

5    Q.      I didn't understand your answer.

6    A.      I don't remember this page.

7    Q.      Have you ever been sued in housing court before?

8    A.      In what?

9    Q.      In housing court.

10          MR. NAHOUM:  Do you have a specific housing

11   court or specific time frame in mind?

12          MR. NIERMAN:  I'm referring specifically to New

13   York County housing court.

14          MR. NAHOUM:  Time frame?

15          MR. NIERMAN:  In April of 2010.

16   A.      In April 2010?  You know anything after this

17   period of time, when I was in New York everything is

18   very mixed and very hard for me to remember.  I had a

19   lot of personal issues so this is why I'm having a hard

20   time.

21   Q.      I'm not -- I'm only looking to find out issues

22   as they relate to this action.

23   A.      I have in front of me the paper.  I'm looking at

24   it.  Let's go on to the questions.

25   Q.      Fair enough.  Have you ever been sued by a

Shaul Levy

Page 14

1    landlord before?

2    A.      Yeah, I'm looking at it.  It's in front of me.

3    Q.      You recall being sued by this landlord?

4    A.      I recall it, yeah, now that I'm looking at the

5    paper I do.

6    Q.      Do you remember Matt Morrison now?

7    A.      I don't.  I really don't remember the names.

8    Q.      Do you remember living at 635 West 42nd Street?

9    A.      Yes, I do, I do.

10   Q.      You were in apartment 19D?

11   A.      That I don't remember.

12   Q.      This was in or around 2010?

13   A.      Should be around 2010, correct.

14   Q.      Did you, yourself, go to court for this case?

15   A.      That I don't remember.

16   Q.      Did you ever hire a lawyer to defend you from a

17   lawsuit that was commenced against you by a landlord?

18   A.      I don't remember.

19   Q.      You remember that you had this lawsuit; is that

20   correct?

21   A.      Now that I look at it, yes.

22   Q.      Did you negotiate a settlement on this lawsuit?

23   A.      Not that I remember.

24   Q.      I'm going to ask you to look at the next page

25   now.

Shaul Levy

Page 15

1          MR. NAHOUM:  Have we established what this

2    document is yet?

3          MR. NIERMAN:  If you would like me to further

4    establish, this document seems to be a transcript of a

5    judgment that Mr. Morrison holds against you or held at

6    one point against you in the amount of $8,748.  Do you

7    see the amount of judgment there on the first page?

8    A.      On this page, right?

9    Q.      On the page before that.

10   A.      Yeah, I see it.

11   Q.      Do you see that this was entered by the clerk on

12   the 15th of April, 2010 in the lower right corner?

13   A.      Yes.

14         MR. NAHOUM:  I'm going to object to that.  This

15   is a document which as a matter of fact speaks for

16   itself, but in particular it doesn't appear to have any

17   court seals or court stamp on it.

18         MR. NIERMAN:  It seems to have the stamp of a

19   clerk in the lower right corner.

20         MR. NAHOUM:  I don't see a seal on it, though.

21   Go ahead.

22   Q.      I'm going to turn your attention to the next

23   page of Exhibit 1.  Can you kindly read the top three

24   lines at the heading there?

25   A.      My reading is bad.  I can't read.

Shaul Levy

Page 16

1    Q.      Does that mean that you do not know how to read?

2    A.      I can, but very slow.  My reading is very bad.

3    You won't get good sound out of me.

4    Q.      This is not a test.  I just want you to know

5    what's written here.  If you could, read it slowly.

6    A.      Where?

7    Q.      The top three lines.  It starts with civil

8    courts.

9    A.      Civil Court of the New York County of New York.

10   Q.      Then you see how there's part C there?

11   A.      It doesn't look like a C, but that's okay.

12   Q.      It says underneath that decision and judgment?

13   A.      Yeah.

14   Q.      If you look and you see this is a case if you

15   continue reading where it says Matt Morrison and it says

16   Morrison, Matt and Yen, Andy, do you see that?

17   A.      Yes.

18   Q.      They are labeled as petitioner and it says

19   against Levy, aka Shaul Guy, aka Charly Guy, aka Charly

20   Levy, do you see that?

21   A.      I see that.

22   Q.      Those are respondents.  It says decision in

23   judgment is rendered?

24   A.      One second.  Who is Guy?

25   Q.      I don't know, I'm asking you.

Shaul Levy

Page 17

1    A.    I don't know, I never heard that name before.

2    Q.    Just so we're clear.  It says against Levy and

3    then they have all of those aka's and then at the end --

4    A.    My name is not Levy.  Charly Guy, never heard

5    that name.

6    Q.    Is your name Shaul Levy?

7    A.    Shaul Levy.

8    Q.    It actually says Levy and if you leave out all

9    the aka's and you get to the comma at the end then it

10   says Shaul Levy beginning -- it's against Shaul Levy who

11   is also known as Shaul Guy or Charly Guy or Charly Levy.

12         MR. NAHOUM:  Is there a question in all this?

13         MR. NIERMAN:  I want to make sure we're on the

14   same page as far as understanding what this exhibit

15   says.

16   Q.    Do you understand that, Mr. Levy?

17   A.    Yes.

18   Q.    If we could look a little further on this page,

19   do you see where it says decision and judgment is

20   rendered based upon a stipulation entered into by the

21   parties as follows and then there's a long reading here

22   where it says judgment of possession is granted in favor

23   of Morrison, Matt, Yen, Andy, and against Shaul Levy aka

24   Shaul Guy, aka Charly Guy, et cetera.  Do you see all

25   that, Mr. Levy?

Shaul Levy

Page 18

1    A.       Yes.

2    Q.       Below that it says a counterclaim is granted in

3    favor of the respondent in the amount of zero dollars

4    and zero cents.  Do you see that?

5    A.       Yes.

6    Q.       Is it possible you can come back so we can see

7    you?

8    A.       Sorry.

9    Q.       Did you file a counterclaim in this action?

10   A.       I don't remember.

11   Q.       As you sit here today, do you recall this

12   judgment being entered against you?

13           MR. NAHOUM:  Objection as to form.  You can

14   answer the question if you know the answer.

15   A.       I don't remember.

16   Q.       If you look at the bottom of the second page it

17   says entry of judgment?

18   A.       Okay.

19   Q.       It says judgment entered in accordance with the

20   above -- excuse me, I should have called your attention

21   to the middle section.  I sort of skipped past it.  I'm

22   going to strike my next question and we'll move to the

23   middle part.  If you look in the center of the page

24   under the part where it says decision in judgment is

25   rendered as follows based upon a stipulation entered by

Shaul Levy

Page 19

1    the parties as follows and then it gives all your names,

2    and in the center there it says for a total amount of

3    $8,700.  Do you see that?

4    A.      Yes.

5    Q.      Then at the very bottom of the page it says

6    entry of judgment and it says judgment entered in

7    accordance with the above on 3/11/2010.  Do you see

8    that?

9    A.      Yes.

10   Q.      It says a warrant issued to Marshall Riviera on

11   March 19, 2010.  Do you see that?

12   A.      Yes.

13   Q.      After reviewing all that, do you recall this

14   judgment being entered by the clerk against you?

15   A.      I don't remember.

16   Q.      Do you remember negotiating with your landlord

17   about this case?

18   A.      No, I don't remember.

19   Q.      Have you ever stepped foot in housing court in

20   the City of New York?

21   A.      I don't remember, no, I don't remember.

22   Q.      Did you ever hear of Recovery of Judgment

23   before?

24   A.      Explain yourself.

25   Q.      Did you ever hear of Recovery of Judgment

Shaul Levy

Page 20

1    before?

2    A.       What is it?

3    Q.       I'm asking you if you heard of it.

4    A.       No.

5    Q.       Have you ever received a letter from Recovery of

6    Judgment?

7    A.       A letter of Recovery of Judgment?

8    Q.       A letter from Recovery of Judgment.

9    A.       Are you talking -- I don't understand the

10   question.

11          MR. NAHOUM:  He hasn't heard of them so maybe

12   you want to ask your question more specifically.

13   Q.       Have you ever heard of a company identified as

14   ROJ.

15   A.       What's the name?

16   Q.       ROJ.

17   A.       No, I don't remember, no.

18   Q.       Did you ever get a letter from a company called

19   Recovery of Judgment?

20   A.       A letter from Recovery of Judgment from a

21   specific person?

22   Q.       Did you ever get a letter from a company called

23   Recovery of Judgment?

24   A.       I have to look it up.

25          MR. NAHOUM:  If there's a specific letter you're

Shaul Levy

Page 21

1    talking about, why don't you just show it to him?  He

2    said he can't recall who they are.

3    A.      You have to be more specific.

4    Q.      It's a very specific question.  It's a yes or no

5    if you recall receiving a letter.

6    A.      I don't remember.

7    Q.      Have you ever received a letter from the law

8    offices of J. Henry Nierman?

9    A.      The letter I received, yes.

10   Q.      Did you ever receive a letter from me?

11   A.      What's your name?

12   Q.      Joseph Nierman.

13   A.      I'm looking at it, yes.

14   Q.      When did you receive that letter?

15   A.      It says here when I received it.

16   Q.      Are you looking at some specific document right

17   now?

18   A.      Yes.

19   Q.      Are you looking at what was marked for purposes

20   of identification as Defendant's Exhibit 2?

21   A.      That's a letter -- again.

22   Q.      It says Law Offices of J. Henry Nierman across

23   the top?

24   A.      I have the letter in front of me, yes.

25   Q.      Do you want to hold that up in front of us so we

Shaul Levy

Page 22

1    can see what you are looking at?

2          (Shows document).

3    Q.      Did you ever receive that letter?

4    A.      I received that with a bunch of letters.

5    Q.      What does that mean with a bunch of letters?

6    A.      I received it in my mail.

7    Q.      When did you receive that letter?

8    A.      Sometime a few years ago.  I don't have exact

9    dates, but it's written here.

10   Q.      Did you receive that mail yourself or someone

11   else gave it to you?

12   A.      No, I received it myself.

13   Q.      Where did you receive this letter?

14   A.      At 5757 Collins Avenue.

15   Q.      What did you do when you saw this letter?

16   A.      I opened it, I read it.

17   Q.      Can you look at the camera here?

18   A.      What happened when I received the letter I

19   became very emotional, I was very disturbed because this

20   came out of no where, I don't even remember this

21   happening, and it was devastation in the house.  We just

22   had a newborn girl, me and my wife, and I was panicking.

23   Q.      When you say you were panicking, was there any

24   medical manifestation?

25   A.      A lot of anxiety, a lot of fear.

Shaul Levy

Page 23

1    Q.      How did that exhibit itself?

2    A.      I didn't sleep the whole night.  I remember

3    coming home late at night and I didn't sleep all night.

4    Q.      How long did you feel this panic?

5    A.      I felt this panic for a while until I was -- a

6    while.

7    Q.      Can you be more specific, was it for hours,

8    days, weeks?

9    A.      Days, days, even a week.

10   Q.      Why did this cause anxiety?

11   A.      There was a lot of fear in the letter put into

12   me.

13   Q.      What type of fear, what was your fear?

14   A.      The action that's going to be taken against me.

15   Q.      What action did you think would be taken against

16   you?

17   A.      People are going to knock on my door.

18   Q.      And do what?

19   A.      Threaten me.

20   Q.      They were going to threaten you?

21   A.      That's how I felt when I read the letter.

22   Q.      Does it say anywhere in there that someone will

23   knock on your door and threaten you?

24   A.      It said everything that I have is going to be

25   taken away from me.

Shaul Levy

Page 24

1          MR. NAHOUM:  Can you be specific what letter we

2    are talking about?

3    A.       The letter I received from you.

4          MR. NIERMAN:  I'm going to enter this letter as

5    Plaintiff's Exhibit 2 for identification.  I would like

6    to enter Plaintiff's Exhibit 1, the judgment that we

7    were referencing before into the record.

8          MR. NAHOUM:  Can we identify this letter?

9          MR. NIERMAN:  This e-mail that I forwarded which

10   is the letter that he held up there.  I would like that

11   letter entered into the record as Defendant's Exhibit 2.

12         MR. NAHOUM:  The court reporter cannot take down

13   him showing a letter to the screen.  Why don't we

14   describe what this letter is?

15         MR. NIERMAN:  I appreciate your assistance in my

16   transference of my deposition background toward video so

17   thank you.  Just so we can be clear about what this

18   letter is, I'm going to -- since you asked me before to

19   read to you, would you prefer I read or would you rather

20   read?

21   A.       I prefer you read it.

22   Q.       Just so we are on the same page we are looking

23   at a page which says on the very top in blue lettering

24   case 7:17cv-04022-NSR-JCM Document 1-2 filed 5/30/17

25   page two of two, do you see that?

Shaul Levy

Page 25

1  A.      Yes.

2  Q.      I'm going to ask you to confirm everything that

3  I'm reading here and then the heading of the letter says

4  Law Offices of J. Henry Nierman, 39 West 29th Street,

5  New York, New York 10001.  Do you see this?

6  A.      Right.

7  Q.      It's a letter that seems to be dated December

8  10, 2016 and addressed to Shaul Levy regarding Matt

9  Morrison versus Shaul Levy.

10  A.      Yes.

11  Q.      Then it says it's also regarding a judgment

12  entered on 3/11/2010 in the current amount of

13  $13,990.08.  Do you see that?

14  A.      Yes.

15  Q.      It's addressed to Mr./Mrs. Levy and it says,

16  "enclosed herein please find a subpoena duces tecum

17  directing you to appear for a post-judgment deposition

18  on December 26, 2016 at 10:00 a.m." and it's signed Very

19  Truly Yours, Joseph Nierman, legal counsel.  Do you see

20  that?

21  A.      Yes.

22          MR. NIERMAN:  I ask that get entered into the

23  record as Defense Exhibit 2.

24  Q.      You said when you received this letter you faced

25  great anxiety.  Did you seek medical attention for the

Shaul Levy

Page 26

1    anxiety you suffered?

2    A.      No.

3    Q.      Did you ever consult with anyone of any kind

4    about this anxiety that you sustained as a result of

5    receiving this letter?

6    A.      No.

7    Q.      Did you ever tell anyone that you were suffering

8    from anxiety as a result of this letter?

9    A.      Yes.

10   Q.      Who did you tell?

11   A.      My wife.

12   Q.      What was her reaction?

13   A.      Same as mine, worried.

14   Q.      When did that fear go away?

15   A.      I don't really remember.  It's a bit blurry.

16   Q.      Did you feel this anxiety for more than two

17   days?

18   A.      More than that.

19   Q.      Did you feel it for more than three days?

20   A.      More than that.

21   Q.      Did you feel it for more than a month?

22   A.      No.

23   Q.      Did you feel this anxiety for more than seven

24   days?

25   A.      Around.

Shaul Levy

Page 27

1    Q.      Around seven days.  Was it more than 10 days?

2    A.      Around.

3    Q.      I'm trying to get to a point that we say it was

4    less than that.  Did you feel this anxiety for more than

5    14 days, two weeks?

6    A.      I would say around.

7    Q.      On a scale of one to ten, how high was your

8    anxiety a week after you received this letter as a

9    result of this letter -- withdrawn.

10           You said you felt anxiety for a period of a week

11   or two weeks as a result of this letter; is that

12   correct?

13   A.      Yes.

14   Q.      Let's go one to ten, ten being the most, how

15   much anxiety have you ever faced, and one being no

16   anxiety at all, how much anxiety did you feel upon

17   receiving this letter?

18   A.      I would say the first few days it was very heavy

19   anxiety.  It's nine, ten.

20   Q.      After a week, how high was your anxiety over

21   this letter?

22   A.      Eight, seven.

23   Q.      After two weeks how high was your anxiety with

24   this letter?

25   A.      Still eight, seven.

Shaul Levy

Page 28

1   Q.      After three weeks how high was your anxiety with

2   this letter?

3   A.      It got better.

4   Q.      Was there a cause that made it get better?

5   A.      I spoke to my counsel.

6   Q.      Just to be clear, you felt anxiety until you

7   spoke to your lawyer?

8   A.      Yes.

9   Q.      When you say your lawyer, do you mean Daniel

10  Schlanger?

11  A.      Yes.

12  Q.      I don't want to get into particulars of your

13  conversation with your lawyer.  I'm not looking to

14  breach attorney client privilege, but by the time you

15  finished your meeting with your lawyer did you feel

16  confident this letter meant no threat to you?

17  A.      No.

18  Q.      You did not feel confident?

19  A.      No.

20  Q.      You were still worried after meeting with your

21  lawyer?

22  A.      Yes.

23  Q.      What was your fear after meeting with your

24  lawyer?

25  A.      The usual, I still was worried.  The fear was so

Shaul Levy

Page 29

1    bad when I received the letter that I was trying to get

2    out of it.

3    Q.      Have you ever suffered from anxiety before?

4    A.      Yeah.

5    Q.      Have you ever taken medication for anxiety?

6    A.      No.

7    Q.      Have you ever received bills before?

8    A.      Yes.

9    Q.      Do you feel anxiety when you get bills?

10   A.      No.

11   Q.      What about this made you feel more anxiety than

12   a bill?

13   A.      The approach of the letter.

14   Q.      What about the approach of the letter?

15   A.      The way it was written.

16   Q.      What about the way it was written, what filled

17   you with anxiety?

18   A.      The fear that everything is going to be taken

19   away from me.

20   Q.      What about this letter made you feel that

21   everything was going to be taken away from you?

22   A.      The judgment.

23   Q.      You are saying the existence of the judgment is

24   what made you afraid?

25   A.      The letter, whatever the letter stated.

Shaul Levy

Page 30

1    Q.      I'm asking you what about the letter made you

2    feel anxious?

3    A.      The judgment.

4    Q.      I feel like we are going in circles here, so you

5    say you were caused anxiety by this letter so I'm going

6    to ask you to review this letter and ask you what

7    specific part of this letter caused you anxiety?

8          MR. NAHOUM:  This letter is an incomplete

9    document.  Why don't you show him the subpoena that

10   accompanied the letter?

11   A.      That's what I'm talking about, yes.

12   Q.      What about the subpoena that accompanied the

13   letter?  I don't have the subpoena in front of me right

14   now, but we can pause and I can pull up the subpoena.

15          MR. NAHOUM:  It's your deposition.  You are

16   asking him questions about a document that references

17   another document enclosed with it.  He testified this

18   letter gave him anxiety.  You are leaving out the other

19   half of the document.  Show him the subpoena.

20          MR. NIERMAN:  Let's do this.  We'll take a break

21   for five minutes.

22          (Break taken.)

23   Q.      That attachment I'm going to have to look to

24   have that marked as Defense Exhibit 5.  Mr. Levy, we

25   just -- I believe you were just forwarded a document

Shaul Levy

Page 31

1    which says on its front or its top if we skip the blue

2    lettering it says Civil Court of the County of New York?

3    A.      Yes.

4    Q.      Matt Morrison Plaintiff versus Shaul Levy, 5757

5    Collins Avenue?

6    A.      Yes.

7    Q.      On the right said it says 056136-2010 and then

8    subpoena duces tecum.  Do you see all that?

9    A.      Yes.

10   Q.      Can you hold that up for us just so I'm going to

11   ask this get marked and entered into the record as

12   Defense Exhibit 5.

13          Are there a number of pages that you have there,

14   Mr. Levy?

15   A.      Five, six, six.

16   Q.      Six pages?

17   A.      Yes.

18   Q.      This exhibit is a six page exhibit.  Do you see

19   that?

20          MR. NAHOUM:  The copy that you have, Mr. Levy,

21   you could tear off this top page that says Exhibit A.

22   This was a document previously submitted in this lawsuit

23   as an exhibit so you have the cover sheet on there.  The

24   document itself is five pages, right?

25          THE WITNESS:  Five pages itself, yeah.

Shaul Levy

Page 32

1    Q.       Just so that we are clear and on the same page,

2    this first page we are looking at here in the upper

3    corner in blue lettering it says page two of six.  Do

4    you see that?

5    A.       I'm sorry?

6    Q.       In the upper right corner you see where it says

7    page two of six?

8    A.       Yes.

9    Q.       The next page is marked page three of six.  Do

10   you see those pages?

11   A.       Yes.

12   Q.       Collectively this will be marked for

13   identification as Defense Exhibit 5.

14            Was this exhibit attached to the letter that we

15   were identifying before?

16   A.       Yes.

17   Q.       Was this what caused you anxiety?

18   A.       Yes.

19   Q.       What about this caused you anxiety?

20   A.       Do you want to read it?

21   Q.       No, I want to know what part of it caused

22   anxiety.

23   A.       Why don't you start reading it?

24   Q.       Do you want to tell me what part caused you the

25   anxiety?

Shaul Levy

Page 33

1    A.      Like I said before, my English is not, my

2    reading is not so well so bear with me.

3    Q.      I will be patient and before we continue were

4    there any other attachments to the letter or was this

5    the letter in total that you received from me?

6    A.      As far as I recall it's what I received.  I

7    don't remember.

8    Q.      Collectively between Defense Exhibit 2 and

9    Defense Exhibit 5 which parts of this caused you anxiety

10   and you can review it and take your time?

11   A.      The whole thing.

12   Q.      Read to me the parts that caused you anxiety.

13   A.      The whole letter.  I want to note that the whole

14   letter caused me anxiety and because of that for two

15   weeks I wasn't functioning.

16   Q.      What does that mean?

17   A.      So much anxiety.

18   Q.      Did you read the letter?  Sir, I'm asking you to

19   answer a question.

20           MR. NAHOUM:  Objection.  He has answered your

21   question.  You're not happy with his answer.

22   A.      I'm holding it right now and having anxiety

23   again.

24   Q.      I'm asking you to read the words that caused you

25   anxiety.

Shaul Levy

Page 34

1           MR. NAHOUM:  I'm going to state my objection.

2   Mr. Nierman, you have asked the same question over and

3   over again and he has answered.  You're not happy with

4   his answer.  If you're not happy with his answer, ask

5   your question differently.

6   Q.      I'm asking you to tell me which words in this

7   letter caused you anxiety.

8           MR. NAHOUM:  Objection.

9   A.      The whole letter.

10  Q.      Read to me the words that caused you anxiety.

11          MR. NAHOUM:  Objection.

12          MR. NIERMAN:  This is the whole root of the

13  claim of the case.  If he is telling me the whole

14  letter --

15  Q.      Was it the envelope that caused you anxiety?

16  A.      The whole letter.  When I opened that and I saw

17  the subpoena with the judgment the whole thing, every

18  word in this letter, so you can state that from

19  beginning of the letter to the end of the letter

20  everything caused anxiety, the whole thing.  I answered

21  your question.

22  Q.      What is a subpoena?

23  A.      I'm sorry?

24  Q.      What is a subpoena?

25  A.      I don't know.

Shaul Levy

Page 35

1   Q.      You don't know what a subpoena is?

2   A.      No.

3   Q.      Do you know what the word subpoena duces tecum

4   means?

5   A.      No.

6   Q.      Did the words subpoena duces tecum cause you

7   anxiety?

8   A.      Explain your question.

9   Q.      You said you don't know what the meaning of

10  subpoena or subpoena duces tecum is.  I'm asking you if

11  those words cause you anxiety.

12  A.      Subpoena?

13  Q.      Yes.

14  A.      Explain your question again.  I'm getting lost

15  here.

16  Q.      I'm asking you if the words subpoena duces tecum

17  cause you anxiety.

18  A.      I don't know what that is.  I know subpoena is

19  something from court when they subpoena you.  That I

20  know, but I don't know what's the other word you were

21  using.

22  Q.      Before I asked you whether you knew what

23  subpoena meant.

24  A.      Everybody knows what subpoena means but the

25  second word that you were using.

Shaul Levy

Page 36

1    Q.      I'm trying to understand your comprehension of
2    English because you said you don't understand English.
3    I'm simply talking the word subpoena is not Greek.  I'm
4    asking you -- I'm trying to figure out what you
5    understand and what you don't understand so I can't
6    spoon feed you what you understand and what you didn't
7    understand.  When you received this letter what did you
8    understand it meant?
9    A.      It meant my life was over.
10   Q.      Does it mean that someone will come and kill
11   you?
12   A.      No, it means they are going to take everything
13   away from me.
14   Q.      Who is they?
15   A.      Whoever is suing me.
16   Q.      You thought whoever was suing you would be
17   taking everything away from you?  Did you think this was
18   a start of a new legal action?
19   A.      All I read is everything that's going to happen
20   to me.
21   Q.      What is going to happen to you?
22   A.      From one to 26.
23   Q.      What's from one to 26?
24   A.      Why don't you open it and look at it?
25   Q.      Number one to 26 I'm assuming you are referring

Shaul Levy

Page 37

1    to Defense Exhibit 5 where you have a list of a number

2    of questions?

3    A.      I thought this is the end of it.

4    Q.      That's not really answering my question.  Please

5    be specific.  We'll take it step by step and we'll go

6    slow.  I'm not looking to badger you.  I'm looking to

7    understand what was causing you anxiety.

8    A.      The whole thing was causing me anxiety.

9    Q.      I'm asking what did you think exactly was going

10   to happen to you?  Avoid using euphemisms.

11   A.      What is euphemisms?

12   Q.      Don't exaggerate.  You said your life was over

13   meaning that you thought you were going to die?

14           MR. NAHOUM:  Objection.  You're not going to

15   tell him what his answer should be.  Ask him a question

16   and he will give you an answer.

17           MR. NIERMAN:  I already asked him if he thought

18   he was going to die and he said no, so clearly when he

19   said he thought his life was over he was exaggerating.

20           MR. NAHOUM:  Ask him a question.

21   Q.      What did you mean?

22   A.      I meant everything would be taken away from me.

23   Q.      Who would take everything away from you?

24   A.      Whoever was suing me.

25   Q.      Did you think people were going to show up at

Shaul Levy

Page 38

1    your house and take things from you?

2    A.        Absolutely.

3    Q.        When you say that you thought your life was

4    over, you mean to say that you thought people were going

5    to take away your money or possessions, is that what you

6    meant?

7    A.        Exactly.

8    Q.        Did you have any other fears at all?

9    A.        If I have any fears?  I had a lot of fears.

10   Q.        Such as?  Please tell me.

11   A.        I was lost once I got the letter because I

12   remember I came home after work and as soon as I opened

13   the mail and I saw that a couple of weeks I was lost,

14   like a zombie.

15   Q.        I don't want to mischaracterize your testimony

16   so I want to make sure you and I are on the same page.

17   When you say you thought your life was over, do you mean

18   you felt threatened that you were going to lose some or

19   all of your financial assets?

20   A.        Yes.

21   Q.        Did you have fear?

22   A.        I had a lot of fear.

23   Q.        I'm asking you what you were afraid of, not how

24   you felt.  I'm asking you what was causing you fear.

25   A.        The letter caused me the fear.

Shaul Levy

Page 39

1   Q.      You said that, sir.  I'm asking you to answer my

2   question, please.  I move to strike as nonresponsive.

3   I'm asking you what damage you felt could come to you?

4   A.      That everything would be taken away from me.

5   Q.      Did you feel any other damage would happen to

6   you besides everything?

7   A.      I'm probably going to lose everything I have.

8   Q.      Besides loss of possessions, of money, did you

9   think anything else would happen to you?  It's a yes or

10  no question.

11  A.      Can you be more specific?

12  Q.      No, I'm asking you what you thought.

13  A.      I had a fear that everything was going to be

14  taken away from me.

15  Q.      You mean your possessions and your money; is

16  that correct?

17  A.      Exactly.

18  Q.      Did you have a fear of anything else happening

19  to you?

20  A.      I had a fear that somebody is going to be

21  knocking on the door.

22  Q.      And doing what?

23  A.      Coming after me because of this letter.

24  Q.      When you say coming after you, do you mean

25  physically trying to hurt you or assault you or do you

Shaul Levy

Page 40

1    mean take your possessions?

2    A.      Take my possessions.

3    Q.      Your anxiety and fear was exclusively that you

4    were going to be losing your money and/or possessions?

5    I'm not trying to minimize your fear.  I'm trying to

6    make sure.  That was the extent of your fear; is that

7    correct?

8    A.      Yes.

9    Q.      Without revealing to me your conversation with

10   your lawyer, did your lawyer tell you that you might

11   lose all your possessions?

12           MR. NAHOUM:  Objection, stop there.  Don't

13   answer that.

14           MR. NIERMAN:  I'm trying to find out --

15           MR.  NAHOUM:  You asked him what his lawyer told

16   him.  Stop right there.

17           MR. NIERMAN:  I will withdraw the question and

18   rephrase.

19   Q.      After you met with your lawyer, did you still

20   think you could lose some of your possessions as a

21   result of this letter?

22   A.      Yes.

23   Q.      Was there any follow up by me or any of the

24   defendants herein to this letter?

25   A.      I don't remember.

Shaul Levy

Page 41

1    Q.      Did you ever hear from me again?

2    A.      I don't remember.

3    Q.      Did you ever receive a letter from the Law

4    Offices of J. Henry Nierman?

5    A.      I don't remember.

6    Q.      Did you ever receive a letter from Recovery

7    Judgments?

8    A.      I don't remember.

9    Q.      Prior to receiving this letter, did you ever

10   receive any contact from me personally?

11   A.      I don't remember.

12   Q.      Did you ever hear my name before you received

13   this letter?

14   A.      I don't remember.

15   Q.      Did you ever hear the Law Offices of J. Henry

16   Nierman before you received this letter?

17   A.      I don't remember.

18   Q.      Did you ever hear of Recovery J0udgment before

19   you saw this letter?

20   A.      Rephrase the question.

21   Q.      Did you ever hear of Recovery Judgment before

22   you received this letter?

23   A.      In general?

24   Q.      Yes.

25   A.      Yes.

Shaul Levy

Page 42

1  Q.      You heard of Recovery Judgment before you

2  received this letter?

3  A.      Yes.

4          MR. NAHOUM:  Objection, let's please clarify

5  whether you're talking about an entity or the phrase

6  recovery judgment?

7  A.      The phrase.

8  Q.      I appreciate that clarification, thank you,

9  counsel.  Did you ever hear of an entity, a corporation

10 called Recovery Judgment before you received this

11 letter?

12 A.      No.

13 Q.      Did anybody contact you about this letter after

14 you received this letter?

15 A.      I don't remember.

16 Q.      How long after you received this letter did you

17 contact an attorney?

18 A.      About two weeks.  I don't remember.  I don't

19 know the exact dates.

20 Q.      You said this letter caused you anxiety and when

21 I say this letter I'm referring to defense Exhibit 2.

22 You said this letter caused you great anxiety; is that

23 correct?

24 A.      Yes.

25 Q.      Why did you wait before consulting an attorney?

Shaul Levy

Page 43

1   A.      I live in Miami and this is in New York.

2   Q.      What does this mean?

3   A.      It means it took me time to find.

4   Q.      To find what?

5   A.      A lawyer.

6   Q.      What methods did you use to find a lawyer?

7   A.      I went on line.

8   Q.      You searched on Google to find a lawyer?

9   A.      Yes.

10  Q.      What type of Google search did you put in to

11  find a lawyer?

12  A.      I don't remember.

13  Q.      It took you a week on line to find a lawyer in

14  New York?

15          MR. NAHOUM:  Objection to form.

16  Q.      Did it take you a week of searching on line to

17  find a lawyer in New York?

18  A.      About.

19  Q.      How many hours a day did you spend looking for a

20  lawyer in New York?

21          MR. NAHOUM:  Objection to form.  You can answer.

22  Q.      How many hours did you spend on line trying to

23  find a lawyer in New York?

24  A.      I don't remember.

25  Q.      Did you spend more than 10 hours looking for a

Shaul Levy

Page 44

1    lawyer?

2    A.       I don't remember.

3    Q.       Did you spend more than 50 hours searching for a

4    lawyer?

5    A.       I don't remember.

6    Q.       You think you might have spent 50 hours

7    searching for a lawyer, Mr. Levy?

8    A.       I don't remember.

9    Q.       Did you spend more than three months looking for

10   a lawyer?

11          MR. NAHOUM:  Objection.

12          MR. NIERMAN: He is saying I don't remember and

13   he is simply trying not to answer a question so I'm

14   asking him a very straight forward question.

15          MR. NAHOUM:  He gave you an answer.

16   Q.       Did you spend more than 20 hours looking for a

17   lawyer in New York in order to defend this letter that

18   you received?

19   A.       I don't remember.

20   Q.       Did you spend more than 50 hours?

21          MR. NAHOUM:  Objection.

22          MR. NIERMAN:  I'm trying to verify how long he

23   spent trying to find a lawyer.

24   Q.       Did you spend more than 50 hours on line looking

25   for a lawyer in New York?

Shaul Levy

Page 45

1    A.      I really don't remember.

2    Q.      It might have been more than 50 hours?

3    A.      I don't remember.  It's three years ago.

4    Q.      You said that you were suffering great anxiety?

5    A.      Yes.

6    Q.      Why would you wait a week to contact a lawyer?

7            MR. NAHOUM:  Objection.

8    A.      Searching for a lawyer.

9            MR. NAHOUM:  He has answered this.

10           MR. NIERMAN:  That's why I'm trying to find out

11   how long he has spent looking for this lawyer.

12           MR. NAHOUM:  He answered.

13   Q.      Have you spent more than 100 hours looking for a

14   lawyer -- withdrawn.

15           Did you spend more than 100 hours on line

16   searching for a lawyer in New York that can help you

17   responding to this letter we received marked for

18   identification as Defendant's Exhibit 2?

19   A.      I don't remember.

20   Q.      You said you spoke with your wife about your

21   anxiety that you had as a result of this letter?

22   A.      Yes.

23   Q.      When I say this letter, you understand I'm

24   referring to Defendant's Exhibit 2; is that correct?

25   A.      We are talking about the two of six.

Shaul Levy

Page 46

1   Q.      I'm talking about two exhibits, the cover letter

2   marked as Defendant's Exhibit 2 and Defendant's Exhibit

3   5 which is that five page document marked two of six,

4   three of six?

5   A.      Yes.

6   Q.      We are clear on that?

7   A.      Yes.

8   Q.      When you received this letter, did you talk to

9   your wife about it?

10  A.      Yes.

11  Q.      Did she make your anxiety better or worse?

12  A.      She went into fear as well.

13  Q.      Did she think you were going to lose everything?

14          MR. NAHOUM:  Objection.  You can answer if you

15  know.

16  A.      She read the letter and she went into so much

17  fear.

18  Q.      Did she ever try to help you find a lawyer in

19  response to the letter?

20  A.      No.

21  Q.      Did she tell you that you should look for a

22  lawyer?

23  A.      Yes, of course.

24  Q.      Did you feel any better at all after you

25  consulted a lawyer?

Shaul Levy

Page 47

1    A.       You asked me this question already.

2    Q.       I'm not sure what your answer was.

3    A.       You asked me this and I answered.

4    Q.       Mr. Levy, I have been very patient with you.

5    I'm asking you a simple question here.

6    A.       I need to hear you.  My speaker is very weak.

7    You don't need to get very upset.

8    Q.       I'm asking you to answer a question.  It's for

9    your lawyer to object, not you, so I'm asking you.

10   A.       But you did ask me that question already.

11           MR. NAHOUM:  Mr. Levy, if you know the answer

12   you can answer him.

13   Q.       Did you feel any change in your anxiety after

14   you met with your lawyer?

15   A.       No.

16   Q.       You felt the exact same level of anxiety after

17   you finished talking with your lawyer as before?

18   A.       Yes.

19   Q.       Did you ever -- did you tell your lawyer a

20   judgment had been entered against you in housing court?

21           MR. NAHOUM:  Objection, don't answer it.  You

22   just asked him what you told his lawyer.

23   Q.       How long after you met with a lawyer did you

24   retain -- strike that.

25           How did you first consult with your lawyer, was

Shaul Levy

Page 48

1    it by telephone or in person?

2    A.       By telephone.

3    Q.       Have you ever met with your lawyer face to face?

4    A.       No.

5    Q.       There came a point in time when you retained Mr.

6    Schlanger or plaintiff's counsel in response to this

7    letter?

8    A.       What was the question?

9    Q.       Did you ever hire a lawyer about this letter?

10   A.       Again, what was the question?

11   Q.       Did you ever hire a lawyer to defend this

12   letter?

13   A.       Yes.

14   Q.       How long after your first phone call with the

15   lawyer did you hire him?

16   A.       I don't remember.

17   Q.       Did you have multiple conversations with your

18   lawyer before you hired him?

19   A.       I don't remember.

20   Q.       Did you agree to hire your lawyer during your

21   first phone call with him?

22   A.       I'm sorry?

23   Q.       Did you agree to hire your lawyer during your

24   first phone call with him?

25            MR. NAHOUM:  Objection.  You are getting too

Shaul Levy

Page 49

1    close to the line here, Mr. Nierman.  You are asking

2    questions about a strategy between a client and counsel.

3            MR. NIERMAN:  I'm trying to get a time frame as

4    to when he consulted with his lawyer.

5            MR. NAHOUM:  You are getting dangerously close.

6    I object to it.

7            MR. NIERMAN:  I want to find out if he had this

8    anxiety that he alleges he had.  I'm asking -- I want to

9    find out when he spoke with a lawyer and when he hired

10   his lawyer.  That's all I'm asking.  There's nothing

11   about his strategy, there's nothing about his

12   conversation with his lawyer.

13           MR. NAHOUM:  He answered you that he couldn't

14   remember so be careful how you push him on the next

15   question.

16   Q.      My question is, did you agree during your first

17   phone call you would hire Mr. Schlanger to be your

18   counsel?

19   A.      I told you I don't remember.

20   Q.      Did you hire Mr. Schlanger to serve as defense

21   in this letter or to serve in the capacity of suing me

22   or both?

23   A.      Again the question.  I'm sorry, I didn't get the

24   question.

25   Q.      Let's take a step back.  You are aware this is a

Shaul Levy

Page 50

1    litigation where you are suing me, correct?

2    A.       Yes.

3    Q.       That's different from hiring a lawyer to defend

4    from a lawyer that you received.  Do you understand

5    that's different?

6    A.       Okay.

7            MR. NAHOUM:  Objection as to form.

8    Q.       My point is that you can hire a lawyer to serve

9    as a shield to stop someone from coming after you or you

10   can hire a lawyer to be a sword so that you can go after

11   someone else.  Do you understand that distinction?

12           MR. NAHOUM:  You're not supposed to make points.

13   Ask questions.

14           MR. NIERMAN:  I'm asking him about what he

15   understands of the scope of the representation of his

16   counsel.

17           MR. NAHOUM:  I'm going to object and instruct

18   him not to answer to you what the scope of his

19   engagement is.  It's protected by the attorney client

20   privilege.  Don't answer it.

21           MR. NIERMAN:  I have a right to know what you

22   were retained for.  Maybe he doesn't know you started

23   this action.

24           MR. NAHOUM:  It's protected by the attorney

25   client privilege.  Don't answer that question.

Shaul Levy

Page 51

1              MR. NIERMAN:  I don't believe it's protected by

2     the attorney client privilege.  We are going to pause

3     this deposition right here.

4     Q.     I want to go back to the level of anxiety that

5     you felt when you got the letter, and when I say the

6     letter it's both exhibits two and five, the letter and

7     the subpoena so just so I'm clear.  If I asked this

8     before I apologize.  Did you seek medical attention for

9     the anxiety?

10    A.     No.

11    Q.     Were you suffering from any type of heart

12    condition at the time that you received the letter?

13    A.     I'm sorry, I couldn't hear you.

14    Q.     Were you suffering from any type of heart

15    condition at the time you received the letter?

16    A.     No.

17    Q.     Have you ever suffered --

18    A.     Not that I'm aware.

19    Q.     Have you ever suffered from any type of heart

20    condition?

21    A.     Not that I'm aware.

22    Q.     Did this -- did receipt of this letter cause you

23    to suffer any type of heart condition that --

24    A.     Not that I'm aware.

25    Q.     I'm going to turn to what I marked in my

Shaul Levy

Page 52

1    exhibits as defense Exhibit 4 which is an eight page

2    document and it should say at the top in black lettering

3    United States District Court.  It's an eight page

4    document.

5    A.      Yes, I have it.

6    Q.      Have you ever seen this document before?

7    A.      Yeah.

8    Q.      Just that we are on the same page as to what

9    this document says, you see it says United States

10   District Court Southern District of New York?

11   A.      Yes.

12   Q.      Below that it says Shaul Levy plaintiff and law

13   offices of J. Henry Nierman.  Do you see that?

14   A.      Yes.

15   Q.      Do you see it's identified on the right side of

16   that caption complaint and your trial demanded?

17   A.      Yes.

18   Q.      Before today have you ever seen this document?

19   A.      Yeah.

20   Q.      When did you see this document?

21   A.      I don't remember.

22   Q.      Let's try and just narrow it down a little bit.

23   First did you see this document months ago or years ago?

24   A.      I don't remember, sorry, I really don't.

25   Q.      What caused you to see this letter?

Shaul Levy

Page 53

1          MR. NAHOUM:  Objection.

2          MR. NIERMAN:  Strike that.  I don't like the way
3     I worded it.

4     Q.     What were the circumstances where you saw this
5     document in the past?

6     A.     When I consulted my lawyer.

7     Q.     Did you review this document at that time?

8     A.     Yes.

9     Q.     Did you read through it?

10    A.     You know my reading is bad.  It took me time,
11    but as best of ability.

12    Q.     Did you agree everything in this document was
13    accurate?

14    A.     Rephrase your question.

15    Q.     You reviewed this document you said, correct?

16    A.     Yes.

17    Q.     When you reviewed this document did you agree
18    that everything contained in here was truthful?

19    A.     Yes.

20    Q.     I'm going to call your attention -- I'm going to
21    ask this document be admitted on the record --

22           (The court has called.)

23           THE COURT:  I have been briefed on the issue,
24    but if someone could tell me what the issue is so that I
25    can rule on it.  Who is being deposed?

Shaul Levy

Page 54

1          MR. NIERMAN:  I'm deposing the plaintiff Shaul

2    Levy.  Perhaps it's easiest if the court reporter read

3    back the question that I asked her to mark and then we

4    can discuss what my objection is and whether my question

5    is improper.  The issue that we were fighting over is

6    whether or not I have the right to inquire about the

7    nature and representation of plaintiff's counsel and

8    when they were retained and what purpose they were

9    retained.

10          (Question read back.)

11          THE COURT:  Why did you object to this question?

12          MR. NAHOUM:  The inquiry calls for an answer

13    regarding legal advice and case strategy and my concern

14    is it comes too close to breaching a privilege.

15          THE COURT:  You would agree that he is entitled

16    to find out when he first contacted him?

17          MR. NAHOUM:  I have no objection to that.  In

18    fact, it has been asked.

19          THE COURT:  Are you -- would you agree or not

20    agree to the question was what was the scope of the

21    representation?

22          MR. NAHOUM:  I do have a problem with that

23    because it's said in the context of there being a

24    distinction between the subpoena and the FTPCA claim.

25    It was one or the other or both.

Shaul Levy

Page 55

```
1          THE COURT:  What if the question is phrased what
2     was the scope of the representation, not in the context
3     of anything?
4          MR. NAHOUM:  I would state the same objection
5     that the inquiry calls for an answer regarding legal
6     advice and case strategy.
7          THE COURT:  Are you saying that there's never a
8     circumstance where someone can ask someone, and this
9     isn't a challenge.  I'm trying to get to the problem
10    because once you get the legal advice and case strategy
11    I don't think Mr. Nierman would object to that.  What he
12    is trying to figure out was, and there may or may not be
13    a way to say this, was like you hire someone one day to
14    represent you in a motor vehicle accident and a you hear
15    they offer you wills and then you go to that guy.
16         MR. NAHOUM:  I would not find that
17    objectionable, but here the two are intimate.  They are
18    not distinct engagements.  These are very much related.
19         MR. NIERMAN:  In the past he has admitted to the
20    courts there were two separate retainer agreements
21    entered into by the plaintiff with his counsel.  One
22    that was the defense of the letter and the other was to
23    prosecute of the FTPCA.  There were two payment
24    arrangements for the two, I would assume, so I'm trying
25    to find out when he hired them for each and I mean I
```

Shaul Levy

Page 56

```
 1   would like to know if he laid out any money.  I'm going
 2   to be asking about that.  I don't know if I will have
 3   objections about that, and I have no interest, the court
 4   was correct, I have no interest in finding out any
 5   specific conversations that they had other than the fact
 6   that these -- the only question I will be asking him
 7   which will really I think Mr. Nahoum's perspective would
 8   be pushing the envelope, is that contained in the
 9   complaint which he has admitted that he has reviewed are
10   allegations which he knew or should have known were
11   false and I am going to want to ask him about whether he
12   discussed those specific allegations with his attorney
13   because I want to know whether he will -- since I know
14   they're false and we have documentary evidence they are
15   false, I want to know whether he told his attorney or
16   whether the attorney made assumptions, he didn't know
17   the attorney was making his allegations, and that's
18   specifically about whether there was an underlying
19   judgment or not.  The documentary evidence says there
20   was not.  The complaint alleges that known judgment
21   exists.
22        MR. NAHOUM:  I would not object to a question
23   that asked whether or not a communication happened.  I
24   would, of course, object when you step into the area of
25   what was said.
```

Shaul Levy

Page 57

1          THE COURT:  I get that and I think that there

2    could be a way to phrase it in the sense of this

3    statement in the complaint at the time that you signed

4    this, were you aware of X, Y or Z.  You can probe it.

5    You can't say if I tell my attorney that, did I tell the

6    attorney he even included that.  You need him to adopt

7    that statement at the time.  When you signed it, that

8    was the information that's in there is information Mr.

9    Nahoum you should be able to ask is this information you

10   gave your attorney.  That's not going to strategy, is

11   it.

12          MR. NAHOUM:  If the question is did you make.

13   it -- he reads a statement from the complaint and says

14   did you convey this information to your attorney, that's

15   objectionable because he is asking about a

16   communication, while it may be a statement in a

17   complaint, he is asking about a communication from the

18   client to the client's attorney.  He can ask whether or

19   not it's true, he can ask whether or not he thought it

20   was true at the time.  He can ask whether or not he

21   thinks it's true now, but if he asks did you tell this

22   to your lawyer, that's a communication between a

23   litigant and their counsel.

24          MR. NIERMAN:  I'm trying to figure out his mind

25   set at the time the complaint was filed.

Shaul Levy

Page 58

1          MR. NAHOUM:  Ask him that.

2          MR. NIERMAN:  It's become evident by this

3   deposition that English is his second language and I'm

4   not saying that in any type of negative way other than

5   it makes asking questions that much more difficult

6   especially when I need to break it down.

7          MR. NAHOUM:  I understand, but asking about

8   privilege that's not a way to get around.

9          THE COURT:  You can ask him at the time he

10  signed.  You can ask him his thoughts and his thought

11  process.  You can ask him if that statement is something

12  that he signed the complaint, he was aware that it was

13  in the complaint, and at the time he signed the

14  complaint did he believe it was true, at the time he

15  signed it did he believe it was true.  Does he now still

16  believe it's true and if the answer is no, he doesn't

17  believe it's true, now the next question is when did you

18  realize it wasn't true.  Mr. Nahoum if there are true

19  retainer agreements, which I vaguely remember there were

20  being, he can ask when those retainer agreements were

21  signed.

22          MR. NAHOUM:  I have no objection to that and I

23  was not aware whether there was one or two retainer

24  agreements, so this is something I wasn't aware of.  I

25  have no objection to a line of questions about the

Shaul Levy

Page 59

1   timing of the retention.  It's when you start talking

2   about the purpose and intent that you are stepping into

3   legal advice and case strategy.

4       MR. NIERMAN:  I was only asking for a very broad

5   scope whether it was retained.  I actually used that

6   analysis when I tried to explain it coming in in his

7   defense or the purpose of his suing me.  I had a whole

8   build up to overcome any secondary language issues so he

9   would understand the representation of what I was asking

10  him.

11      MR. NAHOUM:  There's a way to ask these

12  questions and a way not to and I'm objecting because I

13  need to protect the record here.  You could fairly ask

14  did you retain counsel to defend you on the subpoena,

15  did you retain counsel to prosecute an FDCPA case.  When

16  you start asking about what the strategy was that's what

17  I'm concerned with.

18      THE COURT:  You can ask when did you retain them

19  and if he answer yes, then it's when did you retain

20  them.  Now on the issue of payment, Mr. Nierman --

21      MR. NIERMAN:  Just to be clear, he is very

22  likely going to say I don't know.

23      MR. NAHOUM:  Then that's the answer.

24      THE COURT:  There's nothing you can do about

25  that.  If he says I don't know when he did this or I

Shaul Levy

Page 60

1  don't know when he did that, he reviewed it before it

2  was filed.  You got him to say that?

3          MR. NIERMAN:  He didn't remember when he saw the

4  document before he admitted that he saw it.  When I

5  tried to ask him what context he saw it Mr. Nahoum had

6  an issue with that.

7          THE COURT:  I think you can say when did you see

8  it, did you see it before May 30, 2017.  Is everything

9  in this complaint accurate, was it accurate at the time

10  you saw it, was it accurate, is anything in the

11  statement not accurate at the time because he did not

12  sign this complaint.

13          MR. NIERMAN:  He didn't sign it.

14          THE COURT:  You can say -- you can ask him is it

15  all accurate and if he says something in here is not

16  accurate, he has to be able to ask him did you tell your

17  attorney that.

18          MR. NAHOUM:  I'm trying to understand.  If the

19  witness says this I understood this to not be true at

20  the time I read it or understand it now.

21          THE COURT:  Or ever.  If he ever says look, at

22  the time I originally read it everything was true and if

23  you sit here today what is not true, and then he said

24  this is not true.  Then you can ask a followup question

25  when did you learn that, when did it become clear to you

Shaul Levy

Page 61

1    that it was not true.  You can ask him did you tell your

2    attorney it was not true.  Doesn't ask what the attorney

3    says, but the thing is that, you know, he is -- I would

4    think he would be entitled to know if the attorney knows

5    if something isn't true.

6            MR. NAHOUM:  Yes, although I don't know that you

7    can ask him that.  I'm trying to see how it's still not

8    a protected statement.  I don't see what the exception

9    would be to the privilege.

10           THE COURT:  Mr. Nierman, have you said anything

11   in this complaint, has he adopted all the statements in

12   this complaint as true?

13           MR. NIERMAN:  I haven't asked him the question

14   yet.  He said he is a very slow reader.  He saw this a

15   long time ago and he has no idea if he saw it months ago

16   or years ago.  He's certainly not going to know if he

17   saw it before or after May 30, 2017.

18           THE COURT:  Did you determine that English

19   wasn't his first language?

20           MR. NAHOUM:  No.

21           MR. NIERMAN:  I haven't asked that question

22   although when I was asking to read things he mentioned

23   that he struggles with reading and he reads very slow

24   and he certainly speaks with an accent so I made that

25   assumption without actually putting that on the record.

Shaul Levy

Page 62

1         THE COURT:  You need to put that on the record.

2         MR. NAHOUM:  He hasn't been asked if English is

3    his first language, he hasn't been asked about the scope

4    of his education.  When I asked him to read he read

5    rather slowly and that's why and he did ask when offered

6    that I read and he just confirm or whether he would be

7    allowed because he said he struggles with reading.

8         THE COURT:  I think the issue is if any

9    communications that he has had with his attorney or his

10   attorney has had with him are privileged so I think you

11   can find out, you know, whether did he -- break it down,

12   did he sign two retainer agreements.  He can say yes or

13   no or I don't remember.  When he signed the first one

14   what was the first retainer agreement covering, what was

15   the second retainer agreement covering.  I don't know if

16   there were two.  I don't remember, and you can ask

17   questions about the complaint, has he read it, when did

18   he read it, are all the statements true, if they are not

19   true what is not true.  If something is not true when

20   did he learn it wasn't true.  We are not asking how he

21   learned it wasn't true, but when he learned it wasn't

22   true.

23        MR. NIERMAN:  I want to ask this.  Most of the

24   support stated in the complaint for the allegations, the

25   false allegations, that there was no underlying action

Shaul Levy

Page 63

1    is in paragraphs 40 through 48 of the complaint.  It's

2    mostly allegations made by counsel himself about contact

3    that he made with the clerk and things like that which

4    obviously it's nothing that Mr. Levy is going to know

5    that, but if I ask about that, the key thing appears the

6    underlying action does not exist and that's why I want

7    to know whether he had any conversation, and if this is

8    privilege and I can't ask these I respect that.

9         THE COURT:  You can only ask about the

10   conversation.  Just say were you aware at any time that

11   this underlying action didn't exist or does exist.

12        MR. NAHOUM:  We have been through that today in

13   the deposition and he testified after having his memory

14   refreshed he did remember.

15        THE COURT:  That he remembered it did exist?

16        MR. NIERMAN:  He didn't remember the judgment,

17   though.  He said he remembered the existence of the

18   actions, but not the judgment.

19        MR. SCHNEPS:  Your Honor, I wanted to ask if Mr.

20   Levy would say I now or at some point I came to the

21   conclusion that something in the complaint was not true,

22   so based upon the issue of privilege one could, however,

23   say to him what did you then do after you concluded that

24   something was not true.

25        THE COURT:  I don't see anything wrong with

Shaul Levy

Page 64

1   asking that.

2          MR. NAHOUM:  I don't have a problem with that.

3          THE COURT:  You cannot ask the leading question.

4   You ask the open ended question.  What, if anything,

5   once you realized it was not true what, if anything, did

6   you do.

7          MR. SCHNEPS:  He said he contacted my attorney

8   no more.

9          THE COURT:  You can't ask a leading question

10  here.  In this area you have to be very careful about

11  asking open ended questions, what, if anything, did you

12  do when you learned that, what, if anything, did you

13  think when you received this subpoena.  You want to ask

14  the open ended question.

15         MR. NIERMAN:  I'm going to do my best to comply

16  with everything the Court is directing, and I want to be

17  clear on the record here.  I have zero intention of

18  trying to breach any protected attorney client

19  privilege.  I'm trying to find out what he did and how

20  this false information got in here and what he has done

21  about it.

22         THE COURT:  I understand that.  Unfortunately,

23  questions could be phrased in such a way that comes too

24  close to the line, so ask questions that are more open

25  ended, what, if anything, did you do, what, if anything,

Shaul Levy

Page 65

1    did you know.

2          MR. SCHNEPS:  One fast thing, please.  This

3    deposition is from Joseph Nierman pro se and I have not

4    asked any questions.  Before we started, so to speak,

5    plaintiff's attorney actually said that since he

6    believed I did not formerly notice about taking a joint

7    deposition I wouldn't be allowed to ask questions anyway

8    and we did notice him, but our position was that since

9    these were court ordered discovery if I would want to

10   ask I would and he would either tell his client to

11   answer or not answer.  I was curious if the court had

12   any opinion on this.

13         MR. NAHOUM:  I think that's misstated my

14   position.  What I said was that I didn't want the

15   witness to have to fend off two questioners at one time.

16   I said at the end of Mr. Nierman's examination if he had

17   any questions that he wanted to ask, that was fine.  I

18   wasn't going to have both of them at the same time.

19         THE COURT:  I think you guys are ready to go.

20         (Call with The Court has ended.)

21   Q.     I think the last thing I asked for this

22   complaint to be entered in the record as Defense Exhibit

23   4.  Mr. Levy, I'm returning again to this complaint

24   marked as Defense Exhibit 4 and ask if you can turn to

25   page five of eight, specifically paragraph 40.  In the

Shaul Levy

Page 66

1    complaint it says paragraph 40, "more over the

2    underlying action appears not to exist".  Do you see

3    that in paragraph 40?

4    A.      Yes.

5    Q.      To be specific, the underlying action, these

6    words here, the underlying action is referring to the

7    case that we discussed before where you were sued by

8    your landlord, so my question for you is first and

9    foremost as you sit here today, do you believe that case

10   does not exist?

11          MR. NAHOUM:  Objection to form.  You can answer

12   if you know what he is asking you.

13   Q.      In paragraph 40 it says, "more over the

14   underlying action appears not to exist".  As you sit

15   here today, do you believe that statement is true?

16          MR. NAHOUM:  Objection to form.  If you can

17   answer it, you can answer it.

18   A.      I don't understand the question.

19   Q.      Let's be clear here.  Do you understand what the

20   underlying action in this sentence, "the underlying

21   action does not exist", do you understand what the

22   underlying action means?

23   A.      No.

24   Q.      Mr. Levy, are you originally from the United

25   States of America?

Shaul Levy

Page 67

1   A.      No, from Israel.

2   Q.      What is your in native language?

3   A.      Hebrew.

4   Q.      When did you learn English?

5   A.      Slowly every day, I'm still learning even today.

6   Q.      What I'm going to do, and I want to try and

7   break this down in a way that you can understand it.

8   This sentence, "moreover, the underlying action appears

9   not to exist".  Do you see that sentence there in

10  paragraph 40, correct?

11  A.      Yes.

12  Q.      In the context of the complaint, the underlying

13  action is referring to a particular case, specifically

14  it's a case that you saw in the document you received in

15  the letter.  Do you understand that?

16          MR. NAHOUM:  Objection.

17  A.      What was the question?

18  Q.      I will rephrase it.  I turn your attention to

19  Defense Exhibit 5 for a second.  I'm going to pause and

20  go to Exhibit 5.  You see that subpoena there?

21  A.      Yes.

22  Q.      You see the caption of the subpoena?

23  A.      Yes.

24  Q.      The caption of the subpoena there which is

25  Morrison and Yen as plaintiffs and you as defendant.  Do

Shaul Levy

Page 68

1    you see that?

2    A.       Yes.

3    Q.       Do you understand what that caption references?

4    A.       I don't understand what you are saying right

5    now.

6    Q.       Do you understand what a plaintiff is?

7    A.       No, not really.

8    Q.       You don't know what a plaintiff is, any

9    plaintiff in the world?

10          MR. NAHOUM:  Objection to form.

11   Q.       A plaintiff is someone who sues somebody else.

12   Do you know what a defendant is?

13   A.       Defendant I know.

14   Q.       A caption is something that's identified in a

15   court case, the plaintiff and a defendant, the person

16   who is suing and the person who is being sued.  Does

17   that make sense?

18   A.       Yes.

19   Q.       When you received the letter which had a

20   subpoena the subpoena had a caption.  Do you see in the

21   subpoena where it has a caption there?

22   A.       I see the box.

23   Q.       You see where it says Morrison is the plaintiff?

24   A.       Yes.

25   Q.       You are the defendant?

Shaul Levy

Page 69

1    A.      Yes.

2    Q.      That's referencing a case a long time ago from

3    2010.  Do you understand that?

4    A.      Yeah.

5    Q.      Specifically it's referenced in Defendant's

6    Exhibit 1.  Do you see that?

7    A.      Yes.

8    Q.      Specifically we're talking about that judgement

9    where it says that Mr. Morrison and Mr. Yen have a

10   judgment against you for $8,478, do you see that?

11   A.      Yes.

12   Q.      When you see the caption in Defendant's Exhibit

13   5 it's referring to that case in Defendant's Exhibit 1.

14   Do you understand that?

15           MR. NAHOUM:  Objection.

16   Q.      When your attorney drafted the complaint he

17   referred back to that case and he calls it the

18   underlying action?

19           MR. NAHOUM:  Objection.

20   Q.      Specifically in paragraph 40 where it says,

21   "moreover, the underlying action appears not to exist".

22   He is talking about the case with your landlord from

23   2010.  Do you understand that?

24           MR. NAHOUM:  Objection.

25   A.      I don't understand nothing.  I don't understand

Shaul Levy

Page 70

1  where you are jumping from a question to page 40 and

2  then you are taking it to an exhibit.  It's been

3  draining me so my brain is not working right now.

4  Q.      My objective is not to drain you right now.

5  It's just to find out what you understand.  I want you

6  to understand this complaint when your attorney writes

7  the underlying action does not exist he is saying that

8  there was never a case --

9          MR. NAHOUM:  Objection.  Why don't you ask him

10 what he understands that paragraph to mean?

11         MR. NIERMAN:  Very well.

12 Q.      Mr. Levy, what do you understand that paragraph

13 40 means?

14 A.      I really don't understand that paragraph.

15 Q.      Do you understand that it serves as an

16 allegation that the case -- that there was never a case

17 brought against you?

18         MR. NAHOUM:  Objection.

19 Q.      I haven't finished my question -- that was

20 identified in New York Civil Court by 56136 2010 index

21 number?

22 A.      Are you asking me a question?

23 Q.      Yes, I am.

24 A.      What was the question again?  I thought you were

25 telling me something.

Shaul Levy

Page 71

1    Q.      I'm asking you a question if I'm telling you so

2    that you can understand the question I'm asking you.

3    A.      What's the question again?

4    Q.      The case that's referenced in Defendant's

5    Exhibit 1 and in Defendant's Exhibit 5 has an index

6    number.  Do you understand what an index number is?

7    A.      Yeah.

8    Q.      Do you understand what it means to have an index

9    number?

10   A.      Yes.

11   Q.      What is an index number?

12   A.      It's a number.

13   Q.      What does that mean?

14   A.      A file number.

15   Q.      There's the court's file number, a file number

16   assigned by the court.  So in the subpoena and in the

17   judgment it references case number 56136 from the year

18   2010 in the New York Civil Court.  Do you understand

19   that?

20   A.      Yes.

21   Q.      Sir, do you understand that?

22   A.      I said yes.

23   Q.      In paragraph 40 it states that the underlying

24   action appears not to exist which means this case number

25   of 56136 of 2010 in New York Civil Court in the City of

Shaul Levy

Page 72

1    New York does not exist?

2           MR. NAHOUM:  Objection.

3    Q.     Do you see that, sir?

4           MR. NAHOUM:  What is your question?

5    A.     I don't understand the question.

6           MR. NIERMAN:  I'm trying to see what he

7    understands about this complaint and about the

8    allegations set forth in the complaint.

9    Q.     Do you believe there was an action brought

10   against you by your landlord in 2010?

11   A.     I don't remember.

12   Q.     You said you knew about it before, you testified

13   about that earlier?

14   A.     I said I knew there was something, but you asked

15   me -- repeat your question again.

16   Q.     Do you believe there was an action that was

17   started against you by your landlord which is

18   identified?

19   A.     Believe -- what's the word believe?

20   Q.     You don't know what the word believe means?

21   A.     I know believe, but do you know believe?

22   Q.     It's a yes or no question.

23   A.     It's not a yes or no question.

24          MR. NAHOUM:  Why don't you rephrase the

25   question?

Shaul Levy

1    Q.      Do you think it's true that there was a case

2    against you that was brought by your landlord in New

3    York City civil court that's identified by the civil

4    court under index number 056136 in 2010?

5    A.      I got to find out, I got to find out later, not

6    now, not as we speak now.  Before that there was a

7    period of time that there was a case against me.

8    Q.      You are aware that -- as we sit here today you

9    are aware there was a case against you?

10   A.      There was a case against me, yes.

11   Q.      As you sit here today you are aware that that's

12   true?

13   A.      I'm aware it's true.  No, what do you mean by

14   I'm aware it's true?

15   Q.      You said you are aware there was a case against

16   you?

17   A.      Yes, there's a case against me.

18   Q.      When did you first learn that there was a case

19   against you?

20   A.      When did I learn there's a case against me?

21   Q.      Yes.

22   A.      Be more specific with your question.

23   Q.      The first time you learned about this case

24   against you was back in 2010; is that correct?

25   A.      Absolutely not.

Shaul Levy

Page 74

1    Q.      You didn't learn about this case in 2010?

2    A.      Absolutely not.  I don't remember it because

3    there's nothing I can remember about it.

4    Q.      That implies there's something that you can

5    remember.

6    A.      Once I received the letter from you, yes, once I

7    received the letter.

8    Q.      That's not what I asked you before and that's

9    not what I'm asking you now.  You are changing your

10   testimony from what you said before?

11   A.      I didn't remember that there was a case.

12   Q.      What does that mean that there was something?

13   A.      I had personal issues going on.

14   Q.      I don't know what that means or how that's

15   relevant.

16   A.      Financially I had problems.

17           MR. NIERMAN:  I will move to strike as

18   nonresponsive and ask that you answer my question.

19   Q.      What do you remember about 2010?

20   A.      I was in 2010 I was hospitalized for a while, so

21   that's why.

22   Q.      That's why what?

23   A.      That's why it's blurry.  I don't remember it.

24   Q.      When you looked at the judgment marked for

25   identification as Defendant's Exhibit 1 you seemed to

Shaul Levy

Page 75

1    remember that you had a court case?

2    A.       The address you mentioned.  I said the name is

3    familiar.  We can go backward.  Why don't you go back?

4    Q.       Respectfully, sir, that is not what you

5    testified earlier.  That's not what your counsel has

6    testified on the record that you testified earlier.

7         MR. NAHOUM:  Objection.

8         MR. NIERMAN:  You can object what you want, but

9    you stated on the record with the judge that you

10   admitted there was a court case.

11        MR. NAHOUM:  Do you have a question for this

12   witness?

13        MR. NIERMAN:  I'm wondering why I can't get a

14   straight answer to very simple yes or no questions.

15        MR. NAHOUM:  Control yourself or I'm going to

16   cut this off.

17        MR. NIERMAN:  You control yourself and you

18   control your client.  Get him to at least answer a

19   question the same way twice.

20   A.       I have been answering all your questions, any

21   question you ask.  What I don't remember I don't

22   remember.  It's not my problem you don't like my answer.

23        MR. NIERMAN:  It's a matter that you are

24   answering inconsistently.

25        MR. NAHOUM:  If he asks you a question answer

Shaul Levy

Page 76

1    it.  Otherwise, you have nothing more to say.  Ask him a

2    question.

3              MR. NIERMAN:  I prefer that.

4    Q.    As you sit here today, do you recall being

5    engaged in a lawsuit with your landlord in 2010?

6    A.    No.

7              MR. NIERMAN:  Off the record.

8              (Whereupon, an off the record discussion was

9    held.)

10   Q.    Referring back to Defendant's Exhibit 4 marked

11   for identification on page five thereof, paragraph 40,

12   can you read that sentence please?

13   A.    Underlying action does not exist.

14   Q.    Do you think that's true?

15   A.    We have been through this already.

16   Q.    It's a yes or no question, sir.  Yes or no, do

17   you think that's true?

18   A.    Yes.

19   Q.    Yes, it's true?

20   A.    Yeah.

21   Q.    It's true that the underlying action does not

22   exist?

23   A.    Yes.

24   Q.    That is your belief today, sir?

25   A.    That's with 100 percent, yes.

Shaul Levy

Page 77

1    Q.      As you sit here today, do you believe that

2    there's a judgment against you that was entered in an

3    action?

4    A.      I believe yeah.

5    Q.      You believe there was a judgment that was

6    entered against you?

7    A.      I believe.

8    Q.      Who do you believe holds that judgment?

9    A.      It says on the paper Matt Morrison.

10   Q.      As you sit here today, do you believe who that

11   is?

12   A.      Who I believe it is?

13   Q.      Yes, what relationship, if any, did you have

14   with him?

15   A.      He was the landlord of an apartment on 42nd

16   Street.  I have all the papers in front of me.  That's

17   what it says.

18   Q.      You believe that's a valid judgment?

19          MR. NAHOUM:  Objection.

20          MR. NIERMAN:  What is the objection, asked and

21   answered?

22          MR. NAHOUM:  As to form.  Mr. Levy, please get

23   close to your phone so the court reporter can hear you.

24   Q.      Prior to today, did you believe that there was a

25   judgment held against you?

Shaul Levy

Page 78

1  A.     Prior to today?  What do you mean by prior?

2  Q.     Yesterday did you believe there was a judgment

3  entered against you?

4  A.     No.

5  Q.     You only formed that belief during the course of

6  this deposition?

7  A.     Yes.

8  Q.     Now that you believe there's a judgment against

9  you, do you still believe there was no underlying

10  action?

11  A.     Again, the question?

12  Q.     Now that you recognize that there's a judgment,

13  do you believe there was an underlying action?  Do you

14  believe there was a court case that lead to that

15  judgment?

16  A.     I really don't know.

17         MR. NIERMAN:  Let's take a break.

18         (Break taken.)

19         MR. NIERMAN:  I'm done with my questions.  I

20  believe Mr. Schneps has a couple of questions he wants

21  to ask.

22  EXAMINATION BY MR. SCHNEPS:

23  Q.     Mr. Levy, I wanted to clarify with regard to the

24  trauma which you said you had.  Did you consult with a

25  psychiatrist on that issue?

Shaul Levy

Page 79

1    A.        No.

2    Q.        Did you consult with a psychologist on that

3    issue?

4    A.        No.

5    Q.        Did you consult with any type of therapist in

6    mental health?

7    A.        No.

8    Q.        May I ask you why you did not consult with any

9    professional?

10   A.        Because when I have a situation like this I'm a

11   member of alcohol anonymous and I could discuss this

12   with a sponsor.  He helps me with my anxiety.

13   Q.        I see.  Okay.  With regard to that issue, may I

14   ask how many times you consulted with him?

15   A.        Daily.

16   Q.        For how long?

17   A.        A long time.

18   Q.        When you say a long time, can you give me any

19   more definitive answer?

20   A.        I have been consulting with him for the last 11

21   years.  He is my sponsor.

22             MR. SCHNEPS:  I have no other questions.

23             MR. NIERMAN:  I have some followup questions

24   based on his responses to Mr. Schneps.

25   REDIRECT EXAMINATION BY MR. NIERMAN:

Shaul Levy

Page 80

1   Q.      How many times did you consult with your sponsor

2   regarding the anxiety you felt in the letter?

3   A.      A lot of times.

4   Q.      More than 10 times?

5   A.      More.

6   Q.      Was it more than 20 times?

7   A.      More.

8   Q.      Was it more than 50 times?

9   A.      Probably more.

10  Q.      Over what period of time were you consulting

11  with your sponsor?  I want to be clear.  I'm not asking

12  about your general conversations with your sponsor.  I'm

13  only talking specifically about conversations with your

14  sponsor about that related to the letter, so let's start

15  this over time.  How many times did you consult with

16  your sponsor about the letter or any psychological

17  effects that resulted from the letter?

18  A.      I don't remember.

19  Q.      Was it more than 10 times?

20  A.      Probably more.

21  Q.      Was it more than 20 times?

22  A.      Probably more.

23  Q.      I'm referring exclusively to conversations that

24  involve discussions about the impact of the letter so

25  you are saying it was more than 20 times?

Shaul Levy

Page 81

1   A.      Around, probably more.  I really don't recall.

2   Q.      Over what period of time were you having these

3   discussions with your sponsor?

4   A.      I don't remember.

5   Q.      Was it a period of longer than two weeks?

6   A.      Probably.  I don't remember.

7   Q.      Was it for a period of longer than six months?

8   A.      I don't remember.

9   Q.      Does your sponsor hold any type of medical

10  professional license?

11  A.      Yes.

12  Q.      What type of license is that?

13  A.      He is a consulting for alcoholic anonymous.

14  Q.      Does he have any type of licensing in the

15  medical profession?

16  A.      Yes, he does.

17  Q.      What type of license?

18  A.      A consulting for alcoholic anonymous.  He works

19  with addicts.

20  Q.      Did he or anyone ever advise that you seek

21  psychological assistance from another medical

22  professional?

23  A.      No.

24  Q.      What is the name of your sponsor?

25  A.      Mike Appel.

Shaul Levy

Page 82

1    Q.      How do you spell the last name, sir?

2    A.      I don't know.

3    Q.      Do you have any contact information for Mr.

4    Appel?

5    A.      Yes, I do.

6    Q.      What's his phone number?

7    A.      I have to get it for you?

8    Q.      I would appreciate that.  I can wait.

9    A.      Before I do that I have to see if he's okay with

10   it.

11           MR. NIERMAN:  I'll leave a blank space.

12           MR. NAHOUM:  Why don't you do a followup?

13           MR. NIERMAN:  I call for production for all

14   contact information related to Mike Appel.

15   Q.      Do you have any other sponsors that you conduct

16   with?

17   A.      No, he is the only one.

18   Q.      Have you discussed this letter with any other

19   people?

20   A.      I don't remember.

21   Q.      Did this letter cause you to drink?

22   A.      No.

23           MR. NIERMAN:  No further questions.

24   CROSS EXAMINATION BY MR. NAHOUM:

25   Q.      You testified before that English is not your

Shaul Levy

Page 83

1    first language; is that right?

2    A.      Right.

3    Q.      Your native language is Hebrew, correct?

4    A.      Correct.

5    Q.      How long have you been speaking English?

6    A.      I'm sorry?

7    Q.      How long have you been speaking English?

8    A.      Long time, many years.  For some reason it

9    doesn't click.

10   Q.      Some of the trouble you had with reading, is

11   that a problem with reading English or reading in

12   general?

13   A.      No, reading English.

14   Q.      As a consequence of your English, did you

15   understand all of the questions asked of you today or

16   did you have trouble understanding some of the questions

17   asked of you today?

18          MR. NIERMAN:  Objection, leading.  I'm objecting

19   to this question.

20          MR. NAHOUM:  It's a deposition.  I can lead him.

21   Go ahead and answer the question.

22          MR. NIERMAN:  You cannot lead your own client.

23   That's absurd.  It's a ridiculous question.  You are

24   basically saying that everything he testified to -- he

25   didn't understand anything I was asking him.  I'm

Shaul Levy

Page 84

1    objecting to this question and to any answer.  It's an

2    objective clearly to undermine anything that's happened

3    in this deposition and that's why I'm objecting to this

4    question and I'm calling an end if you ask another

5    question to that.

6          MR. NAHOUM:  You didn't do your job here today.

7    I'm going to ask him the questions.

8          MR. NIERMAN:  I asked him about his English.  I

9    told him I started with that at the very beginning

10   though you are trying to have him back down from his

11   testimony by claiming he didn't understand.

12         MR. NAHOUM:  When he said he did not understand

13   the question you badgered him.

14         MR. NIERMAN:  I changed the question.

15   Q.     Mr. Levy, do you think you might have better

16   understood the questions asked of you today if you had

17   an interpreter.

18   A.     Absolutely.

19         MR. NAHOUM:  I will reserve the right for Mr.

20   Levy to have the opportunity to issue an errata sheet

21   and review any issues any mistakes therein.

22         MR. NIERMAN:  Thank you very much.

23         THE COURT REPORTER:  Mr. Nahoum, do you want a

24   copy?

25         MR. NAHOUM:  Yes, please provide a copy.

Shaul Levy

1              (The deposition was concluded.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Shaul Levy

Page 86

1                    CERTIFICATE

2

3          I, STACEY J. ORLICK, a Notary Public and

4    C.S.R. of the State of New Jersey, License No.

5    XI00226700, do hereby certify that prior to the

6    commencement of the examination SHAUL LEVY was duly

7    sworn by me to testify the truth, the whole truth and

8    nothing but the truth.

9          I DO FURTHER CERTIFY that the foregoing is a

10   true and accurate transcript of the testimony as taken

11   stenographically by and before me at the time, place and

12   on the date hereinbefore set forth.

13         I DO FURTHER CERTIFY that I am neither a

14   relative nor employee nor attorney nor counsel of any of

15   the parties to this action, and that I am neither a

16   relative nor employee of such attorney or counsel, and

17   that I am not financially interested in the action.

18   _____

19   Notary Public of the State of New Jersey

20   My Commission expires June 2022

21   Dated:

22

23

24

25

Shaul Levy

**A**

**a.m** 1:17 25:18
**ability** 53:11
**able** 57:9 60:16
**above-entitled**
  1:13
**Absolutely** 38:2
  73:25 74:2
  84:18
**absurd** 83:23
**accent** 61:24
**accident** 55:14
**accompanied**
  30:10,12
**accurate** 53:13
  60:9,9,10,11
  60:15,16 86:10
**action** 4:6 13:22
  18:9 23:14,15
  36:18 50:23
  62:25 63:6,11
  66:2,5,6,14,20
  66:21,22 67:8
  67:13 69:18,21
  70:7 71:24
  72:9,16 76:13
  76:21 77:3
  78:10,13 86:15
  86:17
**actions** 63:18
**addicts** 81:19
**address** 7:23 8:3
  8:4 9:7,23 10:2
  10:5 12:17
  75:2
**addressed** 25:8
  25:15
**admitted** 53:21
  55:19 56:9
  60:4 75:10
**adopt** 57:6
**adopted** 61:11
**advice** 54:13
  55:6,10 59:3
**advise** 81:20
**affect** 11:4,12

**afraid** 29:24
  38:23
**ago** 6:20 8:13,17
  8:17,18,19
  9:19 10:19
  22:8 45:3
  52:23,23 61:15
  61:15,16 69:2
**agree** 48:20,23
  49:16 53:12,17
  54:15,19,20
**agreement** 62:14
  62:15
**agreements**
  55:20 58:19,20
  58:24 62:12
**ahead** 15:21
  83:21
**aka** 16:19,19,19
  17:23,24
**aka's** 17:3,9
**alcohol** 11:18
  79:11
**alcoholic** 81:13
  81:18
**allegation** 70:16
**allegations**
  56:10,12,17
  62:24,25 63:2
  72:8
**alleges** 49:8
  56:20
**allowed** 62:7
  65:7
**alzheimer's** 11:3
**America** 66:25
**amount** 15:6,7
  18:3 19:2
  25:12
**analysis** 59:6
**and/or** 40:4
**Andy** 10:23
  16:16 17:23
**anonymous**
  79:11 81:13,18
**answer** 5:1,4

**6:19** 7:4,6 9:15
  10:20,21,22
  13:5 18:14,14
  33:19,21 34:4
  34:4 37:15,16
  39:1 40:13
  43:21 44:13,15
  46:14 47:2,8
  47:11,12,21
  50:18,20,25
  54:12 55:5
  58:16 59:19,23
  65:11,11 66:11
  66:17,17 74:18
  75:14,18,22,25
  79:19 83:21
  84:1
**answered** 33:20
  34:3,20 45:9
  45:12 47:3
  49:13 77:21
**answering** 37:4
  75:20,24
**answers** 4:12
**anxiety** 22:25
  23:10 25:25
  26:1,4,8,16,23
  27:4,8,10,15
  27:16,16,19,20
  27:23 28:1,6
  29:3,5,9,11,17
  30:5,7,18
  32:17,19,22,25
  33:22,25 34:7
  34:10,15,20
  35:7,11,17
  37:7,8 40:3
  42:20,22 45:4
  45:21 46:11
  47:13,16 49:8
  51:4,9 79:12
  80:2
**anxious** 30:2
**anybody** 42:13
**anyway** 65:7

**apartment** 9:21
  9:23 14:10
  77:15
**apologize** 51:8
**appear** 15:16
  25:17
**appears** 63:5
  66:2,14 67:8
  69:21 71:24
**Appel** 81:25
  82:4,14
**appreciate**
  24:15 42:8
  82:8
**approach** 29:13
  29:14
**Approximately**
  8:13
**April** 13:15,16
  15:12
**area** 56:24 64:10
**arrangements**
  55:24
**asked** 12:1 24:18
  34:2 35:22
  37:17 40:15
  47:1,3,22 51:7
  54:3,18 56:23
  61:13,21 62:2
  62:3,4 65:4,21
  72:14 74:8
  77:20 83:15,17
  84:8,16
**asking** 4:9,10
  9:15 10:1
  16:25 20:3
  30:1,16 33:18
  33:24 34:6
  35:10,16 36:4
  37:9 38:23,24
  39:1,3,12
  44:14 47:5,8,9
  49:1,8,10
  50:14 56:2,6
  57:15,17 58:5
  58:7 59:4,9,16

**61:22** 62:20
  64:1,11 66:12
  70:22 71:1,2
  74:9 80:11
  83:25
**asks** 57:21 75:25
**assault** 39:25
**assets** 38:19
**assigned** 71:16
**assistance** 24:15
  81:21
**assume** 55:24
**assuming** 36:25
**assumption**
  61:25
**assumptions**
  56:16
**attached** 32:14
**attachment**
  30:23
**attachments**
  12:10 33:4
**attention** 15:22
  18:20 25:25
  51:8 53:20
  67:18
**attorney** 28:14
  42:17,25 50:19
  50:24 51:2
  56:12,15,16,17
  57:5,6,10,14
  57:18 60:17
  61:2,2,4 62:9
  62:10 64:7,18
  65:5 69:16
  70:6 86:14,16
**Attorneys** 2:4,9
  2:13
**Avenue** 2:7 4:1
  5:23 7:24 8:6,7
  22:14 31:5
**Avoid** 37:10
**aware** 49:25
  51:18,21,24
  57:4 58:12,23
  58:24 63:10

73:8,9,11,13
73:14,15

**B**
**back** 9:1,14
10:20 18:6
49:25 51:4
54:3,10 69:17
73:24 75:3
76:10 84:10
**background**
24:16
**backward** 75:3
**bad** 15:25 16:2
29:1 53:10
**badger** 37:6
**badgered** 84:13
**BARRY** 2:11,12
**based** 17:20
18:25 63:22
79:24
**basically** 83:24
**Beach** 4:2
**bear** 33:2
**beginning** 17:10
34:19 84:9
**belief** 76:24 78:5
**believe** 11:23
30:25 51:1
58:14,15,16,17
66:9,15 72:9
72:16,19,19,20
72:21,21 77:1
77:4,5,7,8,10
77:12,18,24
78:2,8,9,13,14
78:20
**believed** 65:6
**BENJAMIN** 2:8
**best** 53:11 64:15
**better** 28:3,4
46:11,24 84:15
**big** 8:23,24
**bill** 29:12
**bills** 29:7,9
**birth** 11:6

**bit** 26:15 52:22
**black** 52:2
**blank** 82:11
**blue** 24:23 31:1
32:3
**blurry** 26:15
74:23
**bottom** 18:16
19:5
**box** 68:22
**brain** 70:3
**breach** 28:14
64:18
**breaching** 54:14
**break** 4:24 5:2,2
5:5 12:11,13
30:20,22 58:6
62:11 67:7
78:17,18
**briefed** 53:23
**Brilliance** 7:14
7:19
**broad** 2:3 59:4
**Brooklyn** 9:6,11
**brought** 70:17
72:9 73:2
**build** 59:8
**bunch** 22:4,5
**business** 7:17

**C**
**C** 2:1,11,12
16:10,11
**C-h-a-r-l-y** 5:14
**C.S.R** 86:4
**C5** 2:11
**call** 48:14,21,24
49:17 53:20
65:20 82:13
**called** 5:19
18:20 20:18,22
42:10 53:22
**calling** 84:4
**calls** 54:12 55:5
69:17
**camera** 22:17

**capacity** 49:21
**caption** 52:16
67:22,24 68:3
68:14,20,21
69:12
**careful** 49:14
64:10
**case** 14:14 16:14
19:17 24:24
34:13 54:13
55:6,10 59:3
59:15 66:7,9
67:13,14 68:15
69:2,13,17,22
70:8,16,16
71:4,17,24
73:1,7,9,10,15
73:17,18,20,23
74:1,11 75:1
75:10 78:14
**cause** 23:10 28:4
35:6,11,17
51:22 82:21
**caused** 30:5,7
32:17,19,21,24
33:9,12,14,24
34:7,10,15,20
38:25 42:20,22
52:25
**causing** 37:7,8
38:24
**center** 18:23
19:2
**cents** 18:4
**certainly** 61:16
61:24
**CERTIFICATE**
86:1
**Certified** 1:14
**certify** 86:5,9,13
**cetera** 17:24
**challenge** 55:9
**change** 47:13
**changed** 84:14
**changing** 74:9
**Charly** 5:12,21

16:19,19 17:4
17:11,11,24
**Chatham** 2:11
**check** 12:8
**children** 7:8
**circles** 30:4
**circumstance**
55:8
**circumstances**
53:4
**city** 8:23,24 10:9
19:20 71:25
73:3
**civil** 16:7,9 31:2
70:20 71:18,25
73:3,3
**claim** 34:13
54:24
**claiming** 84:11
**clarification**
42:8
**clarify** 42:4
78:23
**clear** 4:15 11:2
17:2 24:17
28:6 32:1 46:6
51:7 59:21
60:25 64:17
66:19 80:11
**clearly** 37:18
84:2
**clerk** 15:11,19
19:14 63:3
**click** 83:9
**client** 28:14 49:2
50:19,25 51:2
57:18 64:18
65:10 75:18
83:22
**client's** 57:18
**close** 49:1,5
54:14 64:24
77:23
**Collectively**
32:12 33:8
**Collins** 4:1 5:23

7:24 8:6,7
22:14 31:5
**come** 12:21 18:6
36:10 39:3
**comes** 54:14
64:23
**coming** 23:3
39:23,24 50:9
59:6
**comma** 17:9
**commenced**
14:17
**commencement**
86:6
**commencing**
1:17
**Commission**
86:20
**communication**
56:23 57:16,17
57:22
**communicatio...**
62:9
**company** 20:13
20:18,22
**complaint** 3:10
52:16 56:9,20
57:3,13,17,25
58:12,13,14
60:9,12 61:11
61:12 62:17,24
63:1,21 65:22
65:23 66:1
67:12 69:16
70:6 72:7,8
**comply** 64:15
**comprehend**
4:22
**comprehension**
36:1
**concern** 54:13
**concerned** 59:17
**concluded** 63:23
85:1
**conclusion**
63:21

**condition** 11:4
51:12,15,20,23
**conduct** 82:15
**confident** 28:16
28:18
**confirm** 25:2
62:6
**consequence**
83:14
**consult** 5:2 26:3
47:25 78:24
79:2,5,8 80:1
80:15
**consulted** 46:25
49:4 53:6
79:14
**consulting** 42:25
79:20 80:10
81:13,18
**contact** 41:10
42:13,17 45:6
63:2 82:3,14
**contacted** 54:16
64:7
**contained** 53:18
56:8
**context** 54:23
55:2 60:5
67:12
**continue** 16:15
33:3
**control** 75:15,17
75:18
**conversation**
28:13 40:9
49:12 63:7,10
**conversations**
48:17 56:5
80:12,13,23
**convey** 57:14
**copy** 31:20
84:24,25
**corner** 15:12,19
32:3,6
**corporation**
42:9

**correct** 11:9
14:13,20 27:12
39:16 40:7
42:23 45:24
50:1 53:15
56:4 67:10
73:24 83:3,4
**counsel** 2:4 3:15
5:3 11:25
25:19 28:5
42:9 48:6 49:2
49:18 50:16
54:7 55:21
57:23 59:14,15
63:2 75:5
86:14,16
**counterclaim**
18:2,9
**County** 13:13
16:9 31:2
**couple** 38:13
78:20
**course** 46:23
56:24 78:5
**court** 1:1 4:7,16
13:7,9,11,13
14:14 15:17,17
16:9 19:19
24:12 31:2
35:19 47:20
52:3,10 53:22
53:23 54:2,11
54:15,19 55:1
55:7 56:3 57:1
58:9 59:18,24
60:7,14,21
61:10,18 62:1
62:8 63:9,15
63:25 64:3,9
64:16,22 65:9
65:11,19,20
68:15 70:20
71:16,18,25
73:3,4 75:1,10
77:23 78:14
84:23

**court's** 71:15
**courts** 16:8
55:20
**cover** 31:23 46:1
**covering** 62:14
62:15
**CROSS** 82:24
**curious** 65:11
**current** 7:23
25:12
**currently** 11:2
**cut** 75:16

─────────
**D**
─────────
**D-e-s-s-a** 7:7
**Daily** 79:15
**damage** 39:3,5
**dangerously**
49:5
**Daniel** 28:9
**date** 11:6 86:12
**dated** 25:7 86:21
**dates** 22:9 42:19
**day** 43:19 55:13
67:5
**days** 23:8,9,9
26:17,19,24
27:1,1,5,18
**debtor** 6:13
**December** 25:7
25:18
**decision** 16:12
16:22 17:19
18:24
**defend** 14:16
44:17 48:11
50:3 59:14
**defendant** 2:9
2:13 4:6 67:25
68:12,13,15,25
**Defendant's**
12:20 21:20
24:11 45:18,24
46:2,2 69:5,12
69:13 71:4,5
74:25 76:10

**defendants** 1:9
40:24
**defense** 25:23
30:24 31:12
32:13 33:8,9
37:1 42:21
49:20 52:1
55:22 59:7
65:22,24 67:19
**definitive** 79:19
**demanded** 52:16
**dementia** 11:3
**deposed** 53:25
**deposing** 54:1
**deposition** 1:5
12:2 24:16
25:17 30:15
51:3 58:3
63:13 65:3,7
78:6 83:20
84:3 85:1
**describe** 24:14
**DESCRIPTION**
3:8
**Dessa** 7:7
**determine** 61:18
**devastation**
22:21
**die** 37:13,18
**different** 50:3,5
**differently** 34:5
**difficult** 58:5
**difficulty** 11:1
**directing** 25:17
64:16
**discovery** 65:9
**discuss** 54:4
79:11
**discussed** 56:12
66:7 82:18
**discussion** 76:8
**discussions**
80:24 81:3
**distinct** 55:18
**distinction**
50:11 54:24

**District** 1:1,1
52:3,10,10
**disturbed** 22:19
**document** 13:3
15:2,4,15
21:16 22:2
24:24 30:9,16
30:17,19,25
31:22,24 46:3
52:2,4,6,9,18
52:20,23 53:5
53:7,12,15,17
53:21 60:4
67:14
**documentary**
56:14,19
**doing** 39:22
**dollars** 18:3
**door** 23:17,23
39:21
**drafted** 69:16
**drain** 70:4
**draining** 70:3
**drink** 82:21
**drugs** 11:19
**duces** 25:16 31:8
35:3,6,10,16
**duly** 4:2 86:6

─────────
**E**
─────────
**E** 2:1,1 4:1
**e-mail** 12:8,9
24:9
**e-mails** 12:6,7
**earlier** 72:13
75:5,6
**early** 6:12
**easier** 4:16
**easiest** 54:2
**easy** 5:16
**education** 62:4
**effects** 80:17
**ego** 4:15
**eight** 8:13,16,17
8:18,19 27:22
27:25 52:1,3

Shaul Levy

65:25
**either** 65:10
**emotional** 22:19
**employee** 86:14
86:16
**encaptioned** 4:7
**enclosed** 25:16
30:17
**ended** 64:4,11
64:14,25 65:20
**engaged** 76:5
**engagement**
50:19
**engagements**
55:18
**English** 33:1
36:2,2 58:3
61:18 62:2
67:4 82:25
83:5,7,11,13
83:14 84:8
**enter** 24:4,6
**entered** 15:11
17:20 18:12,19
18:25 19:6,14
24:11 25:12,22
31:11 47:20
55:21 65:22
77:2,6 78:3
**entitled** 54:15
61:4
**entity** 42:5,9
**entry** 18:17 19:6
**envelope** 34:15
56:8
**errata** 84:20
**especially** 58:6
**ESQ** 2:4,8,12
**establish** 15:4
**established** 15:1
**et** 17:24
**euphemisms**
37:10,11
**Everybody**
35:24
**evidence** 56:14

56:19
**evident** 58:2
**exact** 10:18 22:8
42:19 47:16
**exactly** 10:22
37:9 38:7
39:17
**exaggerate**
37:12
**exaggerating**
37:19
**exam** 6:13
**examination** 3:2
4:4 12:5 65:16
78:22 79:25
82:24 86:6
**exception** 61:8
**exclusively** 40:3
80:23
**excuse** 18:20
**exhibit** 15:23
17:14 21:20
23:1 24:5,6,11
25:23 30:24
31:12,18,18,21
31:23 32:13,14
33:8,9 37:1
42:21 45:18,24
46:2,2 52:1
65:22,24 67:19
67:20 69:6,12
69:13 70:2
71:5,5 74:25
76:10
**Exhibit-1** 12:20
12:22
**exhibits** 3:7,15
11:25 12:4
46:1 51:6 52:1
**exist** 63:6,11,11
63:15 66:2,10
66:14,21 67:9
69:21 70:7
71:24 72:1
76:13,22
**existence** 29:23

63:17
**exists** 56:21
**expires** 86:20
**explain** 19:24
35:8,14 59:6
**extent** 40:6

_____
**F**
**face** 48:3,3
**faced** 25:24
27:15
**fact** 15:15 54:18
56:5
**Fair** 13:25
**fairly** 59:13
**false** 56:11,14,15
62:25 64:20
**familiar** 9:20
10:1,11,13,14
10:23 75:3
**far** 17:14 33:6
**fast** 65:2
**favor** 17:22 18:3
**FDCPA** 59:15
**fear** 22:25 23:11
23:13,13 26:14
28:23,25 29:18
38:21,22,24,25
39:13,18,20
40:3,5,6 46:12
46:17
**fears** 38:8,9,9
**February** 11:7
**federal** 4:6
**feed** 36:6
**feel** 4:25 23:4
26:16,19,21,23
27:4,16 28:15
28:18 29:9,11
29:20 30:2,4
39:5 46:24
47:13
**felt** 23:5,21
27:10 28:6
38:18,24 39:3
47:16 51:5

80:2
**fend** 65:15
**fighting** 54:5
**figure** 36:4
55:12 57:24
**file** 12:21 18:9
71:14,15,15
**filed** 24:24 57:25
60:2
**filled** 29:16
**financial** 38:19
**financially** 74:16
86:17
**find** 13:21 25:16
40:14 43:3,4,6
43:8,11,13,17
43:23 44:23
45:10 46:18
49:7,9 54:16
55:16,25 62:11
64:19 70:5
73:5,5
**finding** 56:4
**fine** 65:17
**finish** 4:10
**finished** 28:15
47:17 70:19
**first** 15:7 27:18
32:2 47:25
48:14,21,24
49:16 52:23
54:16 61:19
62:3,13,14
66:8 73:18,23
83:1
**five** 6:20 7:9
12:11 30:21
31:15,24,25
46:3 51:6
65:25 76:11
**Florida** 4:2 5:23
8:19,22 9:2,5
**follow** 40:23
**follows** 4:3
17:21 18:25
19:1

**followup** 60:24
79:23 82:12
**foot** 19:19
**foregoing** 86:9
**foremost** 66:9
**forgot** 8:3
**form** 18:13
43:15,21 50:7
66:11,16 68:10
77:22
**formed** 78:5
**formerly** 65:6
**forth** 72:8 86:12
**forward** 44:14
**forwarded** 24:9
30:25
**four** 6:3,5
**frame** 13:11,14
49:3
**free** 4:25
**front** 10:19
13:23 14:2
21:24,25 30:13
31:1 77:16
**FTPCA** 54:24
55:23
**functioning**
33:15
**further** 15:3
17:18 82:23
86:9,13

_____
**G**
**G-u-y** 5:17
**general** 41:23
80:12 83:12
**gesticulating**
4:13
**getting** 35:14
48:25 49:5
**girl** 22:22
**give** 8:12 37:16
79:18
**gives** 19:1
**go** 5:11 13:24
14:14 15:21

Shaul Levy

26:14 27:14
37:5 50:10
51:4 55:15
65:19 67:20
75:3,3 83:21
going 4:8,11
6:11,12,13
12:6,19 14:24
15:14,22 18:22
23:14,17,20,24
24:4,18 25:2
29:18,21 30:4
30:5,23 31:10
34:1 36:12,19
36:21 37:9,13
37:14,18,25
38:4,18 39:7
39:13,20 40:4
46:13 50:17
51:2,25 53:20
53:20 56:1,11
57:10 59:22
61:16 63:4
64:15 65:18
67:6,19 74:13
75:15 84:7
good 4:5 16:3
Google 43:8,10
granted 17:22
18:2
great 25:25
42:22 45:4
Greek 36:3
GROUP 2:2
guy 5:17,19,21
16:19,19,24
17:4,11,11,24
17:24 55:15
guys 65:19

H

H 4:1
half 30:19
happen 36:19,21
37:10 39:5,9
happened 22:18

56:23 84:2
happening
22:21 39:18
happy 33:21
34:3,4
hard 13:18,19
head 4:13 6:12
heading 15:24
25:3
health 79:6
hear 19:22,25
41:1,12,15,18
41:21 42:9
47:6 51:13
55:14 77:23
heard 17:1,4
20:3,11,13
42:1
heart 51:11,14
51:19,23
heavy 27:18
Hebrew 67:3
83:3
held 1:16 15:5
24:10 76:9
77:25
help 45:16 46:18
helps 79:12
Henry 1:7,7 2:7
2:9 21:8,22
25:4 41:4,15
52:13
hereinbefore
86:12
high 27:7,20,23
28:1
hire 14:16 48:9
48:11,15,20,23
49:17,20 50:8
50:10 55:13
hired 48:18 49:9
55:25
hiring 50:3
hold 21:25 31:10
81:9
holding 33:22

holds 15:5 77:8
home 6:7,9 7:10
23:3 38:12
Honor 63:19
hospitalized
74:20
hours 11:12,18
23:7 43:19,22
43:25 44:3,6
44:16,20,24
45:2,13,15
house 22:21
38:1
housing 13:7,9
13:10,13 19:19
47:20
hurt 39:25

I

idea 61:15
identification
12:21 21:20
24:5 32:13
45:18 74:25
76:11
identified 20:13
52:15 68:14
70:20 72:18
73:3
identify 24:8
identifying
32:15
impact 80:24
impair 11:20
impaired 11:23
implies 74:4
improper 54:5
included 57:6
incomplete 30:8
inconsistently
75:24
index 3:1 70:20
71:5,6,8,11
73:4
individual 10:11
10:23

information
6:17 57:8,8,9
57:14 64:20
82:3,14
inquire 54:6
inquiry 54:12
55:5
instruct 50:17
instructions
4:18
intent 59:2
intention 64:17
interest 56:3,4
interested 86:17
interpreter
84:17
interrupt 4:14
intimate 55:17
involve 80:24
Israel 67:1
issue 53:23,24
54:5 59:20
60:6 62:8
63:22 78:25
79:3,13 84:20
issued 19:10
issues 13:19,21
59:8 74:13
84:21

J

J 1:7,7,14 2:7,9
21:8,22 25:4
41:4,15 52:13
86:3
J0udgment
41:18
Jersey 1:16 2:8
86:4,19
Jewels 7:14,20
job 84:6
joint 65:6
Joseph 4:5
21:12 25:19
65:3
judge 75:9

judgement 69:8
judgment 1:7
2:13 3:9 13:2
15:5,7 16:12
16:23 17:19,22
18:12,17,19,24
19:6,6,14,22
19:25 20:6,7,8
20:19,20,23
24:6 25:11
29:22,23 30:3
34:17 41:21
42:1,6,10
47:20 56:19,20
63:16,18 69:10
71:17 74:24
77:2,5,8,18,25
78:2,8,12,15
Judgments 41:7
jumping 70:1
June 86:20

K

keep 4:12
key 63:5
kids 7:1
kill 36:10
kind 11:3 26:3
kindly 15:23
knew 35:22
56:10 72:12,14
knock 23:17,23
knocking 39:21
know 4:11 6:15
9:16,17,18
11:5,14 13:16
16:1,4,25 17:1
18:14 32:21
34:25 35:1,3,9
35:18,18,20,20
42:19 46:15
47:11 50:21,22
53:10 56:1,2
56:13,13,15,16
59:22,25 60:1
61:3,4,6,16

Shaul Levy

62:11,15 63:4
63:7 65:1
66:12 68:8,12
68:13 72:20,21
72:21 74:14
78:16 82:2
**known** 17:11
56:10,20
**knows** 35:24
61:4

**L**

**L** 4:1,1
**L-e-v-y** 5:10
**labeled** 12:22
16:18
**laid** 56:1
**landlord** 9:13
10:14 14:1,3
14:17 19:16
66:8 69:22
72:10,17 73:2
76:5 77:15
**landscape** 12:25
**language** 58:3
59:8 61:19
62:3 67:2 83:1
83:3
**late** 23:3
**law** 1:7 2:2,7,11
21:7,22 25:4
41:3,15 52:12
**lawsuit** 14:17,19
14:22 31:22
76:5
**lawyer** 14:16
28:7,9,13,15
28:21,24 40:10
40:10,15,19
43:5,6,8,11,13
43:17,20,23
44:1,4,7,10,17
44:23,25 45:6
45:8,11,14,16
46:18,22,25
47:9,14,17,19

47:22,23,25
48:3,9,11,15
48:18,20,23
49:4,9,10,12
50:3,4,8,10
53:6 57:22
**layman's** 4:8
**lead** 78:14 83:20
83:22
**leading** 64:3,9
83:18
**learn** 60:25
62:20 67:4
73:18,20 74:1
**learned** 62:21,21
64:12 73:23
**learning** 67:5
**leave** 17:8 82:11
**leaving** 30:18
**legal** 5:15 25:19
36:18 54:13
55:5,10 59:3
**let's** 6:11 12:11
13:24 27:14
30:20 42:4
49:25 52:22
66:19 78:17
80:14
**letter** 3:9 20:5,7
20:8,18,20,22
20:25 21:5,7,9
21:10,14,21,24
22:3,7,13,15
22:18 23:11,21
24:1,3,4,8,10
24:11,13,14,18
25:3,7,24 26:5
26:8 27:8,9,11
27:17,21,24
28:2,16 29:1
29:13,14,20,25
29:25 30:1,5,6
30:7,8,10,13
30:18 32:14
33:4,5,13,14
33:18 34:7,9

34:14,16,18,19
34:19 36:7
38:11,25 39:23
40:21,24 41:3
41:6,9,13,16
41:19,22 42:2
42:11,13,14,16
42:20,21,22
44:17 45:17,21
45:23 46:1,8
46:16,19 48:7
48:9,12 49:21
51:5,6,6,12,15
51:22 52:25
55:22 67:15
68:19 74:6,7
80:2,14,16,17
80:24 82:18,21
**lettering** 24:23
31:2 32:3 52:2
**letters** 22:4,5
**level** 47:16 51:4
**Levy** 1:3,5 3:3
4:5,7 5:8 12:8
16:19,20 17:2
17:4,6,7,8,10
17:10,11,16,23
17:25 25:8,9
25:15 30:24
31:4,14,20
44:7 47:4,11
52:12 54:2
63:4,20 65:23
66:24 70:12
77:22 78:23
84:15,20 86:6
**license** 1:15
81:10,12,17
86:4
**licensing** 81:14
**life** 36:9 37:12
37:19 38:3,17
**Lincoln** 8:3
**line** 43:7,13,16
43:22 44:24
45:15 49:1

58:25 64:24
**lines** 15:24 16:7
**list** 11:25 37:1
**litigant** 57:23
**litigation** 50:1
**little** 17:18 52:22
**live** 5:23 6:23
7:22 10:5 43:1
**lived** 6:4 7:22
10:3
**lives** 6:25
**living** 5:25 6:16
6:18 7:25 8:2,8
8:10,14,16,21
9:4,7,9,17,18
14:8
**LLC** 1:7
**LLP** 2:2
**located** 7:15
12:15
**long** 5:25 6:15
7:19,25 8:7,14
9:9 17:21 23:4
42:16 44:22
45:11 47:23
48:14 61:15
69:2 79:16,17
79:18 83:5,7,8
**longer** 81:5,7
**look** 10:4,6
12:19 13:1
14:21,24 16:11
16:14 17:18
18:16,23 20:24
22:17 30:23
36:24 46:21
60:21
**looked** 74:24
**looking** 10:17
12:4 13:21,23
14:2,4 21:13
21:16,19 22:1
24:22 28:13
32:2 37:6,6
43:19,25 44:9
44:16,24 45:11

45:13
**looks** 12:25
**lose** 38:18 39:7
40:11,20 46:13
**losing** 40:4
**loss** 39:8
**lost** 35:14 38:11
38:13
**lot** 13:19 22:25
22:25 23:11
38:9,22 80:3
**lower** 15:12,19

**M**

**mail** 22:6,10
38:13
**making** 56:17
**manifestation**
22:24
**manner** 4:13
**March** 13:4
19:11
**mark** 54:3
**marked** 12:20
21:19 30:24
31:11 32:9,12
45:17 46:2,3
51:25 65:24
74:24 76:10
**married** 7:1
**Marshall** 19:10
**Matt** 10:11 14:6
16:15,16 17:23
25:8 31:4 77:9
**matter** 1:13 7:4
15:15 75:23
**mean** 16:1 22:5
28:9 33:16
36:10 37:21
38:4,17 39:15
39:24 40:1
43:2 55:25
70:10 71:13
73:13 74:12
78:1
**meaning** 35:9

37:13
**means** 4:8 35:4
35:24 36:12
43:5 66:22
70:13 71:8,24
72:20 74:14
**meant** 28:16
35:23 36:8,9
37:22 38:6
**medical** 11:4
22:24 25:25
51:8 81:9,15
81:21
**medication**
11:11,15 29:5
**meeting** 28:15
28:20,23
**member** 79:11
**memory** 11:4,13
11:16,20,23
63:13
**mental** 79:6
**mentioned**
61:22 75:2
**met** 40:19 47:14
47:23 48:3
**methods** 43:6
**Miami** 4:2 7:16
12:16 43:1
**middle** 18:21,23
**Mike** 81:25
82:14
**mind** 13:11
57:24
**mine** 26:13
**Mineral** 2:7
**minimize** 40:5
**minute** 12:11
**minutes** 30:21
**mischaracterize**
38:15
**misstated** 65:13
**mistakes** 84:21
**mixed** 13:18
**money** 38:5 39:8
39:15 40:4

56:1
**month** 26:21
**months** 44:9
52:23 61:15
81:7
**morning** 4:5
11:14
**Morrison** 10:12
14:6 15:5
16:15,16 17:23
25:9 31:4
67:25 68:23
69:9 77:9
**motor** 55:14
**move** 18:22 39:2
74:17
**moved** 8:17,19
8:21 9:1,5
**Mr./Mrs** 25:15
**multiple** 48:17

___

**N**

**N** 2:1
**Nahoum** 2:4 3:4
6:11,19 7:6
12:8 13:10,14
15:1,14,20
17:12 18:13
20:11,25 24:1
24:8,12 30:8
30:15 31:20
33:20 34:1,8
34:11 37:14,20
40:12,15 42:4
43:15,21 44:11
44:15,21 45:7
45:9,12 46:14
47:11,21 48:25
49:5,13 50:7
50:12,17,24
53:1 54:12,17
54:22 55:4,16
56:22 57:9,12
58:1,7,18,22
59:11,23 60:5
60:18 61:6,20

62:2 63:12
64:2 65:13
66:11,16 67:16
68:10 69:15,19
69:24 70:9,18
72:2,4,24 75:7
75:11,15,25
77:19,22 82:12
82:24 83:20
84:6,12,19,23
84:25
**Nahoum's** 56:7
**name** 4:5 5:7,15
5:16,17 7:2
9:13 17:1,4,5,6
20:15 21:11
41:12 75:2
81:24 82:1
**named** 10:11,23
**names** 5:11 14:7
19:1
**narrow** 52:22
**native** 67:2 83:3
**nature** 54:7
**need** 4:24 9:25
12:4 47:6,7
57:6 58:6
59:13 62:1
**negative** 58:4
**negotiate** 14:22
**negotiating**
19:16
**neither** 86:13,15
**never** 17:1,4
55:7 70:8,16
**new** 1:1,16 2:3,3
2:8,12,12 8:25
9:4,21,21,24
9:24 10:3,7,9
13:12,17 16:9
16:9 19:20
25:5,5 31:2
36:18 43:1,14
43:17,20,23
44:17,25 45:16
52:10 70:20

71:18,25 72:1
73:2 86:4,19
**newborn** 22:22
**nickname** 5:12
**Nierman** 1:7,7
2:7,8,9 3:3 4:4
4:6,7 6:15
12:11 13:12,15
15:3,18 17:13
21:8,12,22
24:4,9,15 25:4
25:19,22 30:20
34:2,12 37:17
40:14,17 41:4
41:16 44:12,22
45:10 49:1,3,7
50:14,21 51:1
52:13 53:2
54:1 55:11,19
57:24 58:2
59:4,20,21
60:3,13 61:10
61:13,21 62:23
63:16 64:15
65:3 70:11
72:6 74:17
75:8,13,17,23
76:3,7 77:20
78:17,19 79:23
79:25 82:11,13
82:23 83:18,22
84:8,14,22
**Nierman's** 65:16
**night** 23:2,3,3
**nine** 27:19
**nonresponsive**
39:2 74:18
**Northeast** 12:18
**Notary** 1:15 4:3
86:3,19
**note** 33:13
**notes** 1:12
**notice** 65:6,8
**number** 3:8
31:13 36:25
37:1 70:21

71:6,6,9,11,12
71:14,15,15,17
71:24 73:4
82:6

___

**O**

**object** 6:11
15:14 47:9
49:6 50:17
54:11 55:11
56:22,24 75:8
**objecting** 59:12
83:18 84:1,3
**objection** 18:13
33:20 34:1,8
34:11 37:14
40:12 42:4
43:15,21 44:11
44:21 45:7
46:14 47:21
48:25 50:7
53:1 54:4,17
55:4 58:22,25
66:11,16 67:16
68:10 69:15,19
69:24 70:9,18
72:2 75:7
77:19,20 83:18
**objectionable**
55:17 57:15
**objections** 56:3
**objective** 70:4
84:2
**obviously** 63:4
**October** 1:16
**offer** 55:15
**offered** 62:5
**office** 2:11 7:11
7:12 12:9,14
**offices** 1:7 2:7
21:8,22 25:4
41:4,15 52:13
**okay** 16:11
18:18 50:6
79:13 82:9
**old** 11:8

Shaul Levy

once 38:11
  55:10 64:5
  74:6,6
open 36:24 64:4
  64:11,14,24
opened 22:16
  34:16 38:12
opinion 65:12
opportunity
  84:20
order 12:5 44:17
ordered 65:9
Original 3:15
originally 60:22
  66:24
ORLICK 1:14
  86:3
overcome 59:8
owned 10:9

**P**

P 2:1,1
page 3:2,8 12:25
  13:6 14:24
  15:7,8,9,23
  17:14,18 18:16
  18:23 19:5
  24:22,23,25
  31:18,21 32:1
  32:2,3,7,9,9
  38:16 46:3
  52:1,3,8 65:25
  70:1 76:11
pages 31:13,16
  31:24,25 32:10
panic 23:4,5
panicking 22:22
  22:23
paper 13:23
  14:5 77:9
papers 77:16
paragraph
  65:25 66:1,3
  66:13 67:10
  69:20 70:10,12
  70:14 71:23

76:11
paragraphs 63:1
part 16:10 18:23
  18:24 30:7
  32:21,24
particular 15:16
  67:13
particulars
  28:12
parties 17:21
  19:1 86:15
parts 33:9,12
Passaic 2:8
path 6:13
patient 33:3
  47:4
pause 30:14
  51:2 67:19
payment 55:23
  59:20
pending 5:1,3
people 23:17
  37:25 38:4
  82:19
percent 76:25
period 13:17
  27:10 73:7
  80:10 81:2,5,7
person 20:21
  48:1 68:15,16
personal 13:19
  74:13
personally 41:10
perspective 56:7
petitioner 16:18
phone 48:14,21
  48:24 49:17
  77:23 82:6
phrase 42:5,7
  57:2
phrased 55:1
  64:23
physically 39:25
place 86:11
places 10:3
plaintiff 1:4 2:4

31:4 52:12
  54:1 55:21
  68:6,8,9,11,15
  68:23
plaintiff's 24:5,6
  48:6 54:7 65:5
plaintiffs 67:25
please 4:24 6:2
  9:15 25:16
  37:4 38:10
  39:2 42:4 65:2
  76:12 77:22
  84:25
point 10:15 15:6
  27:3 48:5 50:8
  63:20
points 50:12
portrait 13:1
position 65:8,14
possession 17:22
possessions 38:5
  39:8,15 40:1,2
  40:4,11,20
possible 18:6
post-judgment
  25:17
prefer 24:19,21
  76:3
previously 31:22
print 12:1
prints 12:12
prior 41:9 77:24
  78:1,1 86:5
privilege 28:14
  50:20,25 51:2
  54:14 58:8
  61:9 63:8,22
  64:19
privileged 62:10
pro 4:6 65:3
probably 39:7
  80:9,20,22
  81:1,6
probe 57:4
problem 54:22
  55:9 64:2

75:22 83:11
problems 74:16
proceed 12:5
proceedings
  1:13
process 58:11
production
  82:13
profession 81:15
professional
  79:9 81:10,22
property 10:7,9
  10:10
prosecute 55:23
  59:15
protect 59:13
protected 50:19
  50:24 51:1
  61:8 64:18
provide 84:25
provided 11:25
psychiatrist
  78:25
psychological
  80:16 81:21
psychologist
  79:2
Public 1:15 4:3
  86:3,19
pull 30:14
purchase 6:9
purpose 54:8
  59:2,7
purposes 12:20
  21:19
push 49:14
pushing 56:8
put 23:11 43:10
  62:1
putting 61:25

**Q**

question 4:10,20
  5:3,4 7:5 9:15
  17:12 18:14,22
  20:10,12 21:4

33:19,21 34:2
  34:5,21 35:8
  35:14 37:4,15
  37:20 39:2,10
  40:17 41:20
  44:13,14 47:1
  47:5,8,10 48:8
  48:10 49:15,16
  49:23,24 50:25
  53:14 54:3,4
  54:10,11,20
  55:1 56:6,22
  57:12 58:17
  60:24 61:13,21
  64:3,4,9,14
  66:8,18 67:17
  70:1,19,22,24
  71:1,2,3 72:4,5
  72:15,22,23,25
  73:22 74:18
  75:11,19,21,25
  76:2,16 78:11
  83:19,21,23
  84:1,4,5,13,14
questioners
  65:15
questions 4:9
  5:1 10:18
  13:24 30:16
  37:2 49:2
  50:13 58:5,25
  59:12 62:17
  64:11,23,24
  65:4,7,17
  75:14,20 78:19
  78:20 79:22,23
  82:23 83:15,16
  84:7,16

**R**

R 2:1
reaction 26:12
read 15:23,25
  16:1,5 22:16
  23:21 24:19,19
  24:20,21 32:20

33:12,18,24
34:10 36:19
46:16 53:9
54:2,10 60:20
60:22 61:22
62:4,4,6,17,18
76:12
**reader** 61:14
**reading** 15:25
16:2,15 17:21
25:3 32:23
33:2 53:10
61:23 62:7
83:10,11,11,13
**reads** 57:13
61:23
**ready** 12:1 65:19
**real** 10:9
**realize** 58:18
**realized** 64:5
**really** 14:7 26:15
37:4 45:1
52:24 56:7
68:7 70:14
78:16 81:1
**reason** 11:22
83:8
**recall** 14:3,4
18:11 19:13
21:2,5 33:6
76:4 81:1
**receipt** 51:22
**receive** 12:7
21:10,14 22:3
22:7,10,13
41:3,6,10
**received** 20:5
21:7,9,15 22:4
22:6,12,18
24:3 25:24
27:8 29:1,7
33:5,6 36:7
41:12,16,22
42:2,10,14,16
44:18 45:17
46:8 50:4

51:12,15 64:13
67:14 68:19
74:6,7
**receiving** 21:5
26:5 27:17
41:9
**recognize** 78:12
**record** 24:7,11
25:23 31:11
53:21 59:13
61:25 62:1
64:17 65:22
75:6,9 76:7,8
**recovery** 1:7
2:13 19:22,25
20:5,7,8,19,20
20:23 41:6,18
41:21 42:1,6
42:10
**recreational**
11:19
**REDIRECT**
79:25
**referenced** 69:5
71:4
**references** 30:16
68:3 71:17
**referencing** 24:7
69:2
**referred** 69:17
**referring** 13:12
36:25 42:21
45:24 66:6
67:13 69:13
76:10 80:23
**refreshed** 63:14
**regard** 78:23
79:13
**regarding** 25:8
25:11 54:13
55:5 80:2
**relate** 13:22
**related** 55:18
80:14 82:14
**relationship**
77:13

**relative** 86:14,16
**relevant** 7:3,4
74:15
**remember** 9:8
9:18,25 10:22
13:4,6,18 14:6
14:7,8,11,15
14:18,19,23
18:10,15 19:15
19:16,18,21,21
20:17 21:6
22:20 23:2
26:15 33:7
38:12 40:25
41:2,5,8,11,14
41:17 42:15,18
43:12,24 44:2
44:5,8,12,19
45:1,3,19
48:16,19 49:14
49:19 52:21,24
58:19 60:3
62:13,16 63:14
63:16 72:11
74:2,3,5,11,19
74:23 75:1,21
75:22 80:18
81:4,6,8 82:20
**remembered**
63:15,17
**remembering**
11:1
**rendered** 16:23
17:20 18:25
**rent** 6:7 9:11,12
**repeat** 9:22
72:15
**rephrase** 4:21
40:18 41:20
53:14 67:18
72:24
**reporter** 1:15
4:16 24:12
54:2 77:23
84:23
**represent** 55:14

**representation**
50:15 54:7,21
55:2 59:9
**reserve** 84:19
**residence** 9:11
**residing** 4:1
**respect** 63:8
**Respectfully**
75:4
**respond** 4:11
**respondent** 18:3
**respondents**
16:22
**responding**
45:17
**response** 46:19
48:6
**responses** 79:24
**result** 26:4,8
27:9,11 40:21
45:21
**resulted** 80:17
**retain** 47:24
59:14,15,18,19
**retained** 3:15
48:5 50:22
54:8,9 59:5
**retainer** 55:20
58:19,20,23
62:12,14,15
**retention** 59:1
**returning** 65:23
**revealing** 40:9
**review** 30:6
33:10 53:7
84:21
**reviewed** 53:15
53:17 56:9
60:1
**reviewing** 19:13
**ridiculous** 83:23
**right** 15:8,12,19
21:16 25:6
30:13 31:7,24
32:6 33:22
40:16 50:21

51:3 52:15
54:6 68:4 70:3
70:4 83:1,2
84:19
**Riviera** 19:10
**Road** 8:3
**ROBERT** 2:4
**ROJ** 20:14,16
**root** 34:12
**roughly** 8:17
**rule** 53:25

---

**S**

**S** 2:1 4:1
**S-h-a-u-l** 5:10
**saw** 22:15 34:16
38:13 41:19
53:4 60:3,4,5
60:10 61:14,15
61:17 67:14
**saying** 4:17
29:23 44:12
55:7 58:4 68:4
70:7 80:25
83:24
**says** 16:12,15,15
16:18,22 17:2
17:8,10,15,19
17:22 18:2,17
18:19,24 19:2
19:5,6,10
21:15,22 24:23
25:3,11,15
31:1,2,7,21
32:3,6 52:9,9
52:12 56:19
57:13 59:25
60:15,19,21
61:3 66:1,13
68:23 69:9,20
77:9,17
**scale** 27:7
**Schlanger** 2:2
28:10 48:6
49:17,20
**Schneps** 2:11,12

Shaul Levy

3:4 63:19 64:7
65:2 78:20,22
79:22,24
**scope** 50:15,18
54:20 55:2
59:5 62:3
**screen** 24:13
**se** 4:6 65:3
**seal** 15:20
**seals** 15:17
**search** 43:10
**searched** 43:8
**searching** 43:16
44:3,7 45:8,16
**second** 16:24
18:16 35:25
58:3 62:15
67:19
**secondary** 59:8
**section** 18:21
**see** 12:9,22 15:7
15:10,11,20
16:10,14,16,20
16:21 17:19,24
18:4,6 19:3,7
19:11 22:1
24:25 25:5,13
25:19 31:8,18
32:4,6,10 52:9
52:13,15,20,23
52:25 60:7,8
61:7,8 63:25
66:2 67:9,20
67:22 68:1,20
68:22,23 69:6
69:10,12 72:3
72:6 79:13
82:9
**seek** 25:25 51:8
81:20
**seen** 13:2 52:6
52:18
**sense** 57:2 68:17
**sentence** 66:20
67:8,9 76:12
**separate** 55:20

**series** 4:9
**serve** 49:20,21
50:8
**serves** 70:15
**set** 57:25 72:8
86:12
**settlement** 14:22
**seven** 7:21 26:23
27:1,22,25
**shaking** 4:13
**Shaul** 1:3,5 3:3
5:8 16:19 17:6
17:7,10,10,11
17:23,24 25:8
25:9 31:4
52:12 54:1
86:6
**sheet** 31:23
84:20
**shield** 50:9
**Shorthand** 1:14
**show** 21:1 30:9
30:19 37:25
**showing** 24:13
**Shows** 22:2
**side** 11:12 52:15
**sign** 60:12,13
62:12
**signed** 25:18
57:3,7 58:10
58:12,13,15,21
62:13
**simple** 47:5
75:14
**simply** 36:3
44:13
**sir** 33:18 39:1
71:21 72:3
75:4 76:16,24
82:1
**sit** 11:22 18:11
60:23 66:9,14
73:8,11 76:4
77:1,10
**situation** 79:10
**six** 7:21 31:15,15

31:16,18 32:3
32:7,9 45:25
46:3,4 81:7
**skip** 31:1
**skipped** 18:21
**sleep** 23:2,3
**slow** 16:2 37:6
61:14,23
**slowly** 16:5 62:5
67:5
**somebody** 39:20
68:11
**soon** 38:12
**sorry** 8:9 18:8
32:5 34:23
48:22 49:23
51:13 52:24
83:6
**sort** 18:21
**sound** 10:14
16:3
**Sounds** 10:13
**Southern** 1:1
52:10
**space** 82:11
**speak** 65:4 73:6
**speaker** 47:6
**speaking** 83:5,7
**speaks** 15:15
61:24
**specific** 6:2
13:10,11 20:21
20:25 21:3,4
21:16 23:7
24:1 30:7 37:5
39:11 56:5,12
66:5 73:22
**specifically**
13:12 20:12
56:18 65:25
67:13 69:5,8
69:20 80:13
**spell** 5:9 82:1
**spelled** 5:13
**spend** 43:19,22
43:25 44:3,9

44:16,20,24
45:15
**spent** 44:6,23
45:11,13
**spoke** 28:5,7
45:20 49:9
**sponsor** 79:12
79:21 80:1,11
80:12,14,16
81:3,9,24
**sponsors** 82:15
**spoon** 36:6
**Spring** 2:7
**Square** 2:11
**STACEY** 1:14
86:3
**stamp** 15:17,18
**start** 32:23
36:18 59:1,16
80:14
**started** 50:22
65:4 72:17
84:9
**starts** 16:7
**state** 1:16 4:21
34:1,18 55:4
86:4,19
**stated** 29:25
62:24 75:9
**statement** 57:3,7
57:13,16 58:11
60:11 61:8
66:15
**statements**
61:11 62:18
**states** 1:1 52:3,9
66:25 71:23
**stenographic**
1:12
**stenographica...**
86:11
**step** 37:5,5
49:25 56:24
**stepped** 19:19
**stepping** 59:2
**stipulation**

17:20 18:25
**stop** 6:13 40:12
40:16 50:9
**straight** 44:14
75:14
**strategy** 49:2,11
54:13 55:6,10
57:10 59:3,16
**Street** 2:3 9:20
9:23 12:18
14:8 25:4
77:16
**strike** 18:22 39:2
47:24 53:2
74:17
**struggles** 61:23
62:7
**submitted** 31:22
**subpoena** 3:10
25:16 30:9,12
30:13,14,19
31:8 34:17,22
34:24 35:1,3,6
35:10,10,12,16
35:18,19,23,24
36:3 51:7
54:24 59:14
64:13 67:20,22
67:24 68:20,20
68:21 71:16
**substance** 11:19
**sued** 13:7,25
14:3 66:7
68:16
**sues** 68:11
**suffer** 51:23
**suffered** 26:1
29:3 51:17,19
**suffering** 11:3
26:7 45:4
51:11,14
**suing** 4:8 36:15
36:16 37:24
49:21 50:1
59:7 68:16
**Suite** 2:3

Shaul Levy

support 62:24
supposed 50:12
sure 11:2 17:13
  38:16 40:6
  47:2
sustained 26:4
sword 50:10
sworn 4:2 86:7

**T**

take 4:16,24 5:1
  5:4 10:21
  12:11 24:12
  30:20 33:10
  36:12 37:5,23
  38:1,5 40:1,2
  43:16 49:25
  78:17
taken 1:13 11:11
  11:15 12:13
  23:14,15,25
  29:5,18,21
  30:22 37:22
  39:4,14 78:18
  86:10
talk 46:8
talking 20:9
  21:1 24:2
  30:11 36:3
  42:5 45:25
  46:1 47:17
  59:1 69:8,22
  80:13
tear 31:21
tecum 25:16
  31:8 35:3,6,10
  35:16
telephone 48:1,2
tell 12:24 26:7
  26:10 32:24
  34:6 37:15
  38:10 40:10
  46:21 47:19
  53:24 57:5,5
  57:21 60:16
  61:1 65:10

telling 34:13
  70:25 71:1
ten 27:7,14,14
  27:19
terms 4:8
test 16:4
testified 4:3
  30:17 63:13
  72:12 75:5,6,6
  82:25 83:24
testify 86:7
testimony 38:15
  74:10 84:11
  86:10
thank 24:17
  42:8 84:22
therapist 79:5
thereof 76:11
thing 33:11
  34:17,20 37:8
  61:3 63:5 65:2
  65:21
things 38:1
  61:22 63:3
think 4:11 23:15
  36:17 37:9,25
  39:9 40:20
  44:6 46:13
  55:11 56:7
  57:1 60:7 61:4
  62:8,10 64:13
  65:13,19,21
  73:1 76:14,17
  84:15
thinks 57:21
thought 36:16
  37:3,13,17,19
  38:3,4,17
  39:12 57:19
  58:10 70:24
thoughts 58:10
threat 28:16
threaten 23:19
  23:20,23
threatened
  38:18

three 6:3,3,4
  15:23 16:7
  26:19 28:1
  32:9 44:9 45:3
  46:4
time 4:20,24
  13:11,14,17,20
  28:14 33:10
  43:3 48:5 49:3
  51:12,15 53:7
  53:10 57:3,7
  57:20,25 58:9
  58:13,14 60:9
  60:11,20,22
  61:15 63:10
  65:15,18 69:2
  73:7,23 79:17
  79:18 80:10,15
  81:2 83:8
  86:11
times 79:14 80:1
  80:3,4,6,8,15
  80:19,21,25
timing 59:1
today 4:9 11:22
  18:11 52:18
  60:23 63:12
  66:9,15 67:5
  73:8,11 76:4
  76:24 77:1,10
  77:24 78:1
  83:15,17 84:6
  84:16
told 40:15 47:22
  49:19 56:15
  84:9
top 15:23 16:7
  21:23 24:23
  31:1,21 52:2
total 19:2 33:5
tracks 6:14
transcript 1:12
  4:15 13:2 15:4
  86:10
transference
  24:16

trauma 78:24
trial 52:16
tried 59:6 60:5
trouble 83:10,16
true 57:19,20,21
  58:14,15,16,17
  58:18,18 60:19
  60:22,23,24
  61:1,2,5,12
  62:18,19,19,19
  62:20,21,22
  63:21,24 64:5
  66:15 73:1,12
  73:13,14 76:14
  76:17,19,21
  86:10
Truly 25:19
truth 86:7,7,8
truthful 53:18
try 4:21 46:18
  52:22 67:6
trying 6:16 27:3
  29:1 36:1,4
  39:25 40:5,5
  40:14 43:22
  44:13,22,23
  45:10 49:3
  55:9,12,24
  57:24 60:18
  61:7 64:18,19
  72:6 84:10
turn 15:22 51:25
  65:24 67:18
twice 75:19
two 8:1,15 9:10
  24:25,25 26:16
  27:5,11,23
  32:3,7 33:14
  42:18 45:25
  46:1,3 51:6
  55:17,20,23,24
  58:23 62:12,16
  65:15 81:5
type 11:19 23:13
  43:10 51:11,14
  51:19,23 58:4

79:5 81:9,12
  81:14,17

**U**

U 4:1
underlying
  56:18 62:25
  63:6,11 66:2,5
  66:6,14,20,20
  66:22 67:8,12
  69:18,21 70:7
  71:23 76:13,21
  78:9,13
undermine 84:2
underneath
  16:12
understand 4:17
  4:21,22 5:5
  6:17 13:5
  17:16 20:9
  36:1,2,5,5,6,7
  36:8 37:7
  45:23 50:4,11
  58:7 59:9
  60:18,20 64:22
  66:18,19,21
  67:7,15 68:3,4
  68:6 69:3,14
  69:23,25,25
  70:5,6,12,14
  70:15 71:2,6,8
  71:18,21 72:5
  83:15,25 84:11
  84:12
understanding
  17:14 83:16
understands
  50:15 70:10
  72:7
understood
  60:19 84:16
Unfortunately
  64:22
United 1:1 52:3
  52:9 66:24
upper 32:2,6

Shaul Levy

**upset** 47:7
**use** 43:6
**usual** 28:25

_____
**V**

**V** 4:1
**vaguely** 58:19
**valid** 77:18
**vehicle** 55:14
**verbal** 4:12
**verify** 44:22
**versus** 4:7 25:9
    31:4
**video** 24:16
**vs** 1:5

_____
**W**

**wait** 4:10 42:25
    45:6 82:8
**want** 10:20,21
    10:22 11:1
    16:4 17:13
    20:12 21:25
    28:12 32:20,21
    32:24 33:13
    38:15,16 49:7
    49:8 51:4
    56:11,13,15
    62:23 63:6
    64:13,16 65:9
    65:14 67:6
    70:5 75:8
    80:11 84:23
**wanted** 63:19
    65:17 78:23
**wants** 78:20
**warrant** 19:10
**wasn't** 33:15
    58:18,24 61:19
    62:20,21,21
    65:18
**way** 4:22 29:15
    29:16 53:2
    55:13 57:2
    58:4,8 59:11
    59:12 64:23

67:7 75:19
**we'll** 18:22
    30:20 37:5,5
**we're** 17:2,13
    69:8
**weak** 47:6
**week** 23:9 27:8
    27:10,20 43:13
    43:16 45:6
**weeks** 23:8 27:5
    27:11,23 28:1
    33:15 38:13
    42:18 81:5
**went** 43:7 46:12
    46:16
**West** 9:20,23
    14:8 25:4
**wife** 22:22 26:11
    45:20 46:9
**wife's** 7:2
**wills** 55:15
**withdraw** 40:17
**withdrawn** 27:9
    45:14
**witness** 3:2
    31:25 60:19
    65:15 75:12
**wondering**
    75:13
**word** 34:18 35:3
    35:20,25 36:3
    72:19,20
**worded** 53:3
**words** 33:24
    34:6,10 35:6
    35:11,16 66:6
**work** 7:10,10,12
    7:13,14 12:14
    38:12
**working** 7:19
    70:3
**works** 81:18
**world** 68:9
**worried** 26:13
    28:20,25
**worse** 46:11

**wouldn't** 65:7
**writes** 70:6
**written** 16:5
    22:9 29:15,16
**wrong** 63:25

_____
**X**

**X** 57:4
**XI00226700**
    1:15 86:5

_____
**Y**

**Y** 4:1 57:4
**yeah** 6:22 8:18
    9:3 14:2,4
    15:10 16:13
    29:4 31:25
    52:7,19 69:4
    71:7 76:20
    77:4
**year** 8:12 71:17
**years** 6:1,5,20
    7:21,21 8:1,13
    8:15,16,17,18
    8:19 9:10,19
    10:19 11:8
    22:8 45:3
    52:23 61:16
    79:21 83:8
**Yen** 10:24 16:16
    17:23 67:25
    69:9
**Yesterday** 78:2
**York** 1:1 2:3,3
    2:12,12 8:25
    9:4,21,21,24
    9:24 10:3,7,9
    13:13,17 16:9
    16:9 19:20
    25:5,5 31:2
    43:1,14,17,20
    43:23 44:17,25
    45:16 52:10
    70:20 71:18,25
    72:1 73:3

_____
**Z**

**Z** 57:4
**zero** 18:3,4
    64:17
**zombie** 38:14
**Zoom** 1:16

_____
**0**

**056136** 73:4
**056136-2010**
    31:7
**07055** 2:8

_____
**1**

**1** 3:9 15:23 24:6
    69:6,13 71:5
    74:25
**1-2** 24:24
**10** 25:8 27:1
    43:25 80:4,19
**10:00** 25:18
**10:53** 1:17
**100** 8:3 45:13,15
    76:25
**10001** 25:5
**10004** 2:3
**10038** 2:12
**11** 79:20
**12** 3:9
**13** 11:7
**13,990.08** 25:13
**1301** 2:3
**14** 27:5
**157** 2:7
**15th** 15:12
**19** 19:11
**1974** 11:7
**19D** 9:21,24
    14:10
**1st** 12:18

_____
**2**

**2** 3:9 21:20 24:5
    24:11 25:23
    33:8 42:21
    45:18,24 46:2
**20** 44:16 80:6,21
    80:25

**2010** 13:4,15,16
    14:12,13 15:12
    19:11 69:3,23
    70:20 71:18,25
    72:10 73:4,24
    74:1,19,20
    76:5
**2012** 9:1
**2015** 6:21
**2016** 25:8,18
**2017** 60:8 61:17
**2020** 1:17
**2022** 86:20
**21** 3:9
**212** 2:5,13
**22** 1:16
**24** 11:11,18
**26** 25:18 36:22
    36:23,25
**2899** 4:1
**29th** 25:4

_____
**3**

**3/11/2010** 19:7
    25:12
**30** 60:8 61:17
**31** 3:10
**33140** 4:2
**36** 12:18
**39** 25:4

_____
**4**

**4** 3:10 52:1
    65:23,24 76:10
**4,79** 3:3
**40** 63:1 65:25
    66:1,3,13
    67:10 69:20
    70:1,13 71:23
    76:11
**42nd** 9:20,23
    14:8 77:15
**46** 11:8
**48** 63:1
**480-1011** 2:5

_____
**5**

Shaul Levy

**5** 3:10 30:24
31:12 32:13
33:9 37:1 46:3
67:19,20 69:13
71:5
**5/30/17** 24:24
**50** 44:3,6,20,24
45:2 80:8
**52** 3:10
**56136** 70:20
71:17,25
**566-2005** 2:13
**5757** 7:24 22:14
31:4

**6**

**635** 9:20,23 14:8

**7**

**7** 2:11
**7:17cv-04022-...**
24:24
**78** 3:4

**8**

**8,478** 69:10
**8,700** 19:3
**8,748** 15:6
**80** 2:3
**82** 3:4